KEVIN FERRY, AS ADMINISTRATOR
OF THE ESTATE OF TYLEA HUNDLEY,

                            Civil Action No.: 3:20-CV-00099

                Plaintiff,

    Vs.


MEAD JOHNSON & COMPANY, LLC,
MEAD JOHNSON NUTRITION COMPANY,
ABBOTT LABORATORIES, INC.,

              Defendants.

## **[PROPOSED] FIFTH AMENDED COMPLAINT**

### General Allegations

1.      On Nov. 26, 2016, TyLea Hundley (the baby) was born at Yale New Haven Hospital in New Haven, Connecticut.

2.      The baby, TyLea Hundley, was the daughter of Tomika Knight (the mother) and Tyrese Hundley (the father).

3.      On Jan. 12, 2017, TyLea Hundley died at Yale New Haven Hospital.

4.      On March 11, 2019, the plaintiff, Kevin C. Ferry, was appointed Administrator of the Estate of TyLea Hundley, and he brings this claim pursuant to his authority as administrator.

5.      The baby was born extremely prematurely with a low birth weight of 355 grams and was the product of a 26-week 6-day pregnancy.

6.      The baby was placed in the Neonatal Intensive Care Unit N.I.C.U. at Yale New Haven Hospital.

7. The baby was provided total parenteral nutrition by vein at birth and was transitioned to donor human milk beginning six days after birth.

8. The baby did well on human breast milk ~~and fortified human breast milk,~~ and she advanced in weight and size with a healthy and normal brain and heart.

9. On or about December 25, 2016, the product, Enfamil Human Milk Fortifier, was introduced to the baby and feeding of this product continued thereafter.

10. Enfamil Human Milk Fortifier was fed to the baby on December 25, 2016, December 26, 2016, December 27, 2016, December 28, 2016, December 29, 2016, December 30, 2016, December 31, 2016, January 1, 2017, January 2, 2017, January 3, 2017, January 4, 2017, January 5, 2017, January 6, 2017, January 7, 2017, January 8, 2017 and possibly January 9, 2017.

11. Enfamil Human Milk Fortifier was fed on December 25, 2016, December 26, 2016, December 27, 2016, December 28, 2016, with Breastmilk (donor).

12. Enfamil Human Milk Fortifier was fed on December 29, 2016, December 30, 2016, January 1, 2017, January 2, 2017, January 3, 2017, January 4, 2017, with Breastmilk (donor) and Enfacare;

13. Enfamil Human Milk Fortifier was fed ~~to~~ ~~on~~ TyLea on December 31, 2016 with Breastmilk (from syringe), Breastmilk/Enfacare, Breastmilk/Neosure.

14. Also, on January 3, 2017 Enfamil Human Milk Fortifier was fed with Breastmilk/Elecare.

15. Enfamil Human Milk Fortifier was fed on January 5, 2017, January 6, 2017,

2

HMF was fed with Breastmilk, Enfacare and Similac Special Care

16.     Enfamil Human Milk Fortifier was fed on January 7, 2017, with Breastmilk and Enfacare.

17.     On or about December 29, 2016, the product, Enfacare Powder, was introduced to the baby and feedings of this product continued thereafter.

18.     Enfacare Powder was fed to the infant possibly December 29, 2016, and definitely on December 30, 2016, December 31, 2016, January 1, 2017, January 2, 2017, January 3, 2017, January 4, 2017, January 7, 2017.

19.     Enfacare Powder was fed with Donor Breast Milk, Liquid Human Milk Fortifier on December 30, 2016, December 31, 2016, January 1, 2017, January 2, 2017, January 3, 2017, January 4, 2017.

20.     Enfacare Powder was fed with Human Donor Breast Milk, Enfamil Human Milk Fortifier, ¾ SSC 27 on January 7, 2017.

21.     On or about January 5, 2016, the product, Similac Special Care, was introduced to the baby and feedings of this product continued thereafter.

22.     Similac Special Care was given to the infant on January 5, 2017, January 6, 2017, January 7, 2017, January 8, 2017, January 9, 2017, January 10, 2017, and January 11, 2017.

23.     Similac Special Care was fed with Breastmilk, Enfamil Human Milk Fortifier, and Enfacare on January 5, 2017, January 6, 2017, January 7, 2017, January 8, 2017 (at hours 1100, 1000, 0900, 0800, 0515, 0200).

24.     Similac Special Care was fed solely on January 8, 2017 (at hours 1758, 1700, 1600, 1500), January 9, 2017, January 10, 2017, January 11, 2017.

25.     On January 11, 2017, the baby had bloody stool.

26.     On January 11, 2017, radiographic images confirmed the diagnosis of Necrotizing Enterocolitis (N.E.C.)

27.     On January 12, 2017, emergency bedside surgery was performed confirming severe N.E.C.

28.     During the surgery, it was determined further attempts to treat the baby would be futile and the baby died as a result of N.E.C.

**The Science**

29.     According to the World Health Organization ("WHO"), babies born prematurely, or "preterm," are defined as being born alive before 37 weeks of pregnancy are completed, like TyLea Hundley. The WHO estimates that approximately 15 million babies are born preterm every year and that number is rising.

30.     Nutrition for preterm babies, especially those who have a very low birth weight (under 1500 grams) or extremely low birth weight (under 1000 grams), like TyLea Hundley (born at just 355 grams), is significantly important. Since the United States ranks in the top ten countries in the world with the greatest number of preterm births, the market of infant formula and fortifiers is particularly vibrant.

31.     Originally, the cow's milk-based products were believed to be good for the

growth of premature, low birth weight babies; however, science and research have advanced for decades confirming the significant dangers of the Defendants' cow's milk-based products in causing N.E.C. and/or substantially contributing to death in preterm and severely preterm, low-weight infants, along with many other heath complications and long-term risks to babies, yet, the Defendants did nothing to change their product, packaging, guidelines, instructions, and/or warnings. Additionally, advances in science have created alternative formulas and fortifiers that are derived from human milk and non-bovine based products, however, the defendant continues to promote and sell the defunct cow's milk-based products.

32.     The brand name, Similac Baby Formula, was first launched by Abbott in 1951 and Similac baby formula specifically designed for very low birth weight infants was first launched in 1978. Similac baby formula specifically designed for preterm babies was first launched in 1980.

33.     The brand name, Enfamil Baby Formula, was first launched by Mead Johnson in the 1950s and Enfamil baby formula specifically designed for premature infants was first launched in the 1980s.

34.     As early as 1990, a prospective, multicenter study on 926 preterm infants found that NEC was six to ten times more common in exclusively formula-fed babies than in those fed breast milk alone and three times more common than in those who received formula plus breast milk. Babies born at more than 30 weeks gestation confirmed that NEC was rare in those whose diet included breast milk, but it was 20 times more common in those fed formula only. A. Lucas,

T. Cole, *Breast Milk and Neonatal Necrotizing Enterocolitis*, LANCET, 336: 1519-1523 (1990).

35.     In a study published in 2007 it was reported: "The use of an exclusive HUM [Human] diet is associated with significant benefits for extremely premature infants <1259 g BW.  The benefits include decreased N.E.C. rates, mortality, late-onset sepsis, PDA, BPD, ventilator days, and ROP.  Importantly, while evaluating the benefits of using an exclusive HUM-based protocol, it appears that there were no feeding-related adverse outcomes.  This study demonstrates that an exclusive HUM diet provides important benefits beyond N.E.C.." Sisk, PM, et al. *Early human milk feeding is associated with a lower risk of necrotizing enterocolitis in very low birth weight infants.* (Journal of Perinatology 2007; 27:428-433.)

36.     The recommendations and conclusions of the article were significantly scientifically supported with the following references:

1       Llanos A, Moss M, Pinzon M, Dye T, Sinkin R, Kendeg J. Epidemiology of neonatal necrotizing enterocolitis: a population based study. Paediatri Perinat Epidemiol 2002; 16: 342.
2       Fanaroff A, Hack M, Walsh M. The NICHD neonatal research network: changes in practice and outcomes during the first 15 years. Semin Perinatol 2003; 27: 281–287.
3       Lemons J, Bauer C, Korones S, Papile L, Stoll B, Verter J et al. Very low birth weight outcomes of the National Institute of Child Health and Human Development Neonatal Research Network, January 1995 through December 1996. NICHD Neonatal Research Network. Pediatrics 2001; 107: E1.
4       Luig M, Lui K. Epidemiology of necrotizing enterocolitis—Part 1: changing regional trends in extremely premature infants over 14 years. J Paediatr Child Health 2005; 41: 169–173.
5       Guthrie S, Gordon P, Thomas V, Thorp J, Peabody J, Clark R. Necrotizing enterocolitis among neonates in the United States. J Perinatol 2003; 23: 278–285.
6       Lin P, Stoll B. Necrotizing enterocolitis. Lancet 2006; 368: 1271–1283.
7       Salhab W, Perlman J, Silver L, Broyles R. Necrotizing enterocolitis and neurodevelopmental outcome in extremely low birth weight infants. J Perinatol 2004; 24: 534–540.

6

8 ~~Ladd A, Rescorla F, West K, Scherer IL, Engum S, Grosfeld J. Long-term follow-up after resection for necrotizing enterocolitis: factors affecting outcome. J Pediatr Surg 1998; 33: 967–972.~~

9 ~~Walsh M, Kleigman R, Hack M. Severity of necrotizing enterocolitis: influence on outcome at 2 years of age. Pediatrics 1989; 84: 808–814.~~

10 ~~Vohr BR, Wright L, Dusick A. Neurodevelopmental and functional outcomes of extremely low birth weight infants in the National Institute of Child Health and Human Developmental Neonatal Research Network, 1993–1994. Pediatrics 2000; 105: 1216–1226.~~

11 ~~Sonntag J, Grimmer I, Scholz T, Metze B, Wit J, Obladen M. Growth and neurodevelopmental outcome of very low birth weight infants with necrotizing enterocolitis. Acta Paediatr 2000; 89: 528–532.~~

12 ~~Claud E, Walker W. Hypothesis: inappropriate colonization of the premature intestine can cause neonatal necrotizing enterocolitis. FASEB J 2001; 15: 1398–1403.~~

13 ~~Lucas A, Cole T. Breast milk and neonatal necrotising enterocolitis. Lancet 1990; 336: 1519–1523.~~

14 ~~Schanler R, Shulman R, Lau C. Feeding strategies for premature infants: beneficial outcomes of feeding fortified human milk versus preterm formula. Pediatrics 1999; 103: 1150–1157.~~

15 ~~Schanler R, Lau C, Hurst N, O'Brian Smith E. Randomized trial of donor human milk versus preterm formula as substitutes for mothers' own milk in the feeding of extremely premature infants. Pediatrics 2005; 116: 400–406.~~

16 ~~McGuire W, Anthony M. Donor human milk versus formula for preventing necrotising enterocolitis in preterm infants: systematic review. Arch Dis Child Fetal Neonatal Ed 2003; 88: F11–F14.~~

17 ~~Lefebvre F, Ducharme M. Incidence and duration of lactation and lactational performance among mothers of lowbirth and term infants. CMAJ 1989; 140: 1159–1164.~~

18 ~~Kennedy K, Tyson J. Early versus delayed initiation of progressive enteral feedings for parenterally fed low birth weight or preterm infants. Cochrane Database Syst Rev 2000; 2: CD001970.~~

19 ~~Sisk P, Lovelady C, Dillard R, Gruber K. Lactation counseling for mothers of very low birth weight infants: effect on maternal anxiety and infant intake of human milk. Pediatrics 2006; 117: E67–E75.~~

20 ~~Arnold LD. Recommendations for Collection, Storage, and Handling of a Mother's Milk for Her Own Infant in the Hospital Setting, 3rd edn. The Human Milk Banking Association of North America Inc.: Denver, CO, 1999.~~

21 ~~Bell M, Ternberg J, Feignin R. Neonatal necrotizing enterocolitis: therapeutic decisions based upon clinical staging. Ann Surg 1978; 187: 1–7.~~

22 ~~Boyd C, Quigley M, Brocklehurst P. Donor breast milk versus infant formula for preterm infants: a systematic review and meta-analysis. Arch Dis Child Fetal Neonatal Ed. (Online 5 April) 2006.~~

23      Ronnestad A, Abrahamsen T, Medbo S, Reigstad H, Lossius K, Kaaresen P et al. Late-onset septicemia in a Norwegian National Cohort of extremely premature infants receiving very early full human milk feeding. Pediatrics 2005; 115: E269–E276.

24      Furman L, Taylor G, Minich N, Hack M. The effect of maternal milk on neonatal morbidity of very-low-birth-weight infants. Arch Pediatr Adolesc Med 2003; 157: 66–71.

25      Hanson L, Korotokova M. The role of breastfeeding in prevention against neonatal infection. Semin Neonatol 2002; 7: 275–281.

26      Xanthou M. Immune protection of human milk. Biol Neonate 1998; 74: 121–133.

27      Nanthakumar N, Fusunyan R, Sanderson I, Walker A. Inflammation in the developing human intestine: a possible pathophysiologic contribution to necrotizing enterocolitis. Proc Natl Acad Sci USA 2000; 97: 6043–6048.

28      Martin R, Langa S, Reviriego C, Jiminez E, Marin M, Xaus J et al. Human milk is a source of lactic acid bacteria for the infant gut. J Pediatr 2003; 143: 754–758.

29      Martin R, Olivares M, Marin M, Fernandez L, Xaus J, Rodriquez J. Probiotic-potential of 3 lactobacilli strains isolated from breast milk. J Hum Lact 2005; 21: 8–17.

30      Lonnerdal B. Nutritional and physiological significance of human milk proteins. Am J Clin Nutr 2003; 77: 1537S–1543S.

31      Bisquera J, Cooper T, Berseth CL. Impact of necrotizing enterocolitis on length of stay and hospital charges in very low birth weight infants. Pediatrics 2002; 109: 423–428.

32      Meier PP, Engstrom JM, Mingolelli SS, Miracle DJ, Keisling S. The Rush Mothers' Milk Club: breastfeeding interventions for mothers with very low birth weight infants. J Obstet Gynecol Neonatal Nurs 2004; 33: 164–174.

36.     A study published in 2010 established that when premature babies were fed an exclusive diet of mother's milk, donor milk, and human milk derived fortifier, these babies were 90% less likely to develop surgical NEC. Sullivan, S., et al, *An Exclusively Human Milk-Based Diet Is Associated with a Lower Rate of Necrotising Enterocolitis than a Death of Human Milk and Bovine Milk-Based Products. (Journal of Pediatrics 2010; 156:562-7)*

37.     In 2011, the U.S. Surgeon General published a report titled, "The Surgeon General's Call to Action to Support Breastfeeding." In it, the Surgeon General warned that "for vulnerable premature infants, formula feeding is associated with higher rates of [NEC]." U.S. Dep't of Health & Human Serv., Off. of Surgeon Gen., "The Surgeon General's Call to Action to

Support Breastfeeding," p.1, (2011). This same report stated that premature infants who are not breast fed are 138% more likely to develop NEC. Id., Table 1, p.2.

38.     In 2012, the American Academy of Pediatrics issued a policy statement that all premature infants should be fed an exclusive human milk diet because of the risk of NEC associated with the consumption of cow's milk-based Products. The Academy stated that "[t]he potent benefits of human milk are such that all pre-term infants should receive human milk... If the mother's own milk is unavailable ...pasteurized donor milk should be used." Breastfeeding and the Use of Human Milk, PEDIATRICS, 129:e827-e84l (2012).

39.     In another study published in 2013 it was reported: "This is the first randomized trial in EP [Extremely Premature] infants of exclusive HM [Human Milk] vs. PF [Preterm Formula].  The significantly shorter duration of TPN and lower rate of surgical N.E.C. support major changes in the strategy to nourish EP infants in the NICU." Cristofal, E.A., et al, *Exclusive Human Milk vs Preterm formula: Randomized Trial in Extremely Preterm Infants.* (J Pediatr 2013 Dec; 163(6): 1592-1595.)

40.     In another study published in 2013 showed that, out of 104 premature infants participating in the study receiving an exclusive human-milk based diet, all 104 exceeded targeted growth standards, as well as length, weight, and head circumference gain. The authors concluded that "this study provides data showing that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive human milk-based diet." A. Hair, et al, Human Milk Feed Supports Adequate Growth in Infants ≤1250 Grams Birthweight, BMC RESEARCH NOTES, 6- 459 (2013). Thus, inadequate growth was proven to be a poor excuse

for feeding cow's milk-based formula, but the practice continued largely due to extensive and

aggressive marketing campaigns conducted by infant formula companies.

41.     The recommendations and conclusions of the article were significantly

scientifically supported with the following references:

1.     Morales Y, Schanler RJ. Human milk and clinical outcomes in VLBW infants: how
compelling is the evidence of benefit? Semin Perinatol 2007; 31:83-8.
2.     Roze J-C, Darmaun D, Boquien C-Y, Flamant C, Picaud J-C, Savagner C, et al. The
apparent breastfeeding paradox in very preterm infants: relationship between breast feeding,
early weight gain and neurodevelopment based on results from two cohorts, EPIPAGE and
LIFT. BMJ Open 2012;2:e000834.
3.     Schanler RJ, Shulman RJ, Lau C. Feeding strategies for premature infants: beneficial
outcomes of feeding fortified human milk vs preterm formula. Pediatrics 1999;103:1150-7.
4.     Schanler RJ. Mother's own milk, donor human milk, and preterm formulas in the feeding
of extremely premature infants. J Pediatr Gastroenterol Nutr 2007;45:S175-7.
5.     Boyd CA, Quigley MA, Brocklehurst P. Donor breast milk versus infant formula for
preterm infants: a systematic review and meta-analysis. Arch Dis Child Fetal Neonatal Ed
2007;92:F169-75.
6.     Quigley MA, Henderson G, Anthony MY, McGuire W. Formula milk versus donor
breast milk for feeding preterm or low birth weight infants. Cochrane Database Syst Rev
2007;17:CD002971.
7.     Schanler RJ, Lau C, Hurst NM, Smith EO. Randomized trial of donor human milk versus
preterm formula as substitutes for mothers' own milk in the feeding of extremely premature
infants. Pediatrics 2005; 116:400-6.
8.     SullivanS, SchanlerRJ, KimJH, PatelAL, TrawoegerR, Kiechl-Kohlendorfer U, et al. An
exclusively human milk-based diet is associated with a lower rate of necrotizing enterocolitis
than a diet of human milk and bovine milk-based products. J Pediatr 2010;156:562-7.
9.     Terpstra FG, Rechtman DJ, Lee ML, Hoeij KV, Berg H, Van Engelenberg FA, et al.
Antimicrobial and antiviral effect of high-temperature short-time (HTST) pasteurization applied
to human milk. Breastfeed Med 2007;2: 27-33.
10.     Weisman LE, Stoll BJ, Kueser TJ, Rubio TT, Frank CG, Heiman HS, et al. Intravenous
immune globulin prophylaxis of late-onset sepsis in premature neonates. J Pediatr
1994;125:922-30.
11.     Kaplan EL, Meier P. Nonparametric estimation from incomplete observations. J Am Stat
Assoc 1958;53:457-81.
12.     Lucas A, Lucas PJ, Chavin SI, Lyster RL, Baum JD. A human milk formula. Early Hum
Dev 1980;4:15-21.
13.     Eidelman AI, Schanler RJ. Section on Breastfeeding Executive Committee.

~~Breastfeeding and the use of human milk: policy statement. Pediatrics 2012;129:e827-41.~~
~~14.      US Department of Health and Human Services and The Surgeon General's Call to~~
~~Action to Support Breastfeeding. http://www.surgeon general.gov/topics/breastfeeding/. 2011~~.

41.     In another study published in 2014, it was reported: "Necrotizing enterocolitis
(N.E.C.) is a devastating disease of premature infants and is associated with significant
morbidity and mortality.  While the pathogenesis of N.E.C. remains incompletely understood, it
is well established that the risk is increased by the administration of infant formula and
decreased by the administration of breast milk." Good, Misty, et al., *Evidence Based Feeding
Strategies Before and After the Development of Necrotizing Enterocolitis*.  (Expert Rev Clin
Immunol.  2014 July; 10 (7): 875-884.)

In that same article it was reported:    "Necrotizing enterocolitis (N.E.C.) is the most
frequent and lethal gastrointestinal disorder affecting preterm infants [1,2], and is characterized
by intestinal barrier disruption leading to intestinal necrosis, multi-system organ failure and
death.  N.E.C. affects 7-12% of preterm infants weighing less than 1500 grams, and the
frequency of disease appears to be either stable or rising in several studies [1-3].  The typical
patient who develops N.E.C. is a premature infant who displays a rapid progression from mild
feeding intolerance to systemic sepsis, and up to 30% of infants will die from this disease [3,4]."

In that same article it was reported: "A wide variety of feeding practices exist on how to
feed the premature infant in the hopes of preventing necrotizing enterocolitis. There have been
several meta-analysis reviewing the timing of administration and rate of advancement of enteral
feedings in the premature infant as reviewed above, but there is no consensus on the precise

feeding strategy to prevent this disease. The exclusive use of human breast milk is recommended

for all premature infants and is associated with a significant decrease in the incidence of N.E.C.

[11–13]. By determining the specific ingredients in breast milk that are protective against

N.E.C., it is our hope that this devastating disease will one day be preventable."

42.     The recommendations and conclusions of the article were significantly

scientifically supported by citing to the following references:

1.     Henry MC, Moss, RL.  *Necrotizing enterocolitis.*  (Annual review of medicine.  2009; 60:111-124.),
2.     Caplan MS, Jilling T. *New concepts in necrotizing enterocolitis.*  (Current opinion in pediatrics.  2001; 13(2): 111-115.  [PubMed: 11317050],
3.     Neu, J, Walker WA.  *Necrotizing enterocolitis.*  (The New England Journal of Medicine. 2011; 364(3):255-264.)  [PubMed: 21247316].
4.     Lin PW, Stoll BJ. Necrotising enterocolitis. Lancet. 2006; 368(9543):1271–1283. [PubMed: 17027734]
5.     Kliegman RM, Walsh MC. Neonatal necrotizing enterocolitis: pathogenesis, classification, and spectrum of illness. Current problems in pediatrics. 1987; 17(4):213–288. [PubMed: 3556038]
6.     Bell MJ, Ternberg JL, Feigin RD, et al. Neonatal necrotizing enterocolitis.  Therapeutic decisions based upon clinical staging. Annals of surgery. 1978; 187(1):1–7. [PubMed: 413500]
7.     Neu J. Neonatal necrotizing enterocolitis: an update. Acta paediatrica. 2005; 94(449):100–105. [PubMed: 16214774]
8.     Lee JS, Polin RA. Treatment and prevention of necrotizing enterocolitis. Seminars in neonatology: SN. 2003; 8(6):449–459. [PubMed: 15001117]
9.     Frantz ID 3rd, L'Heureux P, Engel RR, Hunt CE. Necrotizing enterocolitis. The Journal of pediatrics. 1975; 86(2):259–263. [PubMed: 803385]
10.    Vollman JH, Smith WL, Tsang RC. Necrotizing enterocolitis with recurrent hepatic portal venous gas. The Journal of pediatrics. 1976; 88(3):486–487. [PubMed: 1245964]
11*.   Lucas A, Cole TJ. Breast milk and neonatal necrotising enterocolitis. Lancet. 1990; 336(8730): 1519–1523. Describes the strong relationship of the protective effect of breast milk on N.E.C. [PubMed: 1979363]
12.    Newburg DS, Walker WA. Protection of the neonate by the innate immune system of developing gut and of human milk. Pediatric research. 2007; 61(1):2–8. [PubMed: 17211132]
13**   . Meinzen-Derr J, Poindexter B, Wrage L, Morrow AL, Stoll B, Donovan EF. Role of human milk in extremely low birth weight infants' risk of necrotizing enterocolitis or death.

Journal of perinatology: official journal of the California Perinatal Association. 2009; 29(1):57–62.

Demonstrated that the protective effects of breast milk on N.E.C. are dose-dependent. [PubMed: 18716628]

14.    Schanler RJ, Lau C, Hurst NM, Smith EO. Randomized trial of donor human milk versus preterm formula as substitutes for mothers' own milk in the feeding of extremely premature infants. Pediatrics. 2005; 116(2):400–406. [PubMed: 16061595]

15.    McGuire W, Anthony MY. Donor human milk versus formula for preventing necrotizing enterocolitis in preterm infants: systematic review. Archives of disease in childhood. Fetal and neonatal edition. 2003; 88(1):F11–14. [PubMed: 12496220]

16**.   Quigley MA, Henderson G, Anthony MY, McGuire W. Formula milk versus donor breast milk for feeding preterm or low birth weight infants. Cochrane database of systematic reviews. 2007; (4):CD002971. Meta-analysis demonstrating the strong relationship of formula feeding and increased incidence of N.E.C. [PubMed: 17943776]

17.    Davies DP. Adequacy of expressed breast milk for early growth of preterm infants. Archives of disease in childhood. 1977; 52(4):296–301. [PubMed: 558739]

18.    Gross SJ. Growth and biochemical response of preterm infants fed human milk or modified infant formula. The New England journal of medicine. 1983; 308(5):237–241. [PubMed: 6848932]

19.    Lucas A, Gore SM, Cole TJ, et al. Multicentre trial on feeding low birthweight infants: effects of diet on early growth. Archives of disease in childhood. 1984; 59(8):722–730. [PubMed: 6476868]

20.    Lucas A, Morley R, Cole TJ, et al. Early diet in preterm babies and developmental status in infancy. Archives of disease in childhood. 1989; 64(11):1570–1578. [PubMed: 2690739]

21.    Raiha NC, Heinonen K, Rassin DK, Gaull GE. Milk protein quantity and quality in low birthweight infants: I. Metabolic responses and effects on growth. Pediatrics. 1976; 57(5):659–684. [PubMed: 7767]

22.    Schultz K, Soltesz G, Mestyan J. The metabolic consequences of human milk and formula feeding in premature infants. Acta paediatrica Scandinavica. 1980; 69(5):647–652. [PubMed: 7234386]

23.    Tyson JE, Lasky RE, Mize CE, et al. Growth, metabolic response, and development in very-lowbirth- weight infants fed banked human milk or enriched formula. I. Neonatal findings. The Journal of pediatrics. 1983; 103(1):95–104. [PubMed: 6864403]

24.    Henderson G, Anthony MY, McGuire W. Formula milk versus maternal breast milk for feeding preterm or low birth weight infants. Cochrane database of systematic reviews. 2007; (4):CD002972. [PubMed: 17943777]

25.    Cristofalo EA, Schanler RJ, Blanco CL, et al. Randomized Trial of Exclusive Human Milk versus Preterm Formula Diets in Extremely Premature Infants. The Journal of pediatrics. 2013; 163(6): 1592–1595. e1591. [PubMed: 23968744]

26.     Schanler RJ, Shulman RJ, Lau C. Feeding strategies for premature infants: beneficial outcomes of feeding fortified human milk versus preterm formula. Pediatrics. 1999; 103(6 Pt 1):1150–1157. [PubMed: 10353922]

27.     Furman L, Taylor G, Minich N, Hack M. The effect of maternal milk on neonatal morbidity of very low-birth-weight infants. Archives of pediatrics & adolescent medicine. 2003; 157(1):66–71. [PubMed: 12517197]

28.     Jones JA, Ninnis JR, Hopper AO, et al. Nitrite and Nitrate Concentrations and Metabolism in Breast Milk, Infant Formula, and Parenteral Nutrition. JPEN. Journal of parenteral and enteral nutrition. 2013

29.     Petersson J, Phillipson M, Jansson EA, Patzak A, Lundberg JO, Holm L. Dietary nitrate increases gastric mucosal blood flow and mucosal defense. American journal of physiology. Gastrointestinal and liver physiology. 2007; 292(3):G718–724. [PubMed: 17082222]

30.     Nankervis CA, Giannone PJ, Reber KM. The neonatal intestinal vasculature: contributing factors to necrotizing enterocolitis. Seminars in perinatology. 2008; 32(2):83–91. [PubMed: 18346531]

31.     Nankervis CA, Reber KM, Nowicki PT. Age-dependent changes in the postnatal intestinal microcirculation. Microcirculation. 2001; 8(6):377–387. [PubMed: 11781811]

32.     Duncan C, Dougall H, Johnston P, et al. Chemical generation of nitric oxide in the mouth from the enterosalivary circulation of dietary nitrate. Nature medicine. 1995; 1(6):546–551.

33.     Kanady JA, Aruni AW, Ninnis JR, et al. Nitrate reductase activity of bacteria in saliva of term and preterm infants. Nitric oxide: biology and chemistry/official journal of the Nitric Oxide Society. 2012; 27(4):193–200. [PubMed: 22842223]

34.     Yazji, I.; Sodhi, CP.; Lee, EK., et al. Endothelial TLR4 activation impairs intestinal microcirculatory perfusion in necrotizing enterocolitis via eNOS-NO-nitrite signaling. Proceedings of the National Academy of Sciences of the United States of America; 2013.

35.     Sodhi C, Richardson W, Gribar S, Hackam DJ. The development of animal models for the study of necrotizing enterocolitis. Disease models & mechanisms. 2008; 1(2–3):94–98. [PubMed: 19048070]

36.     Polycarpou E, Zachaki S, Tsolia M, et al. Enteral L-arginine supplementation for prevention of necrotizing enterocolitis in very low birth weight neonates: a double-blind randomized pilot study of efficacy and safety. JPEN. Journal of parenteral and enteral nutrition. 2013; 37(5):617–622. [PubMed: 23329787]

37.     Amin HJ, Zamora SA, McMillan DD, et al. Arginine supplementation prevents necrotizing enterocolitis in the premature infant. The Journal of pediatrics. 2002; 140(4):425–431. [PubMed: 12006956]

38.     Polycarpou E, Zachaki S, Tsolia M, et al. Enteral L-arginine Supplementation for Prevention of Necrotizing Enterocolitis in Very Low Birth Weight Neonates: A Double-Blind Randomized Pilot Study of Efficacy and Safety. JPEN. Journal of parenteral and enteral nutrition. 2013

39.     Rhoads JM, Argenzio RA, Chen W, et al. L-glutamine stimulates intestinal cell proliferation and activates mitogen-activated protein kinases. The American journal of physiology. 1997; 272(5 Pt 1):G943–953. [PubMed: 9176200]

40.     Poindexter BB, Ehrenkranz RA, Stoll BJ, et al. Parenteral glutamine supplementation does not reduce the risk of mortality or late-onset sepsis in extremely low birth weight infants. Pediatrics. 2004; 113(5):1209–1215. [PubMed: 15121931]

41.     Becker RM, Wu G, Galanko JA, et al. Reduced serum amino acid concentrations in infants with necrotizing enterocolitis. The Journal of pediatrics. 2000; 137(6):785–793. [PubMed: 11113834]

42.     Pawlik D, Lauterbach R, Hurkala J, Radziszewska R. The effects of enteral administration of glutamine enriched solution in very low birth weight infants on reducing the symptoms of feeding intolerance. A prospective, randomized pilot study. Medycyna wieku rozwojowego. 2012; 16(3): 205–211. [PubMed: 23378398]

43.     Moe-Byrne T, Wagner JV, McGuire W. Glutamine supplementation to prevent morbidity and mortality in preterm infants. Cochrane database of systematic reviews. 2012; 3:CD001457. [PubMed: 22419279]

44.     Newburg DS. Neonatal protection by an innate immune system of human milk consisting of oligosaccharides and glycans. Journal of animal science. 2009; 87(13 Suppl):26–34. [PubMed: 19028867]

45.     Ruiz-Palacios GM, Cervantes LE, Ramos P, Chavez-Munguia B, Newburg DS. Campylobacter jejuni binds intestinal H(O) antigen (Fuc alpha 1, 2Gal beta 1, 4GlcNAc), and fucosyloligosaccharides of human milk inhibit its binding and infection. The Journal of biological chemistry. 2003; 278(16):14112–14120. [PubMed: 12562767]

46.     Newburg DS, Ruiz-Palacios GM, Morrow AL. Human milk glycans protect infants against enteric pathogens. Annual review of nutrition. 2005; 25:37–58.

47.     Bode L. Human milk oligosaccharides: prebiotics and beyond. Nutrition reviews. 2009; 67 (Suppl 2):S183–191. [PubMed: 19906222]

48.     Weng M, Walker WA. The role of gut microbiota in programming the immune phenotype. Journal of developmental origins of health and disease. 2013; 4(3)

49**.   Jantscher-Krenn E, Zherebtsov M, Nissan C, et al. The human milk oligosaccharide disialyllacto-N-tetraose prevents necrotising enterocolitis in neonatal rats. Gut. 2012; 61(10): 1417–1425. Authors demonstrate that the specific human milk oligosaccharide disialyllacto-Ntetraose prevents experimental N.E.C. [PubMed: 22138535]

50.     Valenti P, Antonini G. Lactoferrin: an important host defence against microbial and viral attack. Cellular and molecular life sciences: CMLS. 2005; 62(22):2576–2587. [PubMed: 16261253]

51.     Haversen L, Ohlsson BG, Hahn-Zoric M, Hanson LA, Mattsby-Baltzer I. Lactoferrin downregulates the LPS-induced cytokine production in monocytic cells via NF-kappa B. Cellular immunology. 2002; 220(2):83–95. [PubMed: 12657243]

52.     Buccigrossi V, de Marco G, Bruzzese E, et al. Lactoferrin induces concentration-dependent functional modulation of intestinal proliferation and differentiation. Pediatric research. 2007; 61(4):410–414. [PubMed: 17515863]

53.     Sherman MP, Bennett SH, Hwang FF, Yu C. Neonatal small bowel epithelia: enhancing antibacterial defense with lactoferrin and Lactobacillus GG. Biometals: an international journal on the role of metal ions in biology, biochemistry, and medicine. 2004; 17(3):285–289.

54**.    Manzoni P, Rinaldi M, Cattani S, et al. Bovine lactoferrin supplementation for prevention of late-onset sepsis in very low-birth-weight neonates: a randomized trial. JAMA: the journal of the American Medical Association. 2009; 302(13):1421–1428. Compared bovine lactoferrin plus *Lactobacillus rhamnosus* GG versus lactoferrin alone and found a decreased incidence of N.E.C. in the lactoferrin and *Lactobacillus rhamnosus* GG group. [PubMed: 19809023]

55.     Magnuson JS, Henry JF, Yip TT, Hutchens TW. Structural homology of human, bovine, and porcine milk lactoferrins: evidence for shared antigenic determinants. Pediatric research. 1990; 28(2):176–181. [PubMed: 1697671]

56.     Dvorak B. Milk epidermal growth factor and gut protection. The Journal of pediatrics. 2010; 156(2 Suppl):S31–35. [PubMed: 20105663]

57.     Nair RR, Warner BB, Warner BW. Role of epidermal growth factor and other growth factors in the prevention of necrotizing enterocolitis. Seminars in perinatology. 2008; 32(2):107–113. [PubMed: 18346534]

58.     Feng J, Besner GE. Heparin-binding epidermal growth factor-like growth factor promotes enterocyte migration and proliferation in neonatal rats with necrotizing enterocolitis. Journal of pediatric surgery. 2007; 42(1):214–220. [PubMed: 17208569]

59.     Sheng G, Bernabe KQ, Guo J, Warner BW. Epidermal growth factor receptor-mediated proliferation of enterocytes requires p21waf1/cip1 expression. Gastroenterology. 2006; 131(1):153–164. [PubMed: 16831599]

60.     Pollack PF, Goda T, Colony PC, et al. Effects of enterally fed epidermal growth factor on the small and large intestine of the suckling rat. Regulatory peptides. 1987; 17(3):121–132. [PubMed: 3495822]

61.     Dvorak B, Williams CS, McWilliam DL, et al. Milk-borne epidermal growth factor modulates intestinal transforming growth factor-alpha levels in neonatal rats. Pediatric research. 2000; 47(2): 194–200. [PubMed: 10674346]

62.     Clark JA, Doelle SM, Halpern MD, et al. Intestinal barrier failure during experimental necrotizing enterocolitis: protective effect of EGF treatment. American journal of physiology. Gastrointestinal and liver physiology. 2006; 291(5):G938–949. [PubMed: 16798726]

63.     Dvorak B, Halpern MD, Holubec H, et al. Epidermal growth factor reduces the development of necrotizing enterocolitis in a neonatal rat model. American journal of physiology. Gastrointestinal and liver physiology. 2002; 282(1):G156–164. [PubMed: 11751169]

64.    Clark JA, Lane RH, Maclennan NK, et al. Epidermal growth factor reduces intestinal apoptosis in an experimental model of necrotizing enterocolitis. American journal of physiology. Gastrointestinal and liver physiology. 2005; 288(4):G755–762. [PubMed: 15528252]

65.    Yu X, Radulescu A, Zorko N, Besner GE. Heparin-binding EGF-like growth factor increases intestinal microvascular blood flow in necrotizing enterocolitis. Gastroenterology. 2009; 137(1): 221–230. [PubMed: 19361505]

66**.   Dvorak B, Khailova L, Clark JA, et al. Comparison of epidermal growth factor and heparinbinding epidermal growth factor-like growth factor for prevention of experimental necrotizing enterocolitis. Journal of pediatric gastroenterology and nutrition. 2008; 47(1):11–18. Provides side by side comparison of two potential therapeutics for N.E.C. and determines efficacy of each. [PubMed: 18607263]

67.    Morgan J, Bombell S, McGuire W. Early trophic feeding versus enteral fasting for very preterm or very low birth weight infants. Cochrane database of systematic reviews. 2013; 3:CD000504. [PubMed: 23543508]

68.    McClure RJ, Newell SJ. Randomised controlled study of clinical outcome following trophic feeding. Archives of disease in childhood. Fetal and neonatal edition. 2000; 82(1):F29–33. [PubMed: 10634838]

69.    Sallakh-Niknezhad A, Bashar-Hashemi F, Satarzadeh N, Ghojazadeh M, Sahnazarli G. Early versus Late Trophic Feeding in Very Low Birth Weight Preterm Infants. Iranian journal of pediatrics. 2012; 22(2):171–176. [PubMed: 23056882]

70.    Berseth CL, Bisquera JA, Paje VU. Prolonging small feeding volumes early in life decreases the incidence of necrotizing enterocolitis in very low birth weight infants. Pediatrics. 2003; 111(3):  529–534. [PubMed: 12612232]

71.    Morgan J, Young L, McGuire W. Slow advancement of enteral feed volumes to prevent necrotising enterocolitis in very low birth weight infants. Cochrane database of systematic reviews. 2013; 3:CD001241. [PubMed: 23543511]

72.    Rayyis SF, Ambalavanan N, Wright L, Carlo WA. Randomized trial of "slow" versus "fast" feed advancements on the incidence of necrotizing enterocolitis in very low birth weight infants. The Journal of pediatrics. 1999; 134(3):293–297. [PubMed: 10064664]

73.    Caple J, Armentrout D, Huseby V, et al. Randomized, controlled trial of slow versus rapid feeding volume advancement in preterm infants. Pediatrics. 2004; 114(6):1597–1600. [PubMed: 15574620]

74.    Salhotra A, Ramji S. Slow versus fast enteral feed advancement in very low birth weight infants: a randomized control trial. Indian pediatrics. 2004; 41(5):435–441. [PubMed: 15181294]

75.    Krishnamurthy S, Gupta P, Debnath S, Gomber S. Slow versus rapid enteral feeding advancement in preterm newborn infants 1000–1499 g: a randomized controlled trial. Acta paediatrica. 2010; 99(1):42–46. [PubMed: 20002013]

76.    Karagol BS, Zenciroglu A, Okumus N, Polin RA. Randomized controlled trial of slow vs rapid enteral feeding advancements on the clinical outcomes of preterm infants with birth weight

750–1250 g. JPEN. Journal of parenteral and enteral nutrition. 2013; 37(2):223–228. [PubMed: 22664861]

77.     Maas C, Mitt S, Full A, et al. A historic cohort study on accelerated advancement of enteral feeding volumes in very premature infants. Neonatology. 2013; 103(1):67–73. [PubMed: 23095283]

78.     Stephens BE, Walden RV, Gargus RA, et al. First-week protein and energy intakes are associated with 18-month developmental outcomes in extremely low birth weight infants. Pediatrics. 2009; 123(5):1337–1343. [PubMed: 19403500]

79     . Kuschel CA, Harding JE. Multicomponent fortified human milk for promoting growth in preterm infants. Cochrane database of systematic reviews. 2004; (1):CD000343. [PubMed: 14973953]

80.     Thoene M, Hanson C, Lyden E, Dugick L, Ruybal L, Anderson-Berry A. Comparison of the effect of two human milk fortifiers on clinical outcomes in premature infants. Nutrients. 2014; 6(1):261–275. [PubMed: 24394538]

81.     FAO/WHO. Report of a Joint FAO/WHO Working Group on Drafting Guidelines for the Evaluation of Probiotics in Food. London, Ontario, Canada: 2002. Guidelines for the Evaluation of Probiotics in Food.

82.     Indian Council of Medical Research Task F, Co-ordinating Unit I, Co-ordinating Unit DBT. ICMR-DBT guidelines for evaluation of probiotics in food. The Indian journal of medical research. 2011; 134:22–25. [PubMed: 21808130]

83.     Lin HC, Su BH, Chen AC, et al. Oral probiotics reduce the incidence and severity of necrotizing enterocolitis in very low birth weight infants. Pediatrics. 2005; 115(1):1–4. [PubMed: 15629973]

84.     Dani C, Biadaioli R, Bertini G, Martelli E, Rubaltelli FF. Probiotics feeding in prevention of urinary tract infection, bacterial sepsis and necrotizing enterocolitis in preterm infants. A prospective double-blind study. Biology of the neonate. 2002; 82(2):103–108. [PubMed: 12169832]

85.     Li D, Rosito G, Slagle T. Probiotics for the prevention of necrotizing enterocolitis in neonates: an 8-year retrospective cohort study. Journal of clinical pharmacy and therapeutics. 2013

86.     Bin-Nun A, Bromiker R, Wilschanski M, et al. Oral probiotics prevent necrotizing enterocolitis in very low birth weight neonates. The Journal of pediatrics. 2005; 147(2):192–196. [PubMed: 16126048]

87.     Alfaleh K, Anabrees J, Bassler D, Al-Kharfi T. Probiotics for prevention of necrotizing enterocolitis in preterm infants. Cochrane database of systematic reviews. 2011; (3):CD005496. [PubMed: 21412889]

88.     Wang Q, Dong J, Zhu Y. Probiotic supplement reduces risk of necrotizing enterocolitis and mortality in preterm very-low-birth-weight infants: an updated meta-analysis of 20 randomized, controlled trials. Journal of pediatric surgery. 2012; 47(1):241–248. [PubMed: 22244424]

89.    Manzoni P, Mostert M, Leonessa ML, et al. Oral supplementation with Lactobacillus casei subspecies rhamnosus prevents enteric colonization by Candida species in preterm neonates: a randomized study. Clinical infectious diseases: an official publication of the Infectious Diseases Society of America. 2006; 42(12):1735–1742. [PubMed: 16705580]

90.    Braga TD, da Silva GA, de Lira PI, de Carvalho Lima M. Efficacy of Bifidobacterium breve and Lactobacillus casei oral supplementation on necrotizing enterocolitis in very-low-birth-weight preterm infants: a double-blind, randomized, controlled trial. The American journal of clinical nutrition. 2011; 93(1):81–86. [PubMed: 20980486]

91.    Alfaleh K, Bassler D. Probiotics for prevention of necrotizing enterocolitis in preterm infants. Cochrane database of systematic reviews. 2008; (1):CD005496. [PubMed: 18254081]

92.    Deshpande G, Rao S, Patole S. Probiotics for prevention of necrotising enterocolitis in preterm neonates with very low birthweight: a systematic review of randomised controlled trials. Lancet. 2007; 369(9573):1614–1620. [PubMed: 17499603]

93.    Mally P, Golombek SG, Mishra R, et al. Association of necrotizing enterocolitis with elective packed red blood cell transfusions in stable, growing, premature neonates. American journal of perinatology. 2006; 23(8):451–458. [PubMed: 17009195]

94.    Mohamed A, Shah PS. Transfusion associated necrotizing enterocolitis: a meta-analysis of observational data. Pediatrics. 2012; 129(3):529–540. [PubMed: 22351894]

95.    El-Dib M, Narang S, Lee E, Massaro AN, Aly H. Red blood cell transfusion, feeding and necrotizing enterocolitis in preterm infants. Journal of perinatology: official journal of the California Perinatal Association. 2011; 31(3):183–187. [PubMed: 21252964]

96.    Kastenberg ZJ, Sylvester KG. The surgical management of necrotizing enterocolitis. Clinics in perinatology. 2013; 40(1):135–148. [PubMed: 23415269]

97.    Stringer MD, Brereton RJ, Drake DP, Kiely EM, Capps SN, Spitz L. Recurrent necrotizing enterocolitis. Journal of pediatric surgery. 1993; 28(8):979–981. [PubMed: 8229602]

98.    Thyoka M, Eaton S, Hall NJ, et al. Advanced necrotizing enterocolitis part 2: recurrence of necrotizing enterocolitis. European journal of pediatric surgery: official journal of Austrian Association of Pediatric Surgery … [et al] = Zeitschrift fur Kinderchirurgie. 2012; 22(1):13–16.

99**.  Bohnhorst B, Muller S, Dordelmann M, Peter CS, Petersen C, Poets CF. Early feeding after necrotizing enterocolitis in preterm infants. The Journal of pediatrics. 2003; 143(4):484–487. Demonstrates that early reintroduction of feeding after an episode of N.E.C. does not increase the incidence of recurrent N.E.C. [PubMed: 14571225]

100.   Grave GD, Nelson SA, Walker WA, et al. New therapies and preventive approaches for necrotizing enterocolitis: report of a research planning workshop. Pediatric research. 2007; 62(4): 510–514. [PubMed: 17667844]

101.   Leaphart CL, Cavallo J, Gribar SC, et al. A critical role for TLR4 in the pathogenesis of necrotizing enterocolitis by modulating intestinal injury and repair. Journal of immunology. 2007; 179(7):4808–4820.

102.   Jilling T, Simon D, Lu J, et al. The roles of bacteria and TLR4 in rat and murine models of necrotizing enterocolitis. Journal of immunology. 2006; 177(5):3273–3282.

103.    Stoll BJ, Nahmias AJ, Wickliffe C, Brann AW Jr, Dowell VR Jr, Whaley DN. Bacterial toxin and neonatal necrotizing enterocolitis. The Journal of pediatrics. 1980; 96(1):114–115. [PubMed: 7350290]

104.    Nanthakumar N, Meng D, Goldstein AM, et al. The mechanism of excessive intestinal inflammation in necrotizing enterocolitis: an immature innate immune response. PloS one. 2011; 6(3):e17776. [PubMed: 21445298]

105.    Wolfs TG, Derikx JP, Hodin CM, et al. Localization of the lipopolysaccharide recognition complex in the human healthy and inflamed premature and adult gut. Inflammatory bowel diseases. 2010; 16(1):68–75. [PubMed: 20014022]

106.    Chan KL, Wong KF, Luk JM. Role of LPS/CD14/TLR4-mediated inflammation in necrotizing enterocolitis: pathogenesis and therapeutic implications. World journal of gastroenterology: WJG. 2009; 15(38):4745–4752. [PubMed: 19824106]

107.    Richardson WM, Sodhi CP, Russo A, et al. Nucleotide-binding oligomerization domain-2 inhibits toll-like receptor-4 signaling in the intestinal epithelium. Gastroenterology. 2010; 139(3):904–917. 917 e901–906. [PubMed: 20580721]

108.    Sodhi CP, Shi XH, Richardson WM, et al. Toll-like receptor-4 inhibits enterocyte proliferation via impaired beta-catenin signaling in necrotizing enterocolitis. Gastroenterology. 2010; 138(1): 185–196. [PubMed: 19786028]

109.    Sodhi CP, Neal MD, Siggers R, et al. Intestinal epithelial Toll-like receptor 4 regulates goblet cell development and is required for necrotizing enterocolitis in mice. Gastroenterology. 2012; 143(3):708–718. e701–705. [PubMed: 22796522]

110.    Gribar SC, Sodhi CP, Richardson WM, et al. Reciprocal expression and signaling of TLR4 and TLR9 in the pathogenesis and treatment of necrotizing enterocolitis. Journal of immunology. 2009; 182(1):636–646.

111.    Neal MD, Jia H, Eyer B, et al. Discovery and validation of a new class of small molecule Tolllike receptor 4 (TLR4) inhibitors. PloS one. 2013; 8(6):e65779. [PubMed: 23776545]

112.    Good M, Siggers RH, Sodhi CP, et al. Amniotic fluid inhibits Toll-like receptor 4 signaling in the fetal and neonatal intestinal epithelium. Proceedings of the National Academy of Sciences. 2012; 109(28):11330–11335.

113.    Siggers J, Ostergaard MV, Siggers RH, et al. Postnatal amniotic fluid intake reduces gut inflammatory responses and necrotizing enterocolitis in preterm neonates. American journal of physiology. Gastrointestinal and liver physiology. 2013; 304(10):G864–875. [PubMed: 23518680]

114.    Jain SK, Baggerman EW, Mohankumar K, et al. Amniotic Fluid-borne Hepatocyte Growth Factor Protects Rat Pups against Experimental Necrotizing Enterocolitis. American journal of physiology. Gastrointestinal and liver physiology. 2014

42.    In another study published in 2014 it was reported: "An exclusive human milk diet, devoid of CM [Cow Milk] -containing products was associated with lower mortality and

morbidity in EP [Extremely Premature] infants without compromising growth and should be

considered as an approach to nutritional care of these infants." Abrams, Steven, et al.  *Greater*

*Mortality and Morbidity in Extremely Preterm Infants Fed a Diet Containing Cow Milk Protein*

*Products.* (Breastfeeding Medicine.  2014, Nov. 4, 9(6):281-286.)

43.      The recommendations and conclusions of the article were significantly

scientifically supported with the following references:

1.      U.S. Department of Health and Human Services. The Surgeon General's Call to Action
to Support Breastfeeding. Washington, DC: Office of the Surgeon General, U.S.
Department of Health and Human Services, 2011.
2.      Section on Breastfeeding. Breastfeeding and the use of human milk. Pediatrics
2012;129:e827–e841.
3.      Schanler RJ. Evaluation of the evidence to support current recommendations to meet the
needs of premature infants: The role of human milk. Am J Clin Nutr 2007;85:625S–628S.
4.      Sullivan S, Schanler RJ, Kim JH, et al. An exclusively human milk-based diet is
associated with a lower rate of necrotizing enterocolitis than a diet of human milk and
bovine milk-based products. J Pediatr 2010;156:562–567.
5.      Cristofalo EA, Schanler RJ, Blanco CL. Randomized trial of exclusive human milk
versus preterm formula diets in extremely premature infants. J Pediatr 2013;163:1592–1595.
6.      Blyth CR, Still HA. Binomial confidence intervals. J Am Stat Assoc 1983;78:108–116.
7.      Kaplan EL, Meier P. Nonparametric estimation from incomplete observations. J Am Stat
Assoc 1958;53:457–481.
8.      Greenwood M. The Natural Duration of Cancer. Reports on Public Health and Medical
Subjects. Vol. 33. London: Her Majesty's Stationery Office, 1926:1–26.
9.      Wo´jkowska-Mach J, Ro´ _zan´ska A, Borszewska-Kornacka M, et al. Necrotising
enterocolitis in preterm infants: Epidemiology and antibiotic consumption in the Polish
neonatology network neonatal intensive care units in 2009. PLoS One 2014;9:e92865.
10.      Carter BM, Holditch-Davis D. Risk factors for necrotizing enterocolitis in preterm
infants: How race, gender, and health status contribute. Adv Neonatal Care 2008;8:285–290.
11.      Guthrie SO, Gordon PV, Thomas V, et al. Necrotizing enterocolitis among neonates in
the United States. J Perinatol 2003;23:278–285.
12.      Ozkan H, Cetinkaya M, Koksal N, et al. Culture-proven neonatal sepsis in preterm
infants in a neonatal intensive care unit over a 7 year period: Coagulase-negative
Staphylococcus as the predominant pathogen. Pediatr Int 2014;56:  60–66.

13.     Leal YA, Alvarez-Nemegyei J, Vela´zquez JR, et al. Risk factors and prognosis for neonatal sepsis in southeastern Mexico: Analysis of a four-year historic cohort follow-up. BMC Pregnancy Childbirth 2012;12:48.
14.     Troger B, Gopel W, Faust K, et al. Risk for late-onset blood-culture proven sepsis in very-low-birth weight infants born small for gestational age: A large multicenter study from the German Neonatal Network. Pediatr Infect Dis J 2014;33:238–243.
15.     Ganapathy V, Hay JW, Kim JH. Costs of necrotizing enterocolitis and cost-effectiveness of exclusively human milk-based products in feeding extremely premature infants. Breastfeed Med 2012;7:29–37.
16.     Ganapathy V, Hay JW, Kim JH, et al. Long term healthcare costs of infants who survived neonatal necrotizing enterocolitis: A retrospective longitudinal study among infants enrolled in Texas Medicaid. BMC Pediatr 2013;13:127.
17.     Johnson TJ, Patel AL, Bigger HR, et al. Economic benefits and costs of human milk feedings: A strategy to reduce the risk of prematurity-related morbidities in very-low-birthweight infants. Adv Nutr 2014;5:207–212.

43.     In another study published in 2016, it was reported:  "Extremely premature infants who received an exclusive HUM diet had a significantly lower incidence of N.E.C. and mortality.  The HUM group also had a reduction in late-onset sepsis, BPD, and ROP.  This multicenter study further emphasizes the many benefits of an exclusive HUM diet, and demonstrates multiple improved outcomes after implementation of such a feeding protocol."  Hair, Amy, et al. *Beyond Necrotizing Enterocolitis Prevention:  Improving Outcomes with an Exclusive Human Milk-Based Diet.*  (Breastfeeding Medicine.  2016, Nov 2., 11(2):70-75.)

44.     The article was significantly scientifically supported by the following references:

1.     Sharma R, Hudak ML. A clinical perspective of necrotizing enterocolitis: past, present, and future. Clin Perinatol 2013;40:27–51.
2.     Huda S, Chaudhery S, Ibrahim H, et al. Neonatal necrotizing enterocolitis: clinical challenges, pathophysiology and management. Pathophysiology 2014;21:3–12.
3.     Yee WH, Soraisham AS, Shah VS, et al. Incidence and timing of presentation of necrotizing enterocolitis in preterm infants. Pediatrics 2012;129:e298–304.

4.      American Academy of Pediatrics Section on Breastfeeding. Breastfeeding and the use of human milk. Pediatrics 2012; 129:e827–841.
5.      McGuire S. U.S. Dept. of Health and Human Services. The Surgeon General's Call to Action to Support Breastfeeding. U.S. Dept. of Health and Human Services, Office of the Surgeon General. 2011. Adv Nutr 2011;2:523–524.
6.      Hair AB, Hawthorne KM, Chetta KE, et al. Human milk feeding supports adequate growth in infants £1250 grams birth weight. BMC Res Notes 2013;6:459.
7.      Abrams SA, Schanler RJ, Lee ML, et al. Greater mortality and morbidity in extremely preterm infants fed a diet containing cow milk protein products. Breastfeed Med 2014;9:281–285.
8.      Arslanoglu S, Ziegler EE, Moro GE. Donor human milk in preterm infant feeding: evidence and recommendations. J Perinat Med 2010;38:347–351.
9.      Cristofalo EA, Schanler RJ, Blanco CL, et al. Randomized trial of exclusive human milk versus preterm formula diets in extremely premature infants. J Pediatr 2013;163:1592–1595.
10.     Ghandehari H, Lee ML, Rechtman DJ. An exclusive human milk-based diet in extremely premature infants reduces the probability of remaining on total parenteral nutrition: a reanalysis of the data. BMC Res Notes 2012;5:188.
11.     Herrmann K, Carroll K. An exclusively human milk diet reduces necrotizing enterocolitis. Breastfeed Med 2014;9: 184–190.
12.     Sullivan S, Schanler RJ, Kim JH, et al. An exclusively human milk-based diet is associated with a lower rate of necrotizing enterocolitis than a diet of human milk and bovine milk-based products. J Pediatr 2010;156:562–567 e1.
13.     Fenton T. A new growth chart for preterm babies: Babson and Benda's chart updated with recent data and a new format. BMC Pediatr 2003;3(13).
14.     Bell MJ, Ternberg JL, Feigin RD, Keating JP, et al. Neonatal necrotizing enterocolitis. Therapeutic decisions based upon clinical staging. Ann Surg 1978;187:1–7.
15.     Papile LA, Burstein J, Burstein R, et al. Incidence and evolution of subependymal and intraventricular hemorrhage: a study of infants with birth weights less than 1,500 gm. J Pediatr 1978;92:529–534.
16.     Ganapathy V, Hay JW, Kim JH. Costs of necrotizing enterocolitis and cost-effectiveness of exclusively human milkbased products in feeding extremely premature infants. Breastfeed Med 2012;7:29–37.

44.     In another study published in 2017, but based on earlier research, it was

reported: "In summary, HM has been acknowledged as the best source of nutrition for preterm

infants and those at risk for N.E.C. (8, 13, 16, 18, 26, 75, 76, 94-96).  Two RCTs on preterm

infants weighing between 500 and 1250 g at birth compared the effect of bovine milk-based

preterm infant formula to MOM or DHM on the incidence of N.E.C. (18, 76).  Both trials found

that an exclusive HM diet results in a lower incidence of N.E.C..  A Cochrane systematic review

that evaluated the effect of DHM or bovine milk-based formula on health outcomes for preterm

infants also determined that formula significantly increases the risk of N.E.C. (75)." The study

also noted the "exponential" healthcare costs associated with NEC and noted data from the U.S.

from 2011-2012 that showed the cost of NEC is $180,000 to $198,000 per infant and nearly

doubles to $313,000 per infant for surgically-treated NEC. Further, NEC survivors accrue

substantially higher outpatient costs.  Shulhan, Jocelyn, et al *Current Knowledge of Necrotizing*

*Enterocolitis in Preterm Infants and the Impact of Different Types of Enteral Nutrition Products.*

(ASN. ADV Nutr 2017; 8:8—0-91.

45.    The article was significantly scientifically supported by citing:

1.    Thanh NX, Toye J, Savu A, Kumar M, Kaul P. Health service use and costs associated
with low birth weight: a population level analysis.  J Pediatr 2015;167:551–6.e1–3.
2.    Bartholomew S, Deb-Rinker P, Dzakpasu S, Gilbert NL, Nelson C, Liu S. Perinatal
health indicators for Canada 2013 [Internet]. [cited 2016 Sep 26]. Available from:
http://publications.gc.ca/site/eng/411563/ publication.html.
3.    Hamilton BE, Martin JA, Osterman MJK, Curtin SC, Mathews TJ. Births: final data for
2014. Natl Vital Stat Rep 2015;64:1–64.
4.    Blencowe H, Cousens S, Oestergaard MZ, Chou D, Moller A-B, Narwal R, Adler A,
Vera Garcia C, Rohde S, Say L, et al. National, regional, and worldwide estimates of preterm
birth rates in the year 2010 with time trends since 1990 for selected countries: a systematic
analysis and implications. Lancet 2012;379:2162–72.
5.    Institute of Medicine. Preterm birth: causes, consequences, and prevention. Washington
(DC): National Academy of Sciences; 2007.
6.    Yamakawa T, Itabashi K, Kusuda S. Mortality and morbidity risks vary with birth weight
standard deviation score in growth restricted extremely preterm infants. Early Hum Dev
2016;92:7–11.

7.      Verd S, Ginovart G, Gutierrez A, Botet F, Barbero AH, Porta R. Hospital outcomes of extremely low birth weight infants after introduction of donor milk to supplement mother's milk. Breastfeed Med 2015;10:150–5.

8.      Chowning R, Radmacher P, Lewis S, Serke L, Pettit N, Adamkin DH. A retrospective analysis of the effect of human milk on prevention of necrotizing enterocolitis and postnatal growth. J Perinatol 2016;36:221–4.

9.      Mizrahi A, Barlow O, BerdonW, BlancWA, SilvermanWA. Necrotizing enterocolitis in premature infants. J Pediatr 1965;66:697–705.

10.     Yajamanyam PK, Rasiah SV, Ewer AK. Necrotizing enterocolitis: current perspectives. Res Rep Neonatol 2014;4:31–42.

11.     Good M, Sodhi CP, Hackam DJ. Evidence-based feeding strategies before and after the development of necrotizing enterocolitis. Expert Rev Clin Immunol 2014;10:875–84.

12.     Gregory KE, DeForge CE, Natale KM, Phillips M, Van Marter LJ. Necrotizing enterocolitis in the premature infant. Adv Neonatal Care 2011; 11:155–64.

13.     Johnson TJ, Patel AL, Bigger HR, Engstrom JL, Meier PP. Cost savings of human milk as a strategy to reduce the incidence of necrotizing enterocolitis in very low birth weight infants. Neonatology 2015;107: 271–6.

14.     Ghoneim N, Bauchart-Thevret C, Oosterloo B, Stoll B, Kulkarni M, de Pipaon MS, Zamora IJ, Olutoye OO, Berg B, Wittke A, et al. Delayed initiation but not gradual advancement of enteral formula feeding reduces the incidence of necrotizing  enterocolitis (N.E.C.) in preterm pigs. PLoS ONE 2014;9:e106888.

15.     Sho S, Neal MD, Sperry J, Hackam DJ. A novel scoring system to predict the development of necrotizing enterocolitis totalis in premature infants. J Pediatr Surg 2014;49:1053–6.

16.     Ganapathy V, Hay JW, Kim JH. Costs of necrotizing enterocolitis and cost-effectiveness of exclusively human milk-based products in feeding extremely premature infants. Breastfeed Med 2012;7:29–37.

17.     Ganapathy V, Hay JW, Kim JH, Lee ML, Rechtman DJ. Long term healthcare costs of infants who survived neonatal necrotizing enterocolitis: a retrospective longitudinal study among infants enrolled in Texas Medicaid. BMC Pediatrics 2013;13:127.

18.     Sullivan S, Schanler RJ, KimJH, Patel AL, Trawöger R, Kiechl-Kohlendorfer U, Chan GM, Blanco CL, Abrams S, Cotten CM, et al. An exclusively human milk-based diet is associated with a lower rate of necrotizing enterocolitis than a diet of human milk and bovine milk-based products. J Pediatr 2010;156:562–7.e1.

19.     Downard CD, Renaud E, St. Peter SD, Abdullah F, Islam S, Saito JM, Blakely ML, Huang EY, Arca MJ, Cassidy L, et al. Treatment of necrotizing enterocolitis: an American Pediatric Surgical Association Outcomes and Clinical Trials Committee systematic review. J Pediatr Surg 2012;47:2111–22.

20.     Sharma R, Hudak ML. A clinical perspective of necrotizing enterocolitis: past, present, and future. Clin Perinatol 2013;40:27–51.

21.     Markel TA, Engelstad H, Poindexter BB. Predicting disease severity of necrotizing enterocolitis: how to identify infants for future novel therapies. J Clin Neonatol 2014;3:1–9.

22.     Ostlie DJ, Spilde TL, St Peter SD, Sexton N, Miller KA, Sharp RJ, Gittes GK, Snyder CL. Necrotizing enterocolitis in full-term infants. J Pediatr Surg 2003;38:1039–42.

23.     Fitzgibbons SC, Ching Y, Yu D, Carpenter J, Kenny M,Weldon C, Lillehei C, Valim C, Horbar JD, Jaksic T. Mortality of necrotizing enterocolitis expressed by birth weight categories. J Pediatr Surg 2009;44:1072–5.

24.     Sinha SK, Gupta S, Donn SM. Immediate respiratory management of the preterm infant. Semin Fetal Neonatal Med 2008;13:24–9.

25.     Capozzi G, Santoro G. Patent ductus arteriosus: patho-physiology, hemodynamic effects and clinical complications. J Matern Fetal Neonatal Med 2011;24 Suppl 1:15–6.

26.     Siggers RH, Siggers J, Thymann T, Boye M, Sangild PT. Nutritional modulation of the gut microbiota and immune system in preterm neonates susceptible to necrotizing enterocolitis. J Nutr Biochem 2011;22: 511–21.

27.     Neu J. Gastrointestinal development and meeting the nutritional needs of premature infants. Am J Clin Nutr 2007;85:629S–34S.

28.     Barcellini W, Imperiali FG, Zaninoni A, Reda G, Consonni D, Fattizzo B, Lonati S, Nobili L, Zanella A, Cortelezzi A. Toll-like receptor 4 and 9 expression in B-chronic lymphocytic leukemia: relationship with infections, autoimmunity and disease progression. Leuk Lymphoma 2014; 55:1768–73.

29.     Neu J, Walker WA. Necrotizing enterocolitis. N Engl J Med 2011;364: 255–64.

30.     Ward JB, Keely SJ, Keely SJ. Oxygen in the regulation of intestinal epithelial transport. J Physiol 2014;592:2473–89.

31.     Hammers AL, Sanchez-Ramos L, Kaunitz AM. Antenatal exposure to indomethacin increases the risk of severe intraventricular hemorrhage, necrotizing enterocolitis, and periventricular leukomalacia: a systematic review with meta-analysis. Am J Obstet Gynecol 2015;212:505.e1–13.

32.     Tappenden KA. Provision of phosphorylatable substrate during hypoxia decreases jejunal barrier function. Nutrition 2002;18:168–72.

33.     Neu J. Preterm infant nutrition, gut bacteria, and necrotizing enterocolitis. Curr Opin Clin Nutr Metab Care 2015;18:285–8.

34.     Neu J, Douglas-Escobar M, Lopez M. Microbes and the developing gastrointestinal tract. Nutr Clin Pract 2007;22:174–82.

35.     Rezaie A, Pimentel M, Rao SS. How to test and treat small intestinal bacterial overgrowth: an evidence-based approach. Curr Gastroenterol Rep 2016;18:8.

36.     Freedberg DE, Lebwohl B, Abrams JA. The impact of proton pump inhibitors on the human gastrointestinal microbiome. Clin Lab Med 2014;34:771–85.

37.     Lin PW, Stoll BJ. Necrotising enterocolitis. Lancet 2006;368:1271–83.

38.     Sankaran K, Puckett B, Lee DSC, Seshia M, Boulton J, Qiu Z, Lee SK. Variations in incidence of necrotizing enterocolitis in Canadian neonatal intensive care units. J Pediatr Gastroenterol Nutr 2004;39:366–72.

39.   Stey A, Barnert ES, Tseng C-H, Keeler E, Needleman J, Leng M, Kelley- Quon LI, Shew SB. Outcomes and costs of surgical treatments of necrotizing enterocolitis. Pediatrics 2015;135:e1190–7.

40.   Soraisham AS, Amin HJ, Al-Hindi MY, Singhal N, Sauve RS. Does necrotising enterocolitis impact the neurodevelopmental and growth outcomes in preterm infants with birthweight #1250 g? J Paediatr Child Health 2006;42:499–504.

41.   Merhar SL, Ramos Y, Meinzen-Derr J, Kline-Fath BM. Brain magnetic resonance imaging in infants with surgical necrotizing enterocolitis or spontaneous intestinal perforation versus medical necrotizing enterocolitis. J Pediatr 2014;164:410–2.e1.

42.   Rees CM, Pierro A, Eaton S. Neurodevelopmental outcomes of neonates with medically and surgically treated necrotizing enterocolitis. Arch Dis Child Fetal Neonatal Ed 2007;92:F193–8.

43.   Prolacta Bioscience. Prolact+ H2MF_ human milk-based liquid human milk fortifier [Internet]. [cited 2016 Feb 1]. Available from: http://www.prolacta.com/human-milk-fortifier-1.

44.   drugstore.com. Enfamil human milk fortifier, powder, 71g foil sachets [Internet]. [cited 2016 Apr 5]. Available from: http://www.drugstore. com/enfamil-human-milk-fortifier-powder-71g-foil-sachets/qxp308429.

45.   Assad M, Elliott MJ, Abraham JH. Decreased cost and improved feeding tolerance in VLBWinfants fed an exclusive human milk diet. J Perinatol 2016;36:216–20.

46.   Lin PW, Nasr TR, Stoll BJ. Necrotizing enterocolitis: recent scientific advances in pathophysiology and prevention. Semin Perinatol 2008; 32:70–82.

47.   Fallon EM, Nehra D, Potemkin AK, Gura KM, Simpser E, Compher C, Puder M. A.S.P.E. N. clinical guidelines: nutrition support of neonatal patients at risk for necrotizing enterocolitis. JPEN J Parenter Enteral Nutr 2012;36:506–23.

48.   Robinson DT, Shah S, Murthy K. Parenteral nutrition use and associated outcomes in a select cohort of low birth weight neonates. Am J Perinatol 2014;31:933–8.

49.   Blackmer A, Luisa PM. Three-in-one parenteral nutrition in neonates and pediatric patients: risks and benefits. Nutr Clin Pract 2015;30:337–43.

50.   Senterre T. Practice of enteral nutrition in very low birth weight and extremely low birth weight infants. In: Koletzko B, Poindexter B, Uauy R, editors. Nutritional care of preterm infants scientific basis and practical guidelines. Basel (Switzerland): Karger; 2014. p. 201–14.

51.   Morgan J, Bombell S, McGuire W. Early trophic feeding versus enteral fasting for very preterm or very low birth weight infants. Cochrane Database Syst Rev 2013;3: CD000504.

52.   Shah P, Nathan E, Doherty D, Patole S. Optimising enteral nutrition in growth restricted extremely preterm neonates—a difficult proposition. J Matern Fetal Neonatal Med 2015;28:1981–4.

53.   Kim JH, Chan G, Schanler R, Groh-Wargo S, Bloom B, Dimmit R, Williams L, Baggs G, Barrett-Reis B. Growth and tolerance of preterm infants fed a new extensively hydrolyzed liquid human milk fortifier. J Pediatr Gastroenterol Nutr 2015;61:665–71.

54.   Adamkin DH, Radmacher PG. Fortification of human milk in very low birth weight infants (VLBW<1500 g birth weight). Clin Perinatol 2014; 41:405–21.

55. Prince A, Groh-Wargo S. Nutrition management for the promotion of growth in very low birth weight premature infants. Nutr Clin Pract 2013;28:659–68.

56. Mead Johnson Nutritionals. Estimated nutrient content of preterm human milk and Enfamil human milk fortifier [Internet]. [cited 2016 Apr 25]. Available from: https://www.meadjohnson.com/pediatrics/us-en/ product-information/products/premature/enfamil-human-milk-fortifierpowder# nutrients-sup-sup.

57. Fenton TR, Kim JH. A systematic review and meta-analysis to revise the Fenton growth chart for preterm infants. BMC Pediatr 2013;13:59.

58. Noel-Weiss J, Courant G, Woodend AK. Physiological weight loss in the breastfed neonate: a systematic review. Open Med 2008;2:e99–110.

59. Armand M, Hamosh M, Mehta NR, Angelus PA, Philpott JR, Henderson TR, Dwyer NK, Lairon D, Hamosh P. Effect of human milk or formula on gastric function and fat digestion in the premature infant. Pediatr Res 1996;40:429–37.

60. Butte NF, Lopez-Alarcon MG, Garza C. Nutrient adequacy of exclusive breastfeeding for the term infant during the first six months of life. Geneva (Switzerland): WHO; 2002.

61. Infant Feeding Joing Working Group. Nutrition for healthy term infants: recommendations from birth to six months [Internet]. [cited 2016 Apr 25]. Available from: http://www.hc-sc.gc.ca/fn-an/nutrition/ infant-nourisson/recom/index-eng.php#a4.

62. Andreas NJ, Kampmann B, Le-Doare KM. Human breast milk: a review on its composition and bioactivity. Early Hum Dev 2015;91:629–35.

63. Ballard O, Morrow AL. Human milk composition: nutrients and bioactive factors. Pediatr Clin North Am 2013;60:49–74.

64. McInnes RJ, Shepherd AJ, Cheyne H, Niven C. Infant feeding in the neonatal unit. Matern Child Nutr 2010;6:306–17.

65. Caplan MS, Amer M, Jilling T. The role of human milk in necrotizing enterocolitis. Adv Exp Med Biol 2002;503:83–90.

66. WHO. Donor human milk for low-birth-weight infants [Internet]. [cited 2016 Apr 4]. Available from: http://www.who.int/elena/titles/ donormilk_infants/en.

67. Gidrewicz DA, Fenton TR. A systematic review and meta-analysis of the nutrient content of preterm and term breast milk. BMC Pediatr 2014;14:216.

68. Meier PP. Breastfeeding in the special care nursery. Pediatr Clin North Am 2001;48:425–42.

69. Groh-Wargo S, Sapsford A. Enteral nutrition support of the preterm infant in the neonatal intensive care unit. Nutr Clin Pract 2009;24: 363–76.

70. Human Milk Banking Association of North America. Donor human milk processing [Internet]. [cited 2016 Feb 3]. Available from: https: //www.hmbana.org/milk-processing.

71. Aceti A, Corvaglia L, Faldella G. Human milk banks: lights and shadows. JNIM 2014;3: e030225.

72. Stoltz Sjöström E, Ohlund I, Tornevi A, Domellof M. Intake and macronutrient content of human milk given to extremely preterm infants. J Hum Lact 2014;30:442–9.

73.     de Halleux V, Rigo J. Variability in human milk composition: benefit of individualized fortification in very-low-birth-weight infants. Am J Clin Nutr 2013;98:529S–35S.

74.     Underwood MA. Human milk for the premature infant. Pediatr Clin North Am 2013;60:189–207.

75.     Quigley M, McGuire W. Formula versus donor breast milk for feeding preterm or low birth weight infants. Cochrane Database Syst Rev 2014; 4:CD002971.

76.     Cristofalo EA, Schanler RJ, Blanco CL, Sullivan S, Trawoeger R, Kiechl-Kohlendorfer U, Dudell G, Rechtman DJ, Lee ML, Lucas A, et al. Randomized trial of exclusive human milk versus preterm formula diets in extremely premature infants. J Pediatr 2013;163:1592–5.e1.

77.     Di Lorenzo M, Bass J, Krantis A. An intraluminal model of necrotizing enterocolitis in the developing neonatal piglet. J Pediatr Surg 1995;30: 1138–42.

78.     Thymann T, Støy CAF, Bering SB, Mølbak L, Sangild PT. Casein addition to a whey-based formula has limited effects on gut function in preterm pigs. J Anim Sci 2012;90(Suppl 4):378–80.

79.     Timby N, Hernell O, Vaarala O, Melin M, Lönnerdal B, Domellöf M.Infections in infants fed formula supplemented with bovine milk fat globule membranes. J Pediatr Gastroenterol Nutr 2015;60:384–9.

80.     International Society for the Study of Fatty Acids and Lipids. ISSFAL statement on dietary fats in infant nutrition [Internet]. [cited 2016 Sep 26]. Available from: http://www.issfal.org/statements/ pufa-recommendations/statement-2.

81.     Innis S. Lipids for neonates. In: Polin R, Fox WW, editors. Fetal and neonatal physiology. 2nd ed. Amsterdam(Netherlands): Elsevier; 2012, p. 190.

82.     Perrella SL, Hepworth AR, Simmer KN, Geddes DT. Influences of breast milk composition on gastric emptying in preterm infants. J Pediatr Gastroenterol Nutr 2015;60:264–71.

83.     Granot E, Ishay-Gigi K, Malaach L, Flidel-Rimon O. Is there a difference in breast milk fatty acid composition of mothers of preterm and term infants? J Matern Fetal Neonatal Med 2016;29:832–5.

84.     Picaud JC, Rigo J, Normand S, Lapillonne A, Reygrobellet B, Claris O, Salle BL. Nutritional efficacy of preterm formula with a partially hydrolyzed protein source: a randomized pilot study. J Pediatr Gastroenterol Nutr 2001;32:555–61.

85.     Penn AH, Altshuler AE, Small JW, Taylor SF, Dobkins KR, Schmid-Schonbein GW. Digested formula but not digested fresh human milk causes death of intestinal cells in vitro: implications for necrotizing enterocolitis. Pediatr Res 2012;72:560–7.

86.     Hua Z, Turner JM, Mager DR, Sigalet DL, Wizzard PR, Nation PN, Ball RO, Pencharz PB, Wales PW. Effects of polymeric formula vs elemental formula in neonatal piglets with short bowel syndrome. JPEN J Parenter Enteral Nutr 2014;38:498–506.

87.     Connor EE, Evock-Clover CM,Wall EH, Baldwin RL, Santin-Duran M, Elsasser TH, Bravo DM. Glucagon-like peptide 2 and its beneficial effects on gut function and health in production animals. Domest Anim Endocrinol 2016;56(Suppl):S56–65.

88.     Stoll B, Price P, Reeds P, Chang X, Henry J, van Goudoever J, Holst J, Burrin D. Feeding an elemental diet vs a milk-based formula does not decrease intestinal mucosal growth in infant pigs. JPEN J Parenter Enteral Nutr 2006;30:32–9.
89.     Ghandehari H, Lee ML, Rechtman DJ. An exclusive human milk-based diet in extremely premature infants reduces the probability of remaining on total parenteral nutrition: a reanalysis of the data. BMC Res Notes 2012;5:188.
90.     Suresh K. An overview of randomization techniques: an unbiased assessment of outcome in clinical research. J Hum Reprod Sci 2011;4:8–11.
91.     Gross SJ. Growth and biochemical response of preterm infants fed human milk or modified infant formula. N Engl J Med 1983;308: 237–41.
92.     Lucas A, Gore S, Cole T, Bamford M, Dossetor J, Barr I, Dicarlo L, Cork S, Lucas P. Multicentre trial on feeding low birthweight infants: effects of diet on early growth. Arch Dis Child 1984;59:722–30.
93.     Tyson JE, Lasky R, Mize C, Richards C, Blair-Smith N, Whyte R, Beer A. Growth, metabolic response, and development in very-low-birthweight infants fed banked human milk or enriched formula. I. Neonatal findings. J Pediatr 1983;103:95–104.
94.     Herrmann K, Carroll K. An exclusively human milk diet reduces necrotizing enterocolitis. Breastfeed Med 2014;9:184–90.
95.     Lucas A, Cole TJ. Breast milk and neonatal necrotising enterocolitis. Lancet 1990;336:1519–23.
96.     Sisk PM, Lovelady CA, Dillard RG, Gruber KJ, O'Shea TM. Early human milk feeding is associated with a lower risk of necrotizing enterocolitis in very low birth weight infants. J Perinatol 2007;27:428–33.

45.     In study published in 2017, supported by prior data, it was reported: "Human milk is the preferred diet for preterm infants as it protects against a multitude of NICU challenges, specifically necrotizing enterocolitis…Preterm infants are susceptible to NEC due to the immaturity of their gastrointestinal and immune systems. An exclusive human milk diet compensates for these immature systems in many ways such as lowering gastric pH, enhancing intestinal motility, decreasing epithelial permeability, and altering the composition of bacterial flora. Ideally, preterm infants should be fed human milk and avoid bovine protein. A diet consisting of human milk-based human milk fortifier is one way to provide the additional nutritional supplements necessary for adequate growth while receiving the protective benefits of

a human milk diet." Maffei, Diana, Schanler, Richard J, *Human milk is the feeding strategy to prevent necrotizing enterocolitis!* (Semin Perinatol. 2017 Feb;41(1):36-40.)

46.    The studies show Defendants Abbott and Mead's products should not be sold for use in premature infants, yet Defendants continued to market and sell their products under their ubiquitous brand names "Similac" and "Enfamil" knowing their products would be used on premature infants like TyLea Hundley and knowing their products would significantly increase the risk of N.E.C. and death in premature infants like TyLea Hundley and knowing that their marketing over decades had created a false sense of safety to both doctors and parents.

**Safer Alternative Products and Attempts by Mead and Abbott to Reduce N.E.C.**

47.    An exclusive human milk diet has been scientifically proven to reduce the risk of the premature infant suffering N.E.C., Retinopathy of Prematurity, late onset sepsis, cerebral palsy, bronchopulmonary dysplasia, and death. Ganapathy V, Hay JW, Kim JH, Lee ML, Rechtman DJ. Long term healthcare costs of infants who survived neonatal necrotizing enterocolitis: a retrospective longitudinal study among infants enrolled in Texas Medicaid. BMC Pediatrics 2013;13:127. and Hair, Amy, et al. Beyond Necrotizing Enterocolitis Prevention: Improving Outcomes with an Exclusive Human Milk-Based Diet.  (Breastfeeding Medicine. 2016, Nov 2., 11(2):70-75.)

48.    There are human milk based formulas and fortifier products which are feasible alternatives to the premature infant formula and fortifier products offered by Mead.

49.    Since 2006, Prolacta Bioscience has manufactured and sold premature infant

fortifiers and formulas which contain no cow's milk, but rather 100% human donor milk. This product is an example of a feasible alternative.

50.     Based upon information and belief, Mead and Abbott were aware of the increased risk of N.E.C. associated with their cow's milk-based products and in an attempt to remove the harmful effects, Enfamil Pregestimil and Similac Alimentum were developed.

51.     Enfamil Pregestimil states that it is "more easily absorbed by babies with some GI problems" (Exhibit A).

52.     Enfamil claims that by breaking down, or hydrolyzing, cow's milk proteins, "the baby's system no longer recognizes the cow's milk protein and most times there's no allergic response." (Exhibit B)

53.     Similac Alimentum states that it "starts reducing excessive crying due to cow's milk protein sensitivity, in most infants, within 24 hours". (Exhibit C)

54.     Similac claims that their hydrolyzed protein formulas, "[have] broken down proteins that are hypoallergenic and easy to digest…" (Exhibit C)

55.     Mead Johnson has also launched a line of infant prebiotics which they indicate offer: "Improved immune function. The digestive tract is a key part of immunological health. A number of studies have shown a link between prebiotic intake and improved immune function in infants, including reduced incidence of infections, fever episodes, dermatitis and allergies." (Exhibit D) The probiotics developed by Mead show that they know that their cow's milk-based products are defective in their present condition and are dangerous to the premature guts of

infants.

56.     In a recent Federal Court pleading filed by Abbott growing out of a patent infringement suit brought by Evolve Biosystem, Inc. concerning the use of probiotics it has made the following series of factual admissions that are of import in the instant complaint and set forth below.  Evolve Biosystems, Inc. and the Regents of the University of California v Abbott Laboratories, 19-CV-5859 (N. Dist of Illinois, Eastern Division).

a.   Abbott admits that scientists have long appreciated that the microbiome in the infant gut can impact infant health. Abbott admits that, in a healthy infant gut, beneficial bacteria can promote health in various ways.

b.   Abbott admits that it had been developing a combination probiotic product containing the three bacteria strains *Bifidobacteria infantis* (*B. infantis*), *Streptococcus thermophilus* (*S. thermophilus*), and Bifidobacteria bifidus (*B. bifidus*), referred to as Similac® Probiotic Tri-Blend, for years prior to any discussions with Evolve or the commercial launch of Evolve's Evivo® product. Abbott further admits that it had preliminary and early exploratory business discussions with Evolve beginning in 2018 for co-promotion of Evivo®, and that Abbott informed Evolve in August 2019 of Abbott's commercial strategy to promote both probiotic products, with Similac® Probiotic Tri-Blend focused on administration to preterm and low-birthweight infants and Evivo® focused on administration to term and normal-birth-weight infants.

c.  Abbott admits that it trained its sales team to prepare for the launch of Similac®
    Probiotic Tri-Blend and that Abbott in fact launched Similac® Probiotic Tri-
    Blend. Abbott admits that its Similac® Probiotic Tri-Blend is on sale. (pg. 7)
    Abbott admits that it is a healthcare leader in pediatric nutrition in the United
    States and that its portfolio includes the Similac® brand. Abbott admits that for
    many years it has provided certain infant nutrition products—including, but not
    limited to Similac® Probiotic Tri- Blend—to hospitals and NICUs free of charge.

d.  Abbott admits that it supplies Similac® Probiotic Tri-Blend for use by care
    providers in the NICU.

e.  Abbott is a global healthcare leader that helps people live more fully at all stages
    of life through life-changing technologies and products. It is a known and trusted
    brand worldwide that serves people in more than 160 countries and that has been
    discovering new ways to make a lasting impact on health for more than 130
    years.

f.  As a global leader in pediatric nutrition, Abbott makes products to help babies
    and children grow, that work to keep their bodies strong, and that support their
    unique nutritional and therapeutic needs. Abbott offers a diverse line of research-
    driven pediatric nutritional products, including under the Similac®, Elecare®,
    Pediasure®, Pedialyte®, and Vital® Peptide brands. Every day, Abbott pediatric
    nutrition products nourish more than 11 million babies and children. In particular,

and for more than 90 years, Abbott has helped give babies a strong start with Similac®, a complete line of milk and soy-based infant and toddler formulas that support healthy growth and development of a baby's eyes, brain, and immune system by delivering essential protein, minerals, and nutrients.

g.  In August 2019, Abbott introduced Similac® Probiotic Tri-Blend, which supports the developing immune system of infants by promoting the development of a healthy gut microbiome with beneficial bacteria, referred to as "probiotics." Similac® Probiotic Tri-Blend consists of a multi-strain combination of three probiotic bacteria: *B. infantis*, *S. thermophilus*, and *B. lactis*. In its first year of availability, Similac® Probiotic Tri-Blend has been adopted by hospitals across the United States as an essential nutritional tool to promote a healthy gut microbiome in infants in neonatal intensive care units ("NICUs") and newborn wards. But the adoption of Similac® Probiotic Tri-Blend, and thus its availability to provide significant benefits to very vulnerable infant populations, has been negatively impacted by Evolve's tortious business practices.

h.  Care providers have been administering the B. infantis bacterium with human milk and infant formula products for decades before any of Evolve's patents. In fact, Evolve is well-aware that [portions redacted], an independent panel of experts advising the Food & Drug Administration (FDA) regarding the safety of Evolve's B. infantis strain authored a report [portions redacted].

i.  Scientists have long been aware that an infant's diet greatly contributes to which bacteria species colonize and thrive in the infant gut. At least by the 1990s, the scientific literature reported that feeding infants human milk helps create conditions that favor the dominance of *Bifidobacteria* over bacteria in the infant gut:

> It is well known that feeding infants exclusively on human milk (HM) has a specific effect on the appearance of the stools as well as on the composition of their microflora when compared with formula feeding. HM creates conditions which favour the growth and dominance of bifidobacteria and repress the development of other obligate and facultative anaerobes, particularly of *Bacteroides* spp., clostridia and enterobacteria.

See Kleessen B *et al., Influence of two infant formulas and human milk on the development of the faecal flora in newborn infants*, Acta Paediatr, 84:1347-56, 1347 (1995) ("Kleessen 1995").

j.  By the 2000s, probiotic formulations containing *B. infantis*, including ABC Dophilus, Infloran, and FloraBaby, had been developed and were commercially available. Clinical studies administering these *B. infantis* products with human milk and infant formula products were published and demonstrated their health benefits to improving the infant gut microbiome.

For example, a clinical study published in 2005 by Bin-Nun et al. reported

that administering ABC Dophilus (a probiotic mixture of *B. infantis, Streptococcus thermophiles*, and *Bifidobacteria bifidus*) with mother's milk or Abbott's Similac® Special Care infant formula reduced both "the incidence and severity of [necrotizing enterocolitis] in premature infants with no accompanying adverse events." Bin-Nun *et al., Oral probiotics prevent necrotizing enterocolitis in very low birth weight neonates,* Journal of Pediatrics, 147(2):192-196, 196 (2005) ("Bin-Nun 2005").

k.   To distinguish the prior art before the Patent Office, the inventors were required to limit their patent claims to specific prebiotic products derived from human milk that meet particular process, structural, and functional claim limitations.

First, each '872 patent claim requires the presence of particular "oligosaccharides" that "naturally occur in human breast milk." Evolve (and the named inventors of the '872 patent) did not invent these human milk oligosaccharides, and Evolve was not the first to identify these human milk oligosaccharides. The inventors admitted during prosecution of the '872 patent that "[t]he claims encompass oligosaccharides from human milk that were known in the art." '872 Patent Prosecution History, June 20, 2011 Amendment at 7. They further explained that "[t]here are a large number of oligosaccharides found in human milk, and their identities were largely known." Id. at 8. The Patent Office agreed that the prior art, including prior art by Abbott, taught "oligosaccharides

[that] are identical to the oligosaccharides as presently claimed." '872 Patent Prosecution History, January 19, 2011 Office Action at 3 (citing U.S. Patent No. 6,045,854 (Abbott's "Prieto '854 patent") and Thurl S *et al., Quantification of individual oligosaccharide compounds from human milk using high-pH anion-exchange chromatography*, Analytical Biochemistry, 235:202-206 (1996) ("Thurl 1996")).

Second, each '872 patent claim is limited to "synthetic" prebiotic compositions that contain "purified" human milk oligosaccharides. Evolve's patent claims do not extend to natural human milk products, including mother's breast milk that is commonly used in NICUs to feed her infant. The '872 patent claims further require that the human milk products be processed in a manner that would purify these claimed human milk oligosaccharides. Merely supplementing mother's milk with an additive, such as a fortifier, does not meet the requirement for purified human milk oligosaccharides.

l.   Abbott first considered developing a tri-blend probiotic product containing *B. infantis* in late 2012 after attending a research conference where preliminary results were presented from an Australian clinical trial administering the probiotic ABC Dophilus to preterm infants. See Jacobs SE *et al., Probiotic effects on late-onset sepsis in very preterm infants: A randomized controlled trial,* 132(6):1055-1062 (2013) ("Jacobs 2013"). ABC Dophilus was a probiotic mixture of *Bifidobacteria*

*infantis, Streptococcus thermophilus, and Bifidobacteria bifidus* that had been
publicly available at least as early as 2005. See Bin-Nun 2005.

Abbott's Answer and Counterclaim, <u>Evolve Biosystems Inc, et al</u> 19-CV-05859 (N.
Dist. of Illinois, Eastern Division), filed Nov. 30, 2020, Doc. 143, at pp 3, 6, 7, 9, 12,
22, 23, 24, 26, 31, 32, 37, 38, 52.

57.     Abbott's pleadings in the <u>Evolve</u> case show that it understands that it's cow's
milk-based Similac products are unsafe to the guts of premature infants and significantly increase
the risk of N.E.C. and death and need to be changed to prevent further harm.

58.     Abbott has therefore attempted to lessen the harmful impact of its cow's milk-
based products by introducing Human Milk Oligosaccharides to select formulas, yet it has failed
to substitute human milk which already has HMOs constituted within it, while other manufacturers
have been able to achieve this since at least 2006. In an article available on Abbott's website, Flora
Baby, "Why Human Milk Oligosaccharides Are a Breakthrough: *How Human Milk
Oligosaccharides (HMOs) Support Immune Health for Infants,"* Abbott explains that it has
developed the first infant formula with HMOs.

> "We all know about the benefits of breast milk and, as moms, of course we want to give
> our babies the very best. But the reality is that not every mom can breastfeed, either
> exclusively or at all.
> That's where the benefit of years of pioneering Abbott research comes in. Dedicated to
> helping mothers provide their babies with the best nutrition, Abbott researchers
> continuously analyze breast milk, the "gold standard" of infant nutrition, in an effort to
> unlock its potential for formula-fed babies around the world.

NutritionNews.Abbott, Why *Human Milk Oligosaccharides Are a Breakthrough: How Human*

*Milk Oligosaccharides (HMOs) Support Immune Health for Infants,* available at https://www.nutritionnews.abbott/pregnancy-childhood/infant-toddler/breakthroughs-in-infant-nutrition/

59.   In another article, available on NutritionNews.Abbott, "The Power Of Human Milk Oligosaccharides*: Human Milk Oligosaccharides are beneficial prebiotics that can nourish your baby's immune system,"* Abbott reports that "[u]ntil now, human milk oligosaccharides have only been found in breast milk, but thanks to Abbott's cutting-edge research, even moms who choose to use formula can provide their babies with them too."   The Abbott Nutrition article reports that:

> After six weeks, researchers discovered that five immune markers were nearly identical between babies who were breastfed and those who were fed Similac with 2'-FL HMO. The clinical study, published in the Journal of Nutrition, showed that infants fed Similac infant formula supplemented with 2'-FL HMO had the prebiotic in their blood and urine similar to breast fed infants and the same rate of growth as breastfed infants.
>
> "These are ground-breaking results because they show that babies fed the infant formula have an immune response more like breastfed infants," Buck explains. "2'FL HMO helps support a baby's immune system because it helps close multiple gaps in immune function between formula-fed and breastfed babies."
> Abbott was the first company in the world to launch an infant formula with 2'-FL HMO. Adding HMO* to the formula brings it closer to breast milk than ever before.

NutritionNews.Abbott, *The Power Of Human Milk Oligosaccharides: Human Milk Oligosaccharides are beneficial prebiotics that can nourish your baby's immune system,* available at https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-power-of-human-milk-

oligosaccharides/#:~:text=Human%20milk%20oligosaccharides%20are%20beneficial%20prebi
otics%20that%20can%20nourish%20your%20baby's%20immune%20system&text=With%20a
%20perfect%20blend%20of,gold%20standard%20for%20infant%20nutrition.

60.     The probiotics and hydrolyzed protein formulas and fortifiers developed by
Mead and Abbott show that they know that their cow's milk-based products are defective in
their present condition and are dangerous to the premature guts of infants.

**Corporate Marketing of Cow's Milk Formulas and Fortifiers Leading to the Reduction of
the Use of Mother's Milk and/or Human Donor Milk**

61.     The World Health Organization (WHO) and United Nation's International
Children's Emergency Fund (UNICEF) held a meeting more than two decades ago to address
the international marketing of breast-milk substitutes. The World Health Director concluded the
meeting with the following statement: "In my opinion, the campaign against bottle-feed
advertising is unbelievably more important than the fight against smoking advertisement."
(Baumslag & Michels, 1995, p. 162).  Recognizing the abuse and dangers of the marketing of
Infant formula, in 1981, the World Health Assembly (WHA; the decision-making body of the
world's Member States) developed the International Code of Marketing of Breast-milk
Substitutes ("the Code"), which required companies to acknowledge the superiority of breast
milk, and outlawed any advertising or promotion of breast milk substitutes to the general public.
The International Code of Marketing of Breast-milk Substitutes specifically prohibited
advertising in Article 5 Section 1: "There should be no advertising or other form of promotion to
the general public..." The International Code of Marketing of Breast-milk Substitutes.

Geneva:World Health Organization, p.16 - 20 (1981).

62.     Despite the presence of The Code, one study estimates that formula manufacturers spent $4.48 billion on marketing and promotion in 2014. *Baker, P, et al, Global trends and patterns of commercial milk-based formula sales: is an unprecedented infant and young child feeding transition underway? Public Health Nutrition, 2016.*

63.     Despite a commitment to The Code, infant formula manufacturers have continued to advertise and promote their products to the general public. In 2008, The American Journal of Public Health reported, "Since the late 19th Century, infant formula manufacturers have encouraged mothers to substitute formula for breastmilk." *Rosenberg KD, Eastham CA, Kasehagen LJ, Sandoval AP. Marketing infant formula through hospitals: the impact of commercial hospital discharge packs on breastfeeding. Am J Public Health. 2008;98(2):290-295.*

64.     One article reports that "The contradictory messages women receive from images, articles, and advertising in doctors' offices, hospitals, and popular magazines imply that breastfeeding is unnecessary and difficult, if not impossible to achieve" Hausman, B. L. (2000, Summer). *Rational management: Medical authority and ideological conflict in Ruth Lawrence's Breastfeeding: A guide for the medical profession*. Technical Communication Quarterly, 9(3), 271-289.

65.     One study found that direct-to-consumer advertising increased request rates of brand choices and the likelihood that physicians would prescribe those brands. Parker, R. S., & Pettijohn, C. E. (2003). *Ethical considerations in the use of direct-to- consumer advertising and*

*pharmaceutical promotions: The impact on pharmaceutical sales and physicians. Journal of*

*Business Ethics*, 48, 279-290. By advertising their brand names directly to consumers,

Defendants Abbott and Mead created a false sense of security to physicians and parents that its

premature infant products are tested and proven to be safe and effective.  Parents do not even

consider such a well-known and widely distributed product for babies could ever be unsafe or

cause their baby to suffer a horrible disease and die.

66.     Another study found that exposure to infant feeding information through media

advertising has a negative effect on breastfeeding initiation. *Merewood A, Grossman X,*

*Chaudhuri J, Sadacharan R, Fein SB. Exposure to infant feeding information in the media*

*during pregnancy is associated with feeding decisions postpartum. Paper presented at American*

*Public Health Association 138th Annual Meeting & Exposition; November 2010; Washington,*

*DC.*

67.     In a study on infant feeding advertisements in 87 issues of Parents magazine, a

popular parenting magazine, from the years 1971 through 1999, content analysis showed that

when the frequency of infant formula advertisements increased, the percentage change in breast-

feeding rates reported the next year generally tended to decrease. *Stang J, Hoss K, Story M.*

*Health statements made in infant formula advertisements in pregnancy and early parenting*

*magazines: a content analysis. Infant Child Adolesc Nutr. 2010;2(1):16-25.* This study proved

that there is a direct link between infant formula advertising and breast feeding rates.

68.     The Stang study also found that Infant formula company websites, printed

materials, coupons, samples, toll-free infant feeding information lines, and labels may mislead

consumers into purchasing a product that appears equivalent or superior to human milk. This may induce reliance on a biased source for infant feeding guidance. *Stang J, Hoss K, Story M. Health statements made in infant formula advertisements in pregnancy and early parenting magazines: a content analysis. Infant Child Adolesc Nutr. 2010;2(1):16-25.*

69.     Manufacturers have also repeatedly used their relationships with hospitals and the discharge process to encourage mothers to substitute formula for breast milk even after they leave the hospital. K.D. Rosenberg, C.A. Eastham, et al, *Marketing Infant Formula Through Hospitals: The Impact of Commercial Hospital Discharge Packs on Breastfeeding*, AM J PUBLIC HEALTH, 98(2):290-295 (2008).

70.     Indeed, most hospitals in the U.S. distribute "commercial discharge bags packaged as smart diaper bags containing various coupons, advertisements, baby products, and infant formula samples." Yeon Bai, et al, *Alternative Hospital Gift Bags and Breastfeeding Exclusivity*, ISRN NUTR., article ID 560810:2(2013). These commercial gift bags send confusing signals to breastfeeding mothers and have been shown to negatively impact breastfeeding rates I.d. at 5. However, the practice continues since it is a very effective way to encourage potential formula customers, including the parents of preterm infants whom are encompassed within the company's overall marketing strategy.

## COUNT ONE (PRODUCTS LIABILITY AS TO MEAD JOHNSON & COMPANY, LLC AND/OR MEAD JOHNSON NUTRITION COMPANY)

71.     The defendant, Mead Johnson & Company, LLC and/or Mead Johnson Nutrition Company manufactures, designs, formulates, prepares, tests, provides instructions, markets,

labels, packages, places into the stream of commerce in all fifty states, including Connecticut,

and sells premature infant formula products including Enfamil Human Milk Fortifier and

Enfacare Powder and is a "product seller" in accordance with the Connecticut Products Liability

Act (CPLA) Conn. Gen. Stat. Section 52-572m, et seq.

72.     The product, Enfamil Human Milk Fortifier, contained only the following

packaging information guidelines, instructions and warnings:

> "Warning: Your baby's health depends on carefully following the instructions below.
> Use only as directed by a medical professional.  Improper hygiene, preparation, dilution,
> use or storage may result in severe harm.  Although this powder is formulated for
> premature infants, nutritional powders are not sterile and should <u>not</u> be fed to premature
> infants or infants who might have immune problems unless directed and supervised by
> your baby's doctor."

> "Caution:  Regarding use in extremely low-birth-weight infants (ELBW-1 kg or less):
> Hypercalcemia has been reported in some of these infants on full enteral feeds of human
> milk supplemented with human milk fortifiers."

73.     A copy of the product's packaging, information, guidelines, instructions and

warnings is attached and incorporated to this complaint as Exhibit E.

74.     Mead cited no medical literature or any research to guide the user for its

product, Enfamil Human Milk Fortifier, nor that its product causes or significantly increases the

risk of N.E.C. or death.

75.     Despite knowing that its product increases the risk of N.E.C. and death, Mead

did not warn of N.E.C. or death, nor did it provide any instructions or guidance on how to avoid

N.E.C. or death.

76.     Despite knowing that its product increases the risk of N.E.C. and death, Mead

did not warn of N.E.C. or death, nor did it provide any instructions or guidance on how to avoid

N.E.C. or death.

77.     The product, Enfacare Powder, contained only the following packaging

information guidelines, instructions and warnings:

> "Warning:  Your baby's health depends on carefully following the instructions below.
> Use only as directed by a medical professional.  Improper hygiene, preparation, dilation,
> use or storage may result in severe harm.  Although this powder is formulated for infants
> born prematurely, powdered infant formulas are not sterile and should <u>not</u> be fed to
> premature infants or infants who might have immune problems unless directed and
> supervised by your baby's doctor.  Ask your baby's doctor which formula is appropriate
> for your baby."

78.     A copy of Enfacare's product information, guidelines, instructions and warnings

is attached to this complaint as Exhibit F.

79.     Mead cited no medical literature or research to guide the user for its product,

Enfacare Powder, nor that its product causes or significantly increases the risk of N.E.C. or

death.

80.     As previously discussed, science and research have advanced in recent years

confirming the dangers of the defendants, Mead Johnson & Company, LLC, cow's milk-based

cow-based product in causing N.E.C. and death in premature infants, yet the defendants did

nothing to change its product, packaging, guidelines, instructions and warnings.

81.     Enfamil Human Milk Fortifier contains bovine or cow's milk-based or cow-

based formula.

82.     Enfacare Powder contains bovine or cow's milk-based cow-based formula.

83.     The cow's milk-based cow-based formula product, Enfamil Human Milk

Fortifier, is dangerous to premature infants in that it significantly increases the risk that the baby will develop N.E.C.

84.     The cow's milk-based ~~cow-based~~ formula product, Enfacare Powder, is dangerous to premature infants in that it significantly increases the risk that the baby will develop N.E.C.

85.     The defendants, Mead Johnson & Company, LLC and/or Mead Johnson Nutrition Company failed to properly warn that their product, Enfamil Human Milk Fortifier, can significantly increase the risk that the premature infant will develop N.E.C. and/or death.

86.     The defendants, Mead Johnson & Company, LLC and/or Mead Johnson Nutrition Company failed to properly warn that their product, Enfacare Powder, can significantly increase the risk that the premature infant will develop N.E.C. and/or death.

87.     The defendants, Mead Johnson & Company, LLC and/or Mead Johnson Nutrition Company's cow's milk-based ~~cow-based~~ formula product did cause the baby, TyLea Hundley, to develop N.E.C., which triggered a pro-inflammatory cascade leading to epithelial barrier disruption, bacterial translocation and transmural necrosis, bowel perforation, and internal bleeding.

88.     The cow's milk-based ~~cow-based~~ formula product, Enfamil Human Milk Fortifier, is dangerous to premature infants in that it significantly increases the risk that the baby will die.

89.     The cow's milk-based ~~cow-based~~ formula product, Enfacare Powder, is

dangerous to premature infants in that it significantly increases the risk that the baby will die.

90.     Prior to December of 2016, the defendant, Mead Johnson & Company, LLC was aware, or should have been aware, that its product was not safe for use, as it was used, in the premature infant, TyLea Hundley, yet they took no steps to prevent its use in such a situation.

91.     The defendants, Mead Johnson & Company, LLC did foresee, or should have foreseen, that its product would be used as it was in the case of TyLea Hundley and knew or should have known, that such use would significantly increase the risk of N.E.C. and death in TyLea Hundley, yet it took no steps to prevent such use.

92.     The product, Enfamil Human Milk Fortifier, was not safe to be used as it was in the case of TyLea Hundley, and the defendant knew, or should have known, it was unsafe, yet it failed to instruct or warn the FDA, NICUs, hospitals, doctors and parents that its product was not safe.

93.     The product, Enfamil Human Milk Fortifier, was not safe to be used as it was in the case of TyLea Hundley and the defendant knew or should have known it was unsafe, yet it failed to provide any instructions or guidelines on when and how its product would be safe to use in a premature infant like TyLea Hundley.

94.     The product, Enfacare Powder, was not safe to be used as it was in the case of TyLea Hundley, and the defendant knew, or should have known, it was unsafe, yet it failed to instruct or warn the FDA, NICUs, hospitals, doctors and parents that its product was not safe.

95.     The product, Enfacare Powder, was not safe to be used as it was in the case of TyLea Hundley and the defendant knew or should have known it was unsafe, yet it failed to provide any instructions or guidelines on when and how its product would be safe to use in a premature infant like TyLea Hundley.

96.     Because the Mead product is specially designed as food for vulnerable premature infants and contains no warning that it causes death or N.E.C., it is viewed as safe by physicians and parents of premature infants.

**The Marketing by Mead**

97.     The defendant, Mead Johnson & Company, LLC, has~~ve~~ marketed and sold its products as safe and beneficial for premature infants like TyLea Hundley.

98.     The defendant~~s~~, Mead Johnson & Company, LLC, have promoted its products for extremely premature infants and claim its products increases the babies' weight and caloric intake and its product is more beneficial than harmful.

99.     The studies show the Mead products should not be sold for use in extremely premature infants, yet Mead continued to market and sell its product knowing it would be used on infants like TyLea Hundley and knowing its product would significantly increase the risk of N.E.C. and death in extremely premature infants like TyLea Hundley.

100.    Notwithstanding the Code of Marketing of Breastmilk Substitutes, and Mead's commitment to the Code, advertising of infant formula has remained pervasive and widespread in the United States. Defendant Mead aggressively markets and continues to advertise directly to

the new parents by suggesting that by buying these products, they will be beneficial to their

newborns and give them the very best chance of survival. The pervasive marketing involved,

ostensibly prohibited by the Code has impacted the perceptions of synthetic non-human milk

derived substitutes, such as formula and fortifier, in such a way that it lessens the likelihood that

a parent of a baby receiving this food in the NICU will ask questions, query about alternatives,

or object to its ingestion. In short, Defendant Mead has systematically violated the Code's

central provision.

101.    Defendant Mead's marketing strategies go back decades, as Mead Johnson fights

for their respective market share by encouraging mothers to buy its products for their newborn

infants, especially those who are at a higher risk because they are born preterm. Defendant Mead

promoted its products as healthier, necessary for adequate nutrition, and the only appropriate

choice for the modern mother. The Defendant's advertising has at times attempted to portray

breast feeding as an inferior, less sophisticated choice. Often times these strategies discourage

mothers from breast feeding.

102.    Defendant Mead provides their premature Enfamil infant formulas and fortifiers

for free or at a significantly reduced cost to hospitals so that the parents see the products being

fed to their babies and then consider the products safe and important to their baby's health so

that the parents continue to purchase Enfamil when their babies leave the hospital.

103.    Enfamil liquid formulas and powders are sold at all major supermarkets,

drugstores and retail chain stores. It costs between $1,200.00 and $1,500.00 to feed one baby

Enfamil for one year.  Surgeon General's Factsheet

https://www.hhs.gov/surgeongeneral/reports-and-

publications/breastfeeding/factsheet/index.html

104.    Enfamil Enfacare Powder for premature infants is sold on Mead's website for

$21.99 for a single 12.8 ounce can. The website urges parents to stock up, claiming that the

"best value" is to purchase a case of 6 12.8 ounce cans for over $100.

105.    Enfamil Human Milk Fortifier Liquid is sold on Mead's website for over $300

for a case of one hundred 5 mL vials.

106.    Defendant Mead routinely offers free formula, coupons, and other goodies in

"gift baskets" given to mothers by their OBGYNs before birth and after birth in hospitals,

medical clinics, and even left at residential charities where out-of-town families have to stay

when their babies are being treated for a substantial amount of time in the NICUs of hospitals.

The impetus behind such efforts is to create brand loyalty, and create the appearance of "medical

blessing" so that vulnerable parents continue to use formula to feed their babies after they leave

the NICU, resulting in great expense to the parents, significant risk for the babies, and

substantial profit to Defendant Mead.

107.    With the proliferation of the internet, the Defendant Mead has updated their

tactics to advertise heavily on the internet and through its websites.

108.    Defendant Mead's website features a pop-up advertisement, enticing moms to

join their rewards program "Enfamil Family Beginnings." The program offers "up to $400 in

free gifts, baby formula coupons, baby formula samples, special offers, and other savings"
(Exhibit G).

109.    Defendant Mead promotes a range of products specifically for "premature and
low weight" babies on their website: Enfamil Human Milk Fortifier Liquid High Protein,
Enfamil Milk Fortifier Liquid Standard Protein, Enfamil NeuroPro Enfacare, Enfamil Premature
20 Cal, Enfamil Premature 24 Cal , Enfamil Premature 24 Cal/fl oz HP, Enfamil Premature 30
Cal, Enfamil Human Milk Fortifier Acidified Liquid, Enfamil Human Milk Fortifier Powder,
Enfamil 24 and DHA & ARA Supplement.

110.    Defendant Mead falsely boasts their commitment to science on its website, and
claims that "Enfamil is backed by decades of breast milk research and multiple clinical studies"
and it claims that "to create our best formulas, we collaborated on some of the most extensive
breast milk studies to date" (Exhibit H). These representations that Enfamil is backed by science
and equate to breast milk mislead parents by intentionally omitting the established fact that
cow's milk-based products have been proven to significantly increase the risk of N.E.C. and
death in premature infants.

111.    Recognizing a shift in the medical community towards an exclusive human
milk-based diet for premature infants, Defendant Mead developed a product called "Enfamil
Human Milk Fortifier". This name is very misleading in that it suggests that the product is
derived from human milk. In fact, it is a cow's milk-based product. Canvasser, J., *et al.* Parent
and Provider Perspectives on the Imprecise Label of "Human Milk Fortifier" in the NICU.

*Nutrients* 2020, *12*, 720.

112.     Defendant Mead Johnson's website does not disclose the danger posed by their products to premature infants. Defendant Mead Johnson uses bright colors and drop-down menus, while making seemingly innocuous statements such as, "When it comes to making important choices about your baby's nutrition, there is nothing like a recommendation from a trusted source. Whether it comes from your pediatrician, the hospital where your baby was born or another mom, using Enfamil gives you the confidence you've made the best choice for your baby." The website gives mothers the illusion of choice by stating that they should take recommendations from pediatricians, hospitals, and other moms. However, as you scroll down the page, the website provides all three of these recommendations. The webpage boasts "#1 infant formula brand recommended by pediatricians" and that "80% of birthing hospitals use Enfamil." Further down the page is a purported review from "Enfamil Mom," stating "Just wanted to say great job Enfamil! Excellent formula by far…I work with four other expectant mothers and have referred them all to Enfamil."  The website creates the illusion that all trusted sources recommend Enfamil, and does not make reference to the dangers their products pose to premature infants. (Exhibit I)

113.     Defendant Mead also pays for ads on Google and other search engines specifically targeted to searches involving preterm infants and designed to net them more profit share of this lucrative market (Exhibit J).

114.     Defendant Mead markets its company as being wholly dedicated to providing

safe and effective nutrition for children across the globe. "We understand the significance of the trust placed in us by parents, and we offer them ongoing reassurance about the uncompromising and rigorous quality standards to which we hold each and every facility, production line, employee, and product." This statement misleads parents into believing that Defendant Mead's products are safe and based on the latest science, when in fact, science has proven their cow's milk-based products significantly increase the risk of N.E.C. and death in preterm infants. (Exhibit K)

115.    The Defendant has designed competing, systematic, and powerful marketing campaign to cause mothers to believe that: (1) cow's milk-based formula and fortifier is safe; (2) cow's milk-based products are equal, or even superior, substitutes, to breast milk; (3) physicians consider their cow's milk-based products a first choice; and (4) hospitals feed their premature patients Enfamil and Similac which falsely creates a culture of commonality and safety. Similarly, the Defendants have marketed their products for premature infants as necessary for growth, and perfectly safe for premature infants, despite knowing of the extreme risks posed by cow's milk-based products and failing to warn of the deadly disease of N.E.C. and risk of death.

116.    Notwithstanding strong medical evidence establishing the extreme dangers that cow's milk-based products pose for premature infants, the defendants have marketed their cow's milk-based products as equally safe alternatives to breast milk, and have promoted their products as necessary for additional nutrition and growth. Defendant Mead has specifically marketed its formula and fortifiers as necessary to the growth and development of premature infants, when

indeed the products pose a known and substantial risk to these babies.

117.    Thus, despite the existence of alternative and safe human milk-based formulas and fortifiers, Defendant Mead continues to market and/or sell their cow's milk-based products under the guise of being safe for newborns and despite knowing the significant health risk posed by ingesting these products, especially to extremely preterm, extremely low weight infants, like TyLea Hundley.

118.    Over their lifetime, the parents, Tomika Knight and Tyrese Hundley, had been exposed to advertising and marketing by Defendant Mead that the product "Enfamil" was safe, nutritious, and important for their baby. The parents were aware that Enfamil was being fed to their baby, yet no one informed them it carried significant risks. Had the parents, Tomika Knight and Tyrese Hundley, been made aware of the facts, data, and science that linked Enfamil to N.E.C. and death, they would not have allowed their daughter to be fed Enfamil.

119.    Members of the medical community, physicians, and hospitals, as well as the parents, Tomika Knight and Tyrese Hundley, relied upon the representations, warranties, and advertising of the defendant, which categorically omit that their cow's milk-based products significantly increase the risk of N.E.C. and death in infants, which contributed to the product to being fed to TyLea Hundley.

**The Practice of Silence by Mead: No Warnings, No Instructions, and No Information Provided to the Parents**

120.    Mead knew or should have known that its product would be used in the way it

was used on this baby.

121.     The way in which the Mead product was fed to the baby, was extremely

dangerous and caused an unreasonably high risk that the baby would develop N.E.C. and die, yet

Mead provided no detailed instructions or warnings to prevent or alter the way this product was

used.

122.     Despite learning that its product was linked to N.E.C. and death, Mead failed to

properly collect data from patients, parents, doctors and hospitals in order to develop evidence

based strategies, instructions, and warnings to reduce or prevent its product from causing N.E.C.

and death.

123.     Despite knowing its product was leading to N.E.C. and death, Mead took no

steps to determine how or why its product was causing N.E.C. or death, nor did it conduct a

comprehensive risk management plan to combat the tragic end results of using its products.

124.     The defendant, Mead Johnson & Company, LLC has learned that its cow based

product was causing N.E.C. and death in premature infants, yet the defendants did nothing to

change its product, packaging, guidelines, instructions and warnings.

125.     Despite knowing that its cow-based product was causing N.E.C. and death in

premature infants, the defendant, Mead Johnson & Company, LLC did not conduct any testing,

data analysis, or research to determine when its product should not be used or when and how its

product was safe for use.

126.     Despite knowing that its product was causing N.E.C. and death in premature

infants, the defendant, Mead Johnson & Company, LLC did not contact the FDA to inform them its product was linked to causing N.E.C. and death.

127.    The mother saw the product containers and was aware that formula was being fed to her daughter.

128.    The mother was never told that the formula could cause her baby to develop N.E.C. and death.

129.    The mother was never told that the formula could cause her baby to die.

130.    The mother was never told of the studies showing cow-based formula was extremely dangerous to her baby.

131.    The mother was never told of the studies showing human donor milk was safer for her baby.

132.    The mother, Tomika Knight, was aware Enfamil products were being fed to her baby.

133.    The father, Tyrese Hundley, saw the product containers and was aware that formula was being fed to his daughter.

134.    The father, Tyrese Hundley, was never told that the formula could cause her baby to develop N.E.C. and death.

135.    The father, Tyrese Hundley, was never told that the formula could cause his baby to die.

136.    The father, Tyrese Hundley, was never told of the studies showing cow-based

formula was extremely dangerous to her baby.

137.     The father, Tyrese Hundley, was never told of the studies showing human donor milk was safer for his baby.

138.     The father, Tyrese Hundley, was aware Enfamil products were being fed to his baby.

139.     The mother and father believed the formula products would help their baby, not harm their baby.

140.     Because the brand name "Enfamil" is marketed as safe and healthy and similar to breast milk, and is regularly sold in stores and used in hospitals, the parents did not question the safety of the product.

141.     The parents had been strong advocates involved in their infant's care throughout her life.

142.     The parents wanted to know and desired to be participants in all decisions regarding the health and safety of their daughter and wanted to be provided an informed choice on all risks and benefits of medical care and treatment.

143.     Had either one of the parents known of the significant risks of feeding Enfamil to their premature infant, they would not have allowed the product to be fed.

144.     Neither the hospital nor the physicians involved in the care of the infant informed either parent that Enfamil cow's milk-based products could significantly increase the risk of N.E.C. or death in their infant.

145.     Neither the hospital nor the physicians provided a choice to the mother or the father to feed their premature infant cow's milk-based fortifier or formula. This practice of not telling the parents of the risks of feeding cow's milk-based Enfamil formula or fortifier is the common practice throughout the country. Defendant Mead is aware of this practice and is aware that parents are rarely, if ever, informed.

146.     Defendant Mead has known for many years that their premature infant products, Enfamil, are significantly increasing the risk of  premature infants developing N.E.C. and dying and are aware that hospitals and physicians around the United States are not informing the parents of this risk of N.E.C. developing when fed their formula.

147.     Defendant Mead knows that if they required or even requested the hospitals or doctors to obtain an informed consent regarding the risks of feeding their products to their premature infant patients, the parents would not allow Enfamil to be fed to their children.

148.     Defendant Mead knows that if they required or even requested on their product labels that their Enfamil premature infant formulas and fortifiers should not be fed to a premature infant until the parent is warned and informed that feeding a product could significantly increase the risk of N.E.C. or death then the use of the Enfamil products would immediately plummet in hospitals across the country because the truth and the science would finally be brought to light, and the parents would not allow the products to be fed to their infant. The brand name Enfamil would forever be associated with N.E.C. and death to the detriment of the corporate image of Mead Johnson.

149.    If the hospital or physicians had informed either parent, or Mead had required or even requested the hospitals or physicians inform the parents that the Enfamil products for premature infants could significantly increase the risk of N.E.C. or death to their daughter, the parents, Tomika Knight and Tyrese Hundley, would not have allowed the cow's milk-based products to be fed to their infant and TyLea Hundley would not have suffered N.E.C. and would have survived.

150.    Mead provides free or low-priced products to the hospital, which encourages the product to be overused with no warnings, instructions and/or consents.

151.    For decades, Mead has known that there is a complete lack of communication between physicians and parents when it comes to the feeding of the defendant's Enfamil products to preterm infants. Mead has done nothing to fix this dangerous practice of silence. Unfortunately, the effect of this practice is that premature infants have been needlessly succumbing to N.E.C. and dying after being fed the defendant's products and the parents have no idea why.

152.    Essentially what occurs, is that these parents who love and cherish their child, witness them suffering from the horrible disease of N.E.C., often resulting in large portions of their intestines being removed and placed in a bag outside of their body, becoming septic, and often dying in their arms, without ever being told that the defendants products are known to significantly increase this disease.  The parents never even consider that the defendant's well-known product, Enfamil, could be responsible for the injury or loss to their child.

153.    The FDA requires manufacturers of prescription medications to study their medications and perform drug trials and collect data to determine the safety and efficacy of their drugs and to determine the likelihood of side effects and to continuously study the drug's use to review adverse outcomes and create proper warnings and instructions; however, because baby formula and fortifiers, such as Enfamil Enfacare Powder and Enfamil Human Milk Fortifier, are not drugs, the manufacturer, Mead does not perform such trials and does not collect data on when and how the formula and fortifier should be fed. Despite knowing for decades that the products are significantly increasing N.E.C. and death in premature infants, and are far more dangerous than most prescription drugs, Mead is doing nothing to stop or lessen N.E.C. or death.

154.    If Mead performed the pharmacovigilance required by drug manufacturers for their premature infant formulas and fortifiers, these products would not have been fed to TyLea Hundley and she would not have developed N.E.C. and she would have survived.

155.    The manufacturer, Mead has known that their Enfamil products are significantly increasing the risk of N.E.C. and death in premature infants and are aware that there are alternatives to their cow's milk-based formulas and fortifiers, such as human milk derived products, that would reduce the risk of N.E.C. and death, yet they chose to continue to promote, market, and sell their products, causing thousands of premature infants to succumb to N.E.C. and die.

156.    The products made from cow's milk, specifically for premature infants by Enfamil are unsafe to premature infants and are avoidable for use in that there is human donor

milk available and/or human milk derived fortifier products available made from human milk instead of cow's milk.

157.    Despite knowing that its cow-based product was causing N.E.C. and death in premature infants, Mead Johnson & Company, LLC did not recommend to the FDA, hospitals, NICUs or physicians that they should discuss the risks of N.E.C. or death with the parents.

158.    The mother and father believed the formula products would help their baby, not harm their baby.

159.    Despite knowing that its product was causing N.E.C. and death in premature infants, the defendant, Mead Johnson & Company, LLC did not contact the FDA, NICUs, hospitals, and physicians to inform them its cow-based product was linked to causing N.E.C. and death.

160.    Despite knowing for many years that numerous scientific studies were showing horrible adverse affects of its Enfamil products in premature infants, Defendant Mead failed to undertake a rigorous risk management plan, periodic safety update reports, periodic benefit-risk reports, and development safety reports.

161.    If hospitals and physicians had been provided full disclosure of the data and science regarding the risks of N.E.C. and death, or when it occurs, or instructions on how to avoid that (as if it were a drug), or a statistical data-based risk-benefit analysis, or were required or requested by the manufacturers to inform the patient as is ethically required with drugs, then Enfamil would not have been fed to TyLea Hundley and she would not have developed N.E.C.

nor died but would have survived.

162.     The defendant, Mead Johnson & Company, LLC and/or Mead Johnson

Nutrition Company is liable to the plaintiff under the Connecticut Product Liability Act, Conn.

Gen. Stat. Section 52-572m, et seq. in one or more of the following ways:

A.  Failure to Warn and/or Instruct

    a.  The defendant knew or should have known that its cow's milk-based premature infant formula product would be used, as it was, on extremely premature infants like TyLea Hundley, yet it failed to properly warn hospitals, NICUs, doctors, parents and/or consumers that its cow's milk-based product significantly increases the risk of N.E.C. and death in these babies; and/or

    b.  Was unsafe and/or contra-indicated for extremely premature infants like TyLea Hundley; and/or

    c.  Failed to provide proper instructions or guidelines or studies, or data on when and how to feed its product to premature infants in order to decrease the risk of N.E.C. and/or death; and/or

    d.  Failed to insert a warning or instruction that parents needed to be provided an informed choice between the safety of human milk versus the dangers of the defendant's cow's milk-based product; and/or

    e.  Failed to provide instructions that parents needed to know that the defendant's product carried a significant risk that its cow's milk-based product could cause their baby to develop N.E.C. and die; and/or

    f.  The warnings and instructions are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn on cow's milk-based formula significantly involving the risk of N.E.C. and death or providing any details on how to avoid such harm; and/or

    g.  Failed to have a large and prominent "black box" type warning that its cow's milk-based product is known to significantly increase the risk of N.E.C. and death when compared to Human Milk in premature infants; and/or

    h.  Failed to provide well researched and well-established studies that linked its cow's milk-based product to N.E.C. and death in premature infants; and/or

    i.  Failed to cite to or utilize current up to date medical data on the proper and safe use of its product; and/or

    j.  Failed to instruct physicians not to feed infants under 1,000 grams; and/or

    k.   Failed to instruct physicians not to feed infants at 26 weeks 6 days; and/or

l.  Failed to instruct physicians on when or how to transition to 100% cow's milk-based formula; and/or

m. Failed to provide prominent and proper warnings and/or instructions that it's product significantly increases the risk of the following:  N.E.C., R.O.P. (retinopathy of prematurity), late onset sepsis, cerebral palsy, bronchopulmonary dysplasia, and death; and/or

n.  Failed to require or recommend hospitals and/or physicians inform parents that their product significantly increases the risk of N.E.C. and death before allowing the product to be fed to their premature infants; and/or

o.  Failed to provide a thorough and detailed risk-benefit analysis for hospitals, doctors, and parents; and/or

p.  Failed to establish a standard for safe use; and/or

q.  Failed to establish a label or instruction that would correspond to the current science regarding the positive risk-benefit profile; and/or

r.  Failed to provide statistical evidence of adverse effects ragrding the feeding of its product; and/or

s.  Failed to guide or instruct on when to start, how much to start, how to increase, volume and timing of feeds, when not to feed, and/or when to stop feeding its product to premature infants; and/or

t.  Failed to guide or instruct on how to properly monitor a preterm infant who is fed he product; and/or

u.  Failed to instruct or warn that an exclusive human milk based diet significantly decreases the risk of N.E.C. when compare to a cow's milk diet; and/or

v.  Failed to provide periodic or yearly safety reports; and/or

w. Failed to provide periodic or yearly risk-benefit analysis for use of its product; and/or

x.  Failed to provide or produce yearly safety update reports; and/or

y.  Failed to develop comprehensive mitigation strategies to reduce the risk of N.E.C. and death in its products specifically designed for premature infants; and/or

z.  Failed to develop a protocol for hospitals and physicians with the elements to assure safe use; and/or

aa. Failed to provide detailed and adequate instructions on proper use, administration, application, and limitations of its products specifically designed for premature infants; and/or

bb. Failed to condition the products sale or delivery to the hospital with the assurance that the hospital would issue proper warnings of N.E.C. and death to the parents.

B.  Strictly Liable for Defective Product

a. Despite knowing that its product would be used on extremely premature infants, like TyLea Hundley, and despite knowing (or should have known) that such use was unreasonably dangerous to extremely premature infants in that its cow based product was significantly increasing the risk of N.E.C. and death, the defendant continued to sell and market its defective product to extremely premature infants; and/or

b. Over the last several years, scientific data and well researched studies have concluded that the cow based product of the defendant carried unreasonable risks of N.E.C. and death, which far outweighed the product's benefits, yet the defendant continued to market and sell its defective product for extremely premature infants like TyLea Hundley; and/or

c. Failed to develop a human-based milk product which was safer for extremely premature infants; and/or

d. Failed to properly reformulate its product to reduce the risks of N.E.C. and death; and/or

C. Negligence

Despite knowing that its product was significantly increasing the risk of N.E.C. in premature infants, the defendant was careless and negligent and failed to act as a reasonably prudent manufacturer of premature infant formula in one or more of the following ways:

a. Failing to collect data to determine if its product was safe for premature infants; and/or

b. Failing to collect data to determine when and how its product could be used safely; and/or

c. Failing to utilize the significant peer reviewed research to develop instructions and/or warnings on how and when its product should be used in order to protect babies from N.E.C. and death; and/or

d. Failing to develop evidence-based guidelines or instructions to decrease the risk of its product causing N.E.C. and death; and/or

e. Failing to provide evidence-based guidelines or instructions to decrease the risk of its product causing N.E.C. and death; and/or

f. Failing to stop or deter its product from being fed to extremely premature infants like TyLea Hundley; and/or

g. Failing to provide evidence based instructions or guidance on when or how an extremely premature infant should be transitioned to the defendant's product; and/or

h. Failed to continuously and vigorously study its cow's milk-based product in order to avoid N.E.C. and death in premature infants; and/or

i.   Failing to send out letters with warnings to hospitals, NICUs and doctors that its product was significantly increasing the risk of N.E.C. and death in premature infants; and/or

j.   Failing to send out letters with instructions to hospitals, NICUs and doctors on when and how its product should be used to avoid N.E.C. and death; and/or

k.   Failing to market and/or sell its product in a way which would protect the premature infants from N.E.C. and death; and/or

l.   Failed to provide proper training or information to health care providers for safe use of its product; and/or

m.   Failed to take reasonable precautions to prevent premature infants from developing N.E.C. or dying; and/or

n.   Failed to develop a human based premature infant formula; and/or

o.   Failed to develop or reformulate its product to make it safer for premature infants; and/or

p.   Failed to properly or promptly notify the FDA that its cow-based product was significantly increasing N.E.C. and death in premature infants; and/or

q.   Failed to exercise proper pharmacovigilance for a product which was significantly more dangerous than most prescription drugs; and/or

r.   Improperly promoted and marketed its Enfamil brand for premature infants to physicians as safe and necessary for growth when in fact, its product was extremely dangerous; and/or

s.   Improperly promoted and marketed its Enfamil brand for premature infants to parents as safe and necessary for growth when in fact, its product was extremely dangerous; and/or

t.   Improperly created agreements with hospitals whereby its products would be over utilized to the detriment of the premature infants; and/or

u.   Improperly promoted continued use of its product in hospitals despite knowing the great harm it was causing; and/or

v.   Improperly provided free and/or reduced Enfamil products to hospitals which has caused significant harm to premature infants across the United States; and/or

w.   Failed to properly work with the FDA on developing ways to reduce N.E.C. and death when it's products were fed to premature infants; and/or

x.   Failed to provide a thorough and detailed risk-benefit analysis for hospitals, doctors, and parents; and/or

y.   Failed to establish a standard for safe use; and/or

z.   Failed to establish a label or instruction that would correspond to the current science regarding the positive risk-benefit profile; and/or

aa.  Failed to provide statistical evidence of adverse effects regarding the feeding of its product; and/or

bb. Failed to guide or instruct on when to start, how much to start, how to increase, volume and timing of feeds, when not to feed, and/or when to stop feeding its product to premature infants; and/or

cc. Failed to guide or instruct on how to properly monitor a preterm infant who is fed he product; and/or

dd. Failed to instruct or warn that an exclusive human milk based diet significantly decreases the risk of N.E.C. when compare to a cow's milk diet; and/or

ee. Failed to provide periodic or yearly safety reports; and/or

ff. Failed to provide periodic or yearly risk-benefit analysis for use of its product; and/or

gg. Failed to provide or produce yearly safety update reports; and/or

hh. Failed to develop comprehensive mitigation strategies to reduce the risk of N.E.C. and death in its products specifically designed for premature infants; and/or

ii. Failed to develop a protocol for hospitals and physicians with the elements to assure safe use; and/or

jj. Failed to provide detailed and adequate instructions on proper use, administration, application, and limitations of its products specifically designed for premature infants; and/or

kk. Failed to condition the products sale or delivery to the hospital with the assurance that the hospital would issue proper warnings of N.E.C. and death to the parents; and/or

ll. Failed to properly perform a type of pharmacovigilance for the science relating to the collection, detection, assessment, monitoring, and prevention of adverse effects for its premature baby formula and fortifiers; and/or

mm.   Failed to properly and thoroughly identify the hazards associated with its products to minimize its risks to premature infants

nn. Failed to take reasonable steps to protect premature infants from developing N.E.C. and death when feeding their products; and/or

oo. Continued to utilize outdated and ineffective instructions and warnings knowing they were inadequate based in modern science; and/or

pp. Failed to properly work with physicians and hospitals on developing ways to reduce N.E.C. and death when its products were fed to premature infants; and/or

qq. Intentionally promoted a culture of silence whereby the harmful effects of its products were never being communicated to the parents or the public; and/or

rr. Despite knowing for many years that the most vulnerable humans were suffering extreme harm related to the feeding of its products, failed to perform the necessary scientific process of collection, detection, assessment, monitoring, and prevention of these adverse effects of feeding its products.

D.  Misrepresentation

The defendant misrepresented that its cow-based product was safe and beneficial for premature infants when it knew or should have known that its product was unreasonably dangerous and causing N.E.C. and death in premature infants.

E.  Breach of Warranty

The defendant expressly or impliedly breached its warranty that its product was safe to be fed to premature infants, when, in fact, it was extremely dangerous.

F.  Reckless Disregard – Punitive Damages

    a.  In violation of Conn. Gen. Stat. Section 52-240b the defendant was reckless in that it continued to market and sell its cow's milk-based cow-based product to premature infants when it knew its product was causing death and N.E.C. in these babies; and/or

    b.  Intentionally ignored or avoided the more recent scientific data and studies concluding that its product was causing N.E.C. and death so that it could continue to profit from the sale of its product; and/or

    c.  Intentionally failed to take protective measures it knew would save premature infants from developing N.E.C. and/or dying; and/or

    d.  Intentionally allowed NICUs, hospitals, and doctors to utilize different feeding strategies instead of developing an evidence based nationwide safety plan to prevent its product from causing N.E.C. and death in premature infants; and/or

    e.  Continued to claim its product was beneficial to the growth of extremely premature infants when it knew its cow's milk-based cow-based product was unnecessarily causing N.E.C. and death in these babies; and/or

    f.  Deliberately withheld important data to the FDA that its product was causing N.E.C. and death in premature infants; and/or

    g.  Failed to promote human based milk and instead continued to promote its dangerous cow's milk-based cow-based product for premature infants because it did not have a human based product it could sell; and/or

    h.  Intentionally promoted a national culture of silence whereby the devastating effects of its Enfamil premature infant formulas and fortifiers were never communicated to the parents or the public.

165.    As a result and proximate cause, the baby, TyLea Hundley, was fed the

defendants cow's milk-based cow-based product causing the baby to develop N.E.C., which caused the baby's bowels to die and perforate, causing extreme pain, suffering, mental and emotional anguish and distress and ultimately death.

166.    As a further result, the baby was required to undergo and incur medical care and costs and an unsuccessful emergency bedside surgery, where her bowels were opened and she died.

167.    As a further result, she lost her ability to live and grow and enjoy life and participate in all of life's activities.

168.    Also, she lost her ability to earn wages and benefits and suffered an Economic loss.

169.    Also, her Estate incurred burial and funeral expenses.

## COUNT TWO (PRODUCTS LIABILITY AS TO ABBOTT LABORATORIES, INC.)

170.    Plaintiffs reallege all paragraphs previous and subsequent to this paragraph as if fully set forth herein.

171.    The defendant, Abbott Laboratories, Inc. manufactures, designs, formulates, prepares, tests, provides instructions, markets, labels, packages, places into the stream of commerce in all fifty states, including Connecticut, and sells premature infant formula including Similac Special Care 24 kcal/oz High Protein and Similac Special Care 30 and is a "product seller" in accordance with the Connecticut Products Liability Act (CPLA) Conn. Gen. Stat. Section 52-572m, et seq.

172.     The product, Similac Special Care 24 High Protein and Similac Special Care 30,

contained only the following packaging information, guidelines, instructions and warnings:

> "Similac Special Care 20 – Precautions:
>
> • Very low-birth-weight infants are particularly susceptible to
> gastrointestinal complications; therefore, feeding should be
> initiated cautiously
> • Tolerance to enteral feedings should be confirmed by initially
> offering small volumes of formula followed by cautious
> progression to higher caloric feedings
> • Spitting up, abdominal distention, abnormal stools or stool
> patterns, excessive gastric residuals, or other signs of intestinal
> dysfunction have been associated with enteral feeding before
> the intestinal tract is ready to accommodate the regimen.
> At the first sign of these problems, enteral feeding should be
> slowed or discontinued
> • Not intended for feeding low-birth-weight infants after they
> reach a weight of 3600 g (approximately 8 lb.) or as directed
> by a physician"
>
> "Similac Special Care 24 – Precautions:
>
> • Very low-birth weight infants are particularly susceptible to gastrointestinal
> complications; therefore, feeding should be
> initiated cautiously
> • Tolerance to enteral feedings should be confirmed by initially
> offering small volumes of formula followed by cautious
> progression to higher caloric feedings
> • Spitting up, abdominal distention, abnormal stools or stool
> patterns, excessive gastric residuals, or other signs of intestinal
> dysfunction have been associated with enteral feeding before
> the intestinal tract is ready to accommodate the regimen.
> At the first sign of these problems, enteral feeding should be
> slowed or discontinued
> • Not intended for feeding low-birth-weight infants after they
> reach a weight of 3600 g (approximately 8 lb.) or as directed
> by a physician"
>
> "Similac Special Care 24 High Protein – Precautions:

• Very low-birth-weight infants are particularly susceptible to gastrointestinal complications; therefore, feeding should be initiated cautiously
• Tolerance to enteral feedings should be confirmed by initially offering small volumes of formula followed by cautious progression to higher caloric feedings
• Spitting up, abdominal distention, abnormal stools or stool patterns, excessive gastric residuals, or other signs of intestinal dysfunction have been associated with enteral feeding before the intestinal tract is ready to accommodate the regimen. At the first sign of these problems, enteral feeding should be slowed or discontinued
• Not intended for feeding low-birth-weight infants after they reach a weight of 3600 g (approximately 8 lb.) or as directed by a physician

"Similac Special Care 30 – Precautions:

• Very low-birth-weight infants are particularly susceptible to gastrointestinal complications; therefore, feeding should be initiated cautiously
• Use this product only after feedings of lower caloric density are well-established. For improved tolerance, it is best to increase caloric density slowly, by 2- to 4-Cal/fl oz increments
• Hydration status should be monitored
• Spitting up, abdominal distention, abnormal stools or stool patterns, excessive gastric residuals, or other signs of intestinal dysfunction have been associated with enteral feeding before the intestinal tract is ready to accommodate the regimen. At the first sign of these problems, enteral feeding should be slowed or discontinued
• Not intended for feeding low-birth-weight infants after they reach a weight of 3600 g (approximately 8 lb.) or as directed by a physician"

Package warnings as follows:

"Similac Special Care Premature ~~20 calorie and~~ 24 calorie and High Protein - Precaution:

- If signs of intolerance develop, slow feeding or discontinue.

71

● Not intended for low-birth-weight infants after they reach a weight of 3600 grams (approx. 8 lb.) or as directed by a doctor."

"Similac Special Care Premature 30 calorie – Precaution:

● Use once feeding tolerance is established
● If signs of intolerance develop, slow feeding or discontinue.
● Hydration status should be monitored
● Not intended for low-birth-weight infants after they reach a weight of 3600 grams (approx. 8 lb.) or as directed by a doctor."

173.    A copy of the product's packaging, information, guidelines, instructions and

warnings is attached and incorporated to this complaint as Exhibit L.

174.    Abbott Laboratories cited the following medical literature for Similac:

"Similac Special Care 20"

1. Canfield LM, et al. *Eur J* Nutr 2003;42:1 33-141.
2. Schweigert FJ, et al. *Eur J* Nutr2004; 43:39-44.
3. Patton S, et al. *Lipids* 1990;25:159-1 65.
4. Rubin LP, et al. *J Perinatol* 201 2; 32(6):418-424.
5. Mize CE, et al. *AmJ Clin Nutr* 1995;62:385-391 .

"Similac Special Care 24"

1. O'Connor DL, et al. *Pediatrics* 2001;108:359-371.
2. Groh-Wargo S, et al. *Pediatr Res* 2005;57:712-718.
3. Canfield LM, et al. *Eur J Nutr* 2003;42:133-141.
4. Schweigert FJ, et al. *Eur J Nutr* 2004;43:39-44.
5. Patton S, et al. *Lipids* 1990;25:159-165.
6. Rubin LP, et al. *J Perinatol* 2012;32(6):418-424.
7. Mize CE, et al. *Am J Clin Nutr* 1995;62:385-391.

"Similac Special Care 24 High Protein"

1. Ziegler EE. *J Pediatr Gastroenterol Nutr* 2007;45:170-174.
2. Klein CJ. *J Nutr* 2002;132:1395S-1577S.
3. Kleinman RE, Greer FR (eds ). *Pediatric Nutrition*, 7th ed.

Elk Grove Village, IL: American Academy of Pediatrics; 2014:93.
4. Canadian Pediatric Society. *CMAJ* 1995;152(11):1765-1785.
5. Canfield LM, et al. *Eur J Nutr* 2003;42:133-141.
6. Schweigert FJ, et al. *Eur J Nutr* 2004;43:39-44.
7. Patton S, et al. *Lipids* 1990;25:159-165.
8. Rubin LP, et al. *J Perinatol* 2012;32(6):418-424.
9. Mize CE, et al. *Am J Clin Nutr* 1995;62:385-391.

"Similac Special Care 30"

1. Klein CJ. *J Nutr* 2002;132:1395S-1577S.
2. Lewis J, et al. *J Invest Med* 2010;58(2):435. Abstract 283.
3. Canfield LM, et al. *Eur J Nutr* 2003;42:133-141.
4. Schweigert FJ, et al. *Eur J Nutr* 2004;43:39-44.
5. Patton S, et al. *Lipids* 1990;25:159-165.
6. Rubin LP, et al. *J Perinatol* 2012;32(6):418-424.
7. Tsang R, et al (eds). *Nutrition of the Preterm Infant:* Scientific Basis and Practical Guidelines. Cincinnati, OH: Digital Education Publishing Inc., 2005.

175.    None of this literature warns the user that its product causes N.E.C. or death nor provides guidance on how to avoid N.E.C. or death while using its product.

176.    As previously discussed, science and research have advanced in recent years confirming the dangers of the defendant's, Abbott Laboratories, Inc., cow's milk-based ~~cow-based~~ product in causing N.E.C. and death in premature infants, yet the defendant~~s~~ did nothing to change its product, packaging, guidelines, instructions and warnings.

177.    Despite knowing that its product increases the risk of N.E.C. and death, Abbott Laboratories did not warn of N.E.C. or death, nor did it provide any instructions or guidance on how to avoid N.E.C. or death.

178.    Similac Special Care contains bovine or cow's milk-based ~~cow-based~~ formula.

179.    The cow's milk-based ~~cow-based~~ formula product, Similac Special Care 24

kcal/oz High Protein, is dangerous to premature infants in that it significantly increases the risk that the baby will develop N.E.C.

180.    The cow's milk-based cow-based formula product, Similac Special Care 30, is dangerous to premature infants in that it significantly increases the risk that the baby will develop N.E.C.

181.    The cow's milk-based cow-based formula product, Similac Special Care 24 kcal/oz High Protein, is dangerous to premature infants in that it significantly increases the risk that the baby will die.

182.    The cow's milk-based cow-based formula product, Similac Special Care 30, is dangerous to premature infants in that it significantly increases the risk that the baby will die.

183.    The defendant, Abbott Laboratories, Inc., failed to properly warn that its product, Similac Special Care 24 kcal/oz High Protein, can significantly increase the risk that the premature infant will develop N.E.C. and/or death.

184.    The defendant, Abbott Laboratories, Inc., failed to properly warn that its product, Similac Special Care 30, can significantly increase the risk that the premature infant will develop N.E.C. and/or death.

185.    The defendant, Abbott Laboratories, Inc.'s cow's milk-based cow-based formula product did cause the baby, TyLea Hundley, to develop N.E.C., which triggered a pro-inflammatory cascade leading to epithelial barrier disruption, bacterial translocation and transmural necrosis, bowel perforation, and internal bleeding.

186.    Prior to December of 2016, the defendant, Abbott Laboratories, Inc. were aware,

or should have been aware, that its product was not safe for use, as it was used, in the premature infant, TyLea Hundley, yet they took no steps to prevent its use in such a situation.

187.    The defendants, Abbott Laboratories, Inc. did foresee, or should have foreseen, that its product would be used as it was in the case of TyLea Hundley and knew or should have known, that such use would significantly increase the risk of N.E.C. and death in TyLea Hundley, yet it took no steps to prevent such use.

188.    The product, Similac Special Care 24 kcal/oz High Protein, was not safe to be used as it was in the case of TyLea Hundley, and the defendant knew, or should have known, it was unsafe, yet it failed to instruct or warn the FDA, NICUs, hospitals, doctors and parents that its product was not safe.

189.    The product, Similac Special Care 24 kcal/oz High Protein, was not safe to be used as it was in the case of TyLea Hundley and the defendant knew or should have known it was unsafe, yet it failed to provide any instructions or guidelines on when and how its product would be safe to use in a premature infant like TyLea Hundley.

190.    The product, Similac Special Care 30, was not safe to be used as it was in the case of TyLea Hundley, and the defendant knew, or should have known, it was unsafe, yet it failed to instruct or warn the FDA, NICUs, hospitals, doctors and parents that its product was not safe.

191.    The product, Similac Special Care 30, was not safe to be used as it was in the case of TyLea Hundley and the defendant knew or should have known it was unsafe, yet it failed to provide any instructions or guidelines on when and how its product would be safe to use in a

premature infant like TyLea Hundley.

192.     Because the Abbott product is specially designed as food for vulnerable premature infants and contains no warning that it causes death or N.E.C., it is viewed as safe by physicians and parents of premature infants.

**The Marketing by Abbott**

193.     The Defendant, Abbott Laboratories, Inc, have marketed its ~~their~~ products as safe and beneficial for premature infants like TyLea Hundley.

194.     The defendant, Abbott Laboratories, Inc. has ~~have~~ promoted its product for extremely premature infants and claims its product increases the babies' weight and caloric intake and its product is more beneficial than harmful.

195.     The studies show the Abbott products should not be sold for use in extremely premature infants, yet Abbott ~~Mead~~ continued to market and sell its product knowing it would be used on infants like TyLea Hundley and knowing its product would significantly increase the risk of N.E.C. and death in extremely premature infants like TyLea Hundley.

196.     Abbott Laboratories, Inc. has acknowledged the Code of Marketing Breastmilk Substitutes: "We support, educate and encourage mothers to breast-feed for as long as possible, including, where possible, exclusive breast-feeding during the first six months of life and continued breast- feeding up to and beyond two years of age. . . We acknowledge the importance of the World Health Organization's 1981 International Code of Marketing of Breast-Milk Substitutes (the "WHO Code") and subsequent World Health Assembly (WHA) resolutions. We

respect the aim and principles of the WHO Code to contribute to the provision of safe and

adequate nutrition for infants, by: a) the protection and promotion of breast-feeding; and b)

ensuring the proper use of Breast-milk Substitutes, when these are necessary, on the basis of

adequate information and through appropriate marketing and distribution." *Abbott Policy on the*

*Marketing of Infant Formula.*

197.     Despite this assurance and warranty contained in its Policy, Abbott Laboratories,

Inc. has systematically violated the Code's most important provision: "There should be no

advertising or other form of promotion to the general public..."

198.     Notwithstanding the Code of Marketing of Breastmilk Substitutes and Defendant

Abbott's own policy claiming to recognize the Code, advertising of infant formula has remained

pervasive and widespread in the United States. Defendant Abbott aggressively markets and

continues to advertise directly to the new parents by suggesting that by buying these products,

they will be beneficial to their newborns and give them the very best chance of survival. The

pervasive marketing involved, ostensibly prohibited by the Code, has impacted the perceptions

of synthetic, non-human milk derived substitutes, such as formula and fortifier, in such a way

that it lessens the likelihood that a parent of a baby receiving this food in the N.I.C.U. will ask

questions, query about alternatives, or object to its ingestion. In short, Abbott Laboratories, Inc.

has systematically violated the Code's central provision.

199.     Defendant Abbott's marketing strategies go back decades, as the company fights

for their respective market share by encouraging mothers to buy its products for their newborn

infants. The Defendant promoted its products as healthier, necessary for adequate nutrition, and the only appropriate choice for the modern mother. Their advertising has at times attempted to portray breast feeding as an inferior, less sophisticated choice. Often times these strategies discourage mothers from breast feeding.

200.    Defendant Abbott provides its Similac premature infant formulas and fortifiers for free or at a significantly reduced cost to hospitals so that the parents see the products being fed to their babies and then consider the products safe and important to their baby's health so that the parents will continue to purchase Similac when their babies leave the hospital.

201.    Similac liquid formulas and powders are sold at all major supermarkets, drugstores and retail chain stores and costs between $1,200.00 and $1,500.00 to feed one baby Similac for one year.  Surgeon General's Factsheet https://www.hhs.gov/surgeongeneral/reports-and-publications/breastfeeding/factsheet/index.html

202.    Similac Special Care 24 kcal/oz High Protein for premature infants is listed on Abbott's website for $103.99 for a case of forty-eight 2 ounce bottles.

203.    Similac Special Care 30 cal/oz for premature infants is listed on Abbott's website for $83.99 for a case of forty-eight 2 ounce bottles.

204.    Defendant Abbott routinely offers free formula, coupons, and other goodies in "gift baskets" given to mothers by their OBGYNs before birth and after birth in hospitals, medical clinics, and even left at residential charities where out-of-town families have to stay when their babies are being treated for a substantial amount of time in the NICUs of hospitals.

The impetus behind such efforts is to create brand loyalty, and create the appearance of "medical blessing" so that vulnerable parents continue to use formula to feed their babies after they leave the NICU, resulting in great expense to the parents, significant risk for the babies, and substantial profit to Defendant Abbott.

205. Similac marketing tactics were deceptive from the brand's inception. Similac's very name as in "*similar to lactation*" is deceptive in that it likens these cow's milk-based products to breast milk. Beginning with its brand name, Defendant Abbott has continued to perpetuate the false sense that its product is similar to human breast milk. This marketing has altered the perceptions of parents and directly contradicts any type of warnings about the increased risk of NEC that Abbott is not providing directly to the parents in any way.

206. Later, recognizing a shift in the medical community towards an exclusive human milk-based diet for premature infants, Defendant Abbott began developing a product called "Similac Human Milk Fortifier." This name is very misleading in that it suggests that the product is derived from human milk. In fact, it is a cow's milk-based product. Canvasser, J., *et al.* Parent and Provider Perspectives on the Imprecise Label of "Human Milk Fortifier" in the NICU. *Nutrients* 2020, *12*, 720.

207. Defendant Abbot has continuously marketed that its line of products is similar to breast milk. For example, one author found an advertisement for Similac on the back cover of American Baby Magazine, April 2004 issue which made repeated references and comparisons to breast milk. Broussard Hyderkhan, A, *Mammary malfunction: a comparison of breastfeeding and bottle feeding product ads with magazine article content,* 2005.

208.     In addition to perpetuating the myth that Similac is similar to breast milk, Defendant Abbott has also deceived the public into believing that health care providers believe Similac is superior to breast milk or even the ideal choice for babies, and that physicians and institutions endorse the cow's milk-based products.

209.     Beginning in 1989, Abbott Laboratories, Inc. began using claims in its advertising that Similac was "first choice of more physicians."

210.     Although the claim did not specifically compare itself to breast milk, a plain interpretation of this claim is that physicians believe Similac is the "1st choice," naturally implying that it is superior even to breastfeeding.

211.     Beginning in 1995, Abbott Laboratories, Inc. began a heavy marketing campaign which featured "1st choice of Doctors" on all its infant formula product labels.

212.     A marketing report commissioned by Abbott Laboratories, Inc. in March, 1998 summarized consumer reactions to several informational advertising pamphlets on Similac. The one stressing the "1st Choice of Doctors" claim scored highest in terms of consumers' likelihood of purchase. The report concluded: "Doctor recommendations and the 'science' behind the formula appeared to drive purchase interest for this concept, as well as the other concepts tested," and use of similar pieces emphasizing the claim was "highly recommended." By advertising that Similac is both similar to breast milk and the first choice of physicians, Defendant Abbott created a false sense of security to physicians and parents that its premature infant products are tested and proven to be safe and effective.  Parents do not even consider such a well-known and widely distributed product for babies could ever be unsafe or cause their baby

to suffer a horrible disease and die.

213.     With the proliferation of the internet, the Defendants have updated their tactics to advertise heavily on the internet and through their websites.

214.     Defendant Abbott offers new mothers "Similac StrongMoms Rewards" on their website, advertising up to "$400 in great offers" and even though the fine print says that "offers may vary," they advertise providing "formula samples, information about your baby's milestones, and a free Shutterfly photobook," and note: "It's Fast and FREE" to join (Exhibit M).

215.     The Defendant, Abbott Laboratories, Inc. has developed a psychological digital advertisement campaign which attempts to create a perception of "mommy wars." One advertisement, which received significant attention, was called *The Mother 'Hood.* In this ad, Abbott tries to depict a gang war between mostly mothers and a few fathers arguing about the best way to take care of their babies. The ad is effective in so much as it is manipulative. The advertisement, at one point depicts three "bottle feeding moms," and one of them proclaims: "Oh look, the breast police have arrived." The ad then depicts the "breastfeeding moms" with arrogant and superior appearing faces, and even disdainful mannerisms, with one of the moms proclaiming in a condescending voice, "100% breast fed - straight from the source," and a second mom grasping her breast in a profane manner. The negative portrayal of breastfeeding moms is subtle, but powerful, and casts the breastfeeding moms as judgmental and nasty, while portraying the bottle-feeding moms as nurturing victims. At the end, they all come together to rescue a baby in an errant stroller rolling down a hill, and the ad says, "Welcome to the

sisterhood of motherhood" before closing with their product name and new hash tag, reinforcing the idea that formula is good.

www.youtube.com/watch?list=RDJUbGHeZCxe4&v=JUbGHeZCxe4&feature=emb_rel_end

216.    Another advertisement titled "The Judgment Stops Here," is a documentary-style ad that purports to encourage mothers to come together and put aside judgment of one another's choices. However, the ad is manipulative, deceptive and violative of the Code and Defendant Abbot's own marketing policy, in that it puts breast milk and formula on an even playing field, and attempts to chastise any judgment that might be cast in favor of what is clear scientific judgment. In other words, the ad attempts to insulate Similac from criticism or judgment, under the guise of reducing judgment for moms who primarily use infant formula, when, in fact, criticism is wholly appropriate from a scientific standpoint.

217.    In an advertisement for a Similac product, the ad states "when you are ready to turn to infant formula, but you don't want to compromise, look to Pure Bliss by Similac. *It's modeled after breast milk…*" www.youtube.com/watch?v=kRaHiTMyYXs .

218.    Moreover, Abbott Laboratories, Inc. has also attempted to market its products specifically to *premature infants*, who are the infants at highest risk from the dangers of the product. In 1978, Abbott Laboratories, Inc. began marketing "Similac 24 LBW", specifically for premature infants, claiming that the product was "introduced to meet the special needs of premature infants." In 1980, Abbott Laboratories, Inc. began marketing "Similac Special Care" claiming it was the first low-birth-weight, premature infant formula with a composition designed to meet fetal accretion rates." In 1988, Abbott Laboratories, Inc. introduced and began

marketing Similac Special Care with Iron, claiming it "was the first iron-fortified formula for premature and low-birth-weight infants introduced in the US."

219.    As of 2016, Defendant Abbott marketed and sold seven products specifically targeting "Premature/Low birth-Weight Infants": Similac Liquid Protein Fortifier, Similac® NeoSure®, Similac® Human Milk Fortifiers, Similac® Special Care® 20, Similac® Special Care® 24, Similac® Special Care® 24 High Protein, and Similac® Special Care® 30.

220.    On Defendant Abbott's web page for the product, Similac Human Milk Fortifier, there is no mention of the risk of necrotizing enterocolitis. The web page tells potential buyers that this product results in "improved growth for your littlest babies." The web page expressly and implicitly represents that its cow's milk-based products are safe for use with premature infants. This is false and misleading.

221.    The website for Similac's line of premature infant formulas asks the question, "What important baby formula ingredients should Moms be aware of?" But is extremely misleading in that it omits that moms should be aware of cow's milk because of how dangerous it is for premature infants (Exhibit N).

222.    The website for the premature Similac products states that their formula is "backed by science – nutrition you can trust." And, "more than 90 years of innovation, generations of strong starts." (Exhibit N). These statements create the false idea in consumers' minds that Defendant Abbott's Similac products are backed by the latest science and are the products of constant innovation, when in fact, as the previously referenced peer-reviewed scientific studies show, Similac cow's milk based preterm infant formulas and fortifiers are not

backed by up-to-date science and are based on practices common in the 20th century, accordingly these statements are false and misleading.

223.    Another advertisement from Defendant Abbott's website states that it has, "a spirit of innovation since 1925, and has not stopped since…so, whether you choose to formula feed or, to supplement breast feeding with formula, you can be confident in the nourishment of Similac." (Exhibit O) The representation to parents that they can be "confident" is in direct contradiction of the studies that indicate the cow's milk-based formula is dangerous to premature infants. Accordingly, it is false and misleading.

224.    Additional misleading statements made by defendant Abbott Laboratories, Inc. on their website include the following:

a.    "To nourish the journey of parents and their baby." (Exhibit P)

b.    "We promise to give your baby the best." (Exhibit P)

c.    "Proper nutrition helps your baby grow strong." (Exhibit Q)

225.    These statements to parents that Defendant Abbott's Similac products are safe, beneficial, and in fact the best choice for infant nutrition are in direct contradiction of the studies that indicate cow's milk based formulas and fortifiers are dangerous to premature infants. Accordingly, they are false and misleading.

226.    On its website, Defendant Abbott also has a drop-down menu which mothers can use to help choose the formula Abbott recommends. One of the key questions it asks is whether the child was born prematurely. By clicking yes, the website directs the mother to

another page about Similac NeoSure, another cow's milk based product. Abbott claims that Similac NeoSure "supports excellent growth in premature babies' gains in weight, length, and head circumference when compared to these gains in preterm babies fed term formulas."

227.    This webpage makes numerous representations specific to premature infants. For example, Similac "Promotes catch-up growth during your premature baby's first 12 months" and states that "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." There is no reference on this page to the risks associated with Abbott Laboratories, Inc.'s product in terms of causing N.E.C. The promotional website misleads parents of premature infants to believe that Abbott Laboratories, Inc.'s product is optimal for premature infants. This is false and misleading.

228.    The website of Abbott Laboratories, Inc. also has purported reviews from mothers whose premature infants were in the NICU. The reviews all discuss how wonderful and safe the Similac products were for their babies. There are no mother reviews discussing N.E.C. or death. This is false and misleading as it suggests to these vulnerable mothers that the cow's milk-based products are safe to use for their infants, and is perpetuated by Defendant Abbott. Defendant Abbott has designed a plan to induce mothers to continue to purchase their cow's milk-based products after leaving the NICU, at great expense.

229.    CBS news reported that Defendant Abbott has even paid mom bloggers to give

positive reviews of Similac products.

230.     Defendant Abbott specifically target parents of preterm infants in their

marketing. For example, a Google search "feeding preemies formula," reveals a paid

advertisement on the first page for Similac, with the heading "For Babies Born Prematurely."

The web-based advertisement states "Your premature baby didn't get her full 9 months in the

womb, so her body is working hard to catch up. During her first full year, feed her Similac

NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support

her development." The advertisement further claims that it is "pediatrician recommended" and

the "#1 brand fed in Hospitals" and incredulously, that it is "backed by science and "nutrition

you can trust." The advertisement makes no reference to specialized need preterm infants have

for human breast milk, and it makes no mention of the risk of developing N.E.C. or other health

problems (Exhibit R)

231.     The Defendant has designed competing, systematic, and powerful marketing

campaigns to cause mothers to believe that: (1) cow's milk-based formula and fortifier is safe;

(2) cow's milk-based products are equal, or even superior, substitutes, to breast milk; (3)

physicians consider their cow's milk-based products a first choice; and (4) hospitals feed their

premature patients Enfamil and Similac which falsely creates a culture of commonality and

safety.  Similarly, the Defendants have marketed their products for premature infants as

necessary for growth, and perfectly safe for premature infants, despite knowing of the extreme

risks posed by cow's milk-based products and failing to warn of the deadly disease of N.E.C.

and risk of death.

232.    Thus, despite the existence of alternative and safe human milk-based formulas and fortifiers, Defendant Abbott continues to market and/or sell its cow's milk-based products under the guise of being safe for newborns and despite knowing the significant health risk posed by ingesting these products, especially to extremely preterm, extremely low weight infants, like TyLea Hundley.

233.    Over their lifetime, the parents, Tomika Knight and Tyrese Hundley, had been exposed to advertising and marketing by Defendant Abbott that the product "Similac" was safe, nutritious, and important for their baby. The parents were aware that Similac was being fed to their baby, yet no one informed them it carried significant risks. Had the parents, Tomika Knight and Tyrese Hundley, been made aware of the facts, data, and science that linked Similac to N.E.C. and death, they would not have allowed their daughter to be fed Similac.

234.    Members of the medical community, physicians, and hospitals, as well as the parents, Tomika Knight and Tyrese Hundley, relied upon the representations and advertising of the defendant, which categorically omit that their cow's milk-based products significantly increase the risk of N.E.C. and death in infants, which contributed to the product being fed to TyLea Hundley.

**The Practice of Silence by Abbott: No Warnings, No Instructions, and No Information Provided to the Parents**

235.    Abbott knew or should have known that its product would be used in the way it

was used on this baby.

236.     The way in which the Abbott product was fed to the baby was extremely
dangerous and caused an unreasonably high risk that the baby would develop N.E.C. and die, yet
Abbott provided no detailed instructions or warnings to prevent or alter the way this product was
used.

237.     Despite learning that its product was linked to N.E.C. and death, Abbott failed to
properly collect data from patients, parents, doctors and hospitals in order to develop evidence
based strategies, instructions, and warnings to reduce or prevent its product from causing N.E.C.
and death.

238.     Despite knowing its product was leading to N.E.C. and death, Abbott took no
steps to determine how or why its product was causing N.E.C. or death, nor did it conduct a
comprehensive risk management plan to combat the tragic end results of using its products.

239.     The defendant, Abbott Laboratories, Inc. has learned that its cow based product
was causing N.E.C. and death in premature infants, yet the defendants did nothing to change its
product, packaging, guidelines, instructions and warnings.

240.     Despite knowing that its cow-based product was causing N.E.C. and death in
premature infants, the defendant, Abbott Laboratories, Inc. did not conduct any testing, data
analysis, or research to determine when its product should not be used or when and how its
product was safe for use.

241.     Despite knowing that its product was causing N.E.C. and death in premature

infants, the defendant, Abbott Laboratories, Inc. did not contact the FDA to inform them its product was linked to causing N.E.C. and death.

242.    The mother saw the product containers and was aware that formula was being fed to her daughter.

243.    The mother was never told that the formula could cause her baby to develop N.E.C. and death.

244.    The mother was never told that the formula could cause her baby to die.

245.    The mother was never told of the studies showing cow-based formula was extremely dangerous to her baby.

246.    The mother was never told of the studies showing human donor milk was safer for her baby.

247.    The mother, Tomika Knight, was aware Similac products were being fed to her baby.

248.    The father, Tyrese Hundley, saw the product containers and was aware that formula was being fed to his daughter.

249.    The father, Tyrese Hundley, was never told that the formula could cause his baby to develop N.E.C. and death.

250.    The father, Tyrese Hundley, was never told that the formula could cause his baby to die.

251.    The father, Tyrese Hundley, was never told of the studies showing cow-based

formula was extremely dangerous to his baby.

252.    The father, Tyrese Hundley, was never told of the studies showing human donor milk was safer for his baby.

253.    The father, Tyrese Hundley, was aware Similac products were being fed to his baby.

254.    Because the brand name "Similac" is marketed as safe and healthy and similar to breast milk, and is regularly sold in stores and used in hospitals, the parents did not question the safety of the product.

255.    The parents had been strong advocates involved in their infant's care throughout her life.

256.    The parents wanted to know and desired to be participants in all decisions regarding the health and safety of their daughter and wanted to be provided an informed choice on all risks and benefits of medical care and treatment.

257.    Had either one of the parents known of the significant risks of feeding Similac to their premature infant, they would not have allowed the product to be fed.

258.    Neither the hospital nor the physicians involved in the care of the infant informed either parent that Similac cow's milk-based products could significantly increase the risk of N.E.C. or death in their infant.

259.    The hospitals and physicians involved in the infant's care never informed the mother or father that Similac cow's milk-based products could significantly increase the risk of

N.E.C. or death to their daughter.

260.    Neither the hospital nor the physicians provided a choice to the mother or the father to feed their premature infant cow's milk-based fortifier or formula. This practice of not telling the parents of the risks of feeding cow's milk-based Similac formula or fortifier is the common practice throughout the country. Abbott is aware of this practice and is aware that parents are rarely, if ever, informed.

261.    Defendant Abbott has known for many years that its premature infant products, Similac, are significantly increasing the risk of premature infants developing N.E.C. and dying and are aware that hospitals and physicians around the United States are not informing the parents of this risk of N.E.C. developing when fed their formula.

262.    Abbott knows that if they required or even requested the hospitals or doctors to obtain an informed consent regarding the risks of feeding their products to their premature infant patients, the parents would not allow Similac to be fed to their children.

263.    Abbott knows that if they required or even requested on their product labels that their premature infant formulas Similac should not be fed to a premature infant until the parent is warned and informed that feeding a product could significantly increase the risk of N.E.C. or death then the use of the Similac products would immediately plummet in hospitals across the country because the truth and the science would finally be brought to light, and the parents would not allow the products to be fed to their infant.  The brand name Similac would forever be associated with N.E.C. and death to the detriment of the Corporate image of Abbott.

264.     If the hospital or physicians had informed either parent, or if Abbott had required or even requested the hospitals or physicians inform the parents that the Similac products for premature infants could significantly increase the risk of N.E.C. or death to their daughter, the parents, Tomika Knight and Tyrese Hundley, would not have allowed the cow's milk-based products to be fed to their infant and TyLea Hundley would not have suffered N.E.C. and would have survived.

265.     In exchange for free or low-priced products to the hospital, Abbott expects that hospitals and physicians will routinely feed these cow's milk-based products to infants with no warnings, instructions and/or consents.

266.     For decades, Abbott has known that there is a complete lack of communication between physicians and parents when it comes to the feeding of the defendants' Similac products to preterm infants. Abbott has done nothing to fix this dangerous practice of silence. Unfortunately the effect of this practice is that premature infants have been needlessly succumbing to N.E.C. and dying after being fed the defendant's products and the parents have no idea why.

267.     Essentially what occurs, is that these parents who love and cherish their child, witness them suffering from the horrible disease of N.E.C., often resulting in large portions of their intestines being removed and placed in a bag outside of their body, becoming septic, and often dying in their arms, without ever being told that the defendants products are known to significantly increase this disease.  The parents never even consider that the defendant's well-

known product, Similac, could be responsible for the injury or loss to their child.

268.    The FDA requires manufacturers of prescription medications to study their medications and perform drug trials and collect data to determine the safety and efficacy of their drugs and to determine the likelihood of side effects and to continuously study the drug's use to review adverse outcomes and create proper warnings and instructions; however because baby formulas, such as Similac Special Care, are not drugs, the manufacturer,  Abbott does not perform such trials and does not collect data on when and how the formula should be fed. Despite knowing for decades that the products are significantly increasing N.E.C. and death in premature infants, and are far more dangerous than most prescription drugs, Abbott is doing nothing to stop or lessen N.E.C. or death.

269.    If Abbott had performed the pharmacovigilance required by drug manufacturers for their premature infant formulas and fortifiers, these products would not have been fed to TyLea Hundley and she would not have developed N.E.C. and she would have survived.

270.    The manufacturer Abbott has known that their Similac products are significantly increasing the risk of N.E.C. and death in premature infants and are aware that there are alternatives to their cow's milk-based formulas and fortifiers, such as human milk derived products, that would reduce the risk of N.E.C. and death, yet they chose to continue to promote, market, and sell their products, causing thousands of premature infants to succumb to N.E.C. and die.

271.    The products made from cow's milk, specifically for premature infants by

Similac are unsafe to premature infants and are avoidable for use in that there is human donor milk available and/or human milk derived fortifier products available made from human milk instead of cow's milk.

272.    Despite knowing that its cow-based product was causing N.E.C. and death in premature infants, Abbott Laboratories, Inc. did not recommend to the FDA, hospitals, NICUs or physicians that they should discuss the risks of N.E.C. or death with the parents.

273.    The mother and father believed the formula products would help their baby, not harm their baby.

274.    Despite knowing that its product was causing N.E.C. and death in premature infants, the defendant, Abbott Laboratories, Inc. did not contact the FDA, NICUs, hospitals, and physicians to inform them its cow-based product was linked to causing N.E.C. and death.

275.    Despite knowing for many years that numerous scientific studies were showing horrible adverse affects of its Similac products in premature infants, the defendant Abbott failed to undertake a rigorous risk management plan, periodic safety update reports, periodic benefit-risk reports, and development safety reports.

276.    If hospitals and physicians had been provided full disclosure of the data and science regarding the risks of N.E.C. and death, or when it occurs, or instructions on how to avoid that (as if it were a drug), or a statistical data-based risk-benefit analysis, or were required or requested by the manufacturers to inform the patient as is ethically required with drugs, then neither Similac would not have been fed to TyLea Hundley and she would not have developed

N.E.C. nor died but would have survived.

277.    The defendant, Abbott Laboratories, Inc., is liable to the plaintiff under the

Connecticut Product Liability Act, Conn. Gen. Stat. Section 52-572m, et seq. in one or more of

the following ways:

A.  Failure to Warn and/or Instruct

    a.  The defendant knew or should have known that its cow's milk-based premature infant formula product would be used, as it was, on extremely premature infants like TyLea Hundley, yet it failed to properly warn hospitals, NICUs, doctors, parents and/or consumers that its cow-based product significantly increases the risk of N.E.C. and death in these babies; and/or

    b.  Was unsafe and/or contra-indicated for extremely premature infants like TyLea Hundley; and/or

    c.  Failed to provide proper instructions or guidelines or studies, or data on when and how to feed its product to premature infants in order to decrease the risk of N.E.C. and/or death; and/or

    d.  Failed to insert a warning or instruction that parents needed to be provided an informed choice between the safety of human milk versus the dangers of the defendant's cow's milk-based product; and/or

    e.  Failed to provide instructions that parents needed to know that the defendant's product carried a significant risk that its cow's milk-based product could cause their baby to develop N.E.C. and die; and/or

    f.  The warnings and instructions are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn on cow's milk-based formula significantly involving the risk of N.E.C. and death or providing any details on how to avoid such harm; and/or

    g.  Failed to have a large and prominent "black box" type warning that its cow's milk-based product is known to significantly increase the risk of N.E.C. and death when compared to Human Milk in premature infants; and/or

    h.  Failed to provide well researched and well-established studies that linked its cow's milk-based product to N.E.C. and death in premature infants; and/or

    i.  Failed to cite to or utilize current up to date medical data on the proper and safe use of its product; and/or

    j.  Failed to instruct physicians not to feed infants under 1,000 grams; and/or

    k.  Failed to instruct physicians not to feed infants at 26 weeks 6 days; and/or

l.  Failed to instruct physicians on when or how to transition to 100% cow's milk-based formula; and/or

m. Failed to provide prominent and proper warnings and/or instructions that it's product significantly increases the risk of the following:  N.E.C., R.O.P. (retinopathy of prematurity), late onset sepsis, cerebral palsy, bronchopulmonary dysplasia, and death; and/or

n.  Failed to require or recommend hospitals and/or physicians inform parents that their product significantly increases the risk of N.E.C. and death before allowing the product to be fed to their premature infants

o.  Failed to provide a thorough and detailed risk-benefit analysis for hospitals, doctors, and parents; and/or

p.  Failed to establish a standard for safe use; and/or

q.  Failed to establish a label or instruction that would correspond to the current science regarding the positive risk-benefit profile; and/or

r.  Failed to provide statistical evidence of adverse effects regarding the feeding of its product; and/or

s.  Failed to guide or instruct on when to start, how much to start, how to increase, volume and timing of feeds, when not to feed, and/or when to stop feeding its product to premature infants; and/or

t.  Failed to guide or instruct on how to properly monitor a preterm infant who is fed he product; and/or

u.  Failed to instruct or warn that an exclusive human milk based diet significantly decreases the risk of N.E.C. when compare to a cow's milk diet; and/or

v.  Failed to provide periodic or yearly safety reports; and/or

w. Failed to provide periodic or yearly risk-benefit analysis for use of its product; and/or

x.  Failed to provide or produce yearly safety update reports; and/or

y.  Failed to develop comprehensive mitigation strategies to reduce the risk of N.E.C. and death in its products specifically designed for premature infants; and/or

z.  Failed to develop a protocol for hospitals and physicians with the elements to assure safe use; and/or

aa. Failed to provide detailed and adequate instructions on proper use, administration, application, and limitations of its products specifically designed for premature infants; and/or

bb. Failed to condition the products sale or delivery to the hospital with the assurance that the hospital would issue proper warnings of N.E.C. and death to the parents.

B.  Strictly Liable for Defective Product

a. Despite knowing that its product would be used on extremely premature infants, like TyLea Hundley, and despite knowing (or should have known) that such use was unreasonably dangerous to extremely premature infants in that its cow based product was significantly increasing the risk of N.E.C. and death, the defendant continued to sell and market its defective product to extremely premature infants; and/or

b. Over the last several years, scientific data and well researched studies have concluded that the cow based product of the defendant carried unreasonable risks of N.E.C. and death, which far outweighed the product's benefits, yet the defendant continued to market and sell its defective product for extremely premature infants like TyLea Hundley; and/or

c. Failed to develop a human-based milk product which was safer for extremely premature infants; and/or

d. Failed to properly reformulate its product to reduce the risks of N.E.C. and death; and/or

C.  Negligence

Despite knowing that its product was significantly increasing the risk of N.E.C. in premature infants, the defendant was careless and negligent and failed to act as a reasonably prudent manufacturer of premature infant formula in one or more of the following ways:

a. Failing to collect data to determine if its product was safe for premature infants; and/or

b. Failing to collect data to determine when and how its product could be used safely; and/or

c. Failing to utilize the significant peer reviewed research to develop instructions and/or warnings on how and when its product should be used in order to protect babies from N.E.C. and death; and/or

d. Failing to develop evidence-based guidelines or instructions to decrease the risk of its product causing N.E.C. and death; and/or

e. Failing to provide evidence-based guidelines or instructions to decrease the risk of its product causing N.E.C. and death; and/or

f. Failing to stop or deter its product from being fed to extremely premature infants like TyLea Hundley; and/or

g. Failing to provide evidence based instructions or guidance on when or how an extremely premature infant should be transitioned to the defendant's product; and/or

h. Failed to continuously and vigorously study its cow's milk-based ~~cow based~~ product in order to avoid N.E.C. and death in premature infants; and/or

i.   Failing to send out letters with warnings to hospitals, NICUs and doctors that its product was significantly increasing the risk of N.E.C. and death in premature infants; and/or

j.   Failing to send out letters with instructions to hospitals, NICUs and doctors on when and how its product should be used to avoid N.E.C. and death; and/or

k.   Failing to market and/or sell its product in a way which would protect the premature infants from N.E.C. and death; and/or

l.   Failed to provide proper training or information to health care providers for safe use of its product; and/or

m.   Failed to take reasonable precautions to prevent premature infants from developing N.E.C. or dying; and/or

n.   Failed to develop a human milk based premature infant formula; and/or

o.   Failed to develop or reformulate its product to make it safer for premature infants; and/or

p.   Failed to properly or promptly notify the FDA that its cow-based product was significantly increasing N.E.C. and death in premature infants; and/or

q.   Failed to exercise proper pharmacovigilance for a product which was significantly more dangerous than most prescription drugs; and/or

r.   Improperly promoted and marketed its Similac brand for premature infants to physicians as safe and necessary for growth when in fact, its product was extremely dangerous; and/or

s.   Improperly promoted and marketed its Similac brand for premature infants to parents as safe and necessary for growth when in fact, its product was extremely dangerous; and/or

t.   Improperly created agreements with hospitals whereby its products would be over utilized to the detriment of the premature infants; and/or

u.   Improperly promoted continued use of its product in hospitals despite knowing of the great harm it was causing; and/or

v.   Improperly provided free and/or reduced Similac products to hospitals which has caused significant harm to premature infants across the United States; and/or

w.   Failed to properly work with the FDA on developing ways to reduce N.E.C. and death when it's products were fed to premature infants; and/or

x.   Failed to provide a thorough and detailed risk-benefit analysis for hospitals, doctors, and parents; and/or

y.   Failed to establish a standard for safe use; and/or

z.   Failed to establish a label or instruction that would correspond to the current science regarding the positive risk-benefit profile; and/or

aa.   Failed to provide statistical evidence of adverse effects regarding the feeding of its product; and/or

bb. Failed to guide or instruct on when to start, how much to start, how to increase, volume and timing of feeds, when not to feed, and/or when to stop feeding its product to premature infants; and/or

cc. Failed to guide or instruct on how to properly monitor a preterm infant who is fed he product; and/or

dd. Failed to instruct or warn that an exclusive human milk based diet significantly decreases the risk of N.E.C. when compare to a cow's milk diet; and/or

ee. Failed to provide periodic or yearly safety reports; and/or

ff. Failed to provide periodic or yearly risk-benefit analysis for use of its product; and/or

gg. Failed to provide or produce yearly safety update reports; and/or

hh. Failed to develop comprehensive mitigation strategies to reduce the risk of N.E.C. and death in its products specifically designed for premature infants; and/or

ii. Failed to develop a protocol for hospitals and physicians with the elements to assure safe use; and/or

jj. Failed to provide detailed and adequate instructions on proper use, administration, application, and limitations of its products specifically designed for premature infants; and/or

kk. Failed to condition the products sale or delivery to the hospital with the assurance that the hospital would issue proper warnings of N.E.C. and death to the parents; and/or

ll. Failed to properly perform a type of pharmacovigilance for the science relating to the collection, detection, assessment, monitoring, and prevention of adverse effects for its premature baby formula and fortifiers; and/or

mm. Failed to properly and thoroughly identify the hazards associated with its products to minimize its risks to premature infants

nn. Failed to take reasonable steps to protect premature infants from developing N.E.C. and death when feeding their products; and/or

oo. Continued to utilize outdated and ineffective instructions and warnings knowing they were inadequate based in modern science; and/or

pp. Failed to properly work with physicians and hospitals on developing ways to reduce N.E.C. and death when its products were fed to premature infants; and/or

qq. Intentionally promoted a culture of silence whereby the harmful effects of its products were never being communicated to the parents or the public; and/or

rr. Despite knowing for many years that the most vulnerable humans were suffering extreme harm related to the feeding of its products, failed to perform the necessary scientific process of collection, detection, assessment, monitoring, and prevention of these adverse effects of feeding its products.

D.  Misrepresentation

    The defendant misrepresented that its cow-based product was safe and beneficial for premature infants when it knew or should have known that its product was unreasonably dangerous and causing N.E.C. and death in premature infants.

E.  Breach of Warranty

    The defendant expressly or impliedly breached its warranty that its product was safe to be fed to premature infants, when, in fact, it was extremely dangerous.

F.  Reckless Disregard – Punitive Damages

    a.  In violation of Conn. Gen. Stat. Section 52-240b the defendant was reckless in that it continued to market and sell its cow-based product to premature infants when it knew its product was causing death and N.E.C. in these babies; and/or

    b.  Intentionally ignored or avoided the more recent scientific data and studies concluding that its product was causing N.E.C. and death so that it could continue to profit from the sale of its product; and/or

    c.  Intentionally failed to take protective measures it knew would save premature infants from developing N.E.C. and/or dying; and/or

    d.  Intentionally allowed NICUs, hospitals, and doctors to utilize different feeding strategies instead of developing an evidence based nationwide safety plan to prevent its product from causing N.E.C. and death in premature infants; and/or

    e.  Continued to claim its product was beneficial to the growth of extremely premature infants when it knew its cow-based product was unnecessarily causing N.E.C. and death in these babies; and/or

    f.  Deliberately withheld important data to the FDA that its product was causing N.E.C. and death in premature infants; and/or

    g.  Failed to promote human based milk and instead continued to promote its dangerous cow-based product for premature infants because it did not have a human based product it could sell; and/or

    h.  Intentionally promoted a national culture of silence whereby the devastating effects of its Similac premature infant formulas and fortifiers were never communicated to the parents or the public.

278.     As a result and proximate cause, the baby, TyLea Hundley, was fed the defendants cow's milk-based product causing the baby to develop N.E.C., which caused the baby's bowels to die and perforate, causing extreme pain, suffering, mental and emotional anguish and distress and ultimately death.

279.     As a further result, the baby was required to undergo and incur medical care and costs and an unsuccessful emergency bedside surgery, where her bowels were opened and she died.

280.     As a further result, she lost her ability to live and grow and enjoy life and participate in all of life's activities.

281.     Also, she lost her ability to earn wages and benefits and suffered an Economic loss.

282.     Also, her Estate incurred burial and funeral expenses.

WHEREFORE, Plaintiff demands:

a)    Fair, just and adequate money damages;
b)    As to the reckless allegations, punitive damages up to twice the damages pursuant
       to 52- 240b; and
c)    Such other relief as the Court deems just and proper.

                              THE PLAINTIFF


                              By
                              Stephen M. Reck
                              The Law Firm of Stephen M. Reck and Scott D.
                              Camassar, LLC
                              P.O. Box 431
                              North Stonington, CT 06359
                              860-535-4040
                              860-535-3434 facsimile
                              attorneyreck@yahoo.com
                              Juris No. 405481
                              Dated _____

## **CERTIFICATION**

I hereby certify that on this ____ day of February, 2021, the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Stephen M. Reck 405481

Stephen M. Reck