UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KEVIN FERRY, AS ADMINISTRATOR
OF THE ESTATE OF TYLEA HUNDLEY,

Plaintiff

v.

MEAD JOHNSON & COMPANY, LLC,
MEAD JOHNSON NUTRITION COMPANY,
and ABBOTT LABORATORIES, INC.,

Defendants.

Civil Action No. 3:20-cv-00099-SRU

Chief Judge Stefan R. Underhill

April 23, 2021

**MEMORANDUM OF LAW IN SUPPORT OF ABBOTT'S
MOTION FOR EVIDENTIARY HEARING
REGARDING POTENTIALLY SANCTIONABLE CONDUCT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................................1

BACKGROUND ..................................................................................................................4

      A.     Advertising to generate lawsuits .................................................................4

      B.     Counsel and Kevin Ferry ............................................................................6

      C.     The present case ..........................................................................................7

      D.     Voluntary dismissals in several cases.......................................................10

      E.     The *Hunte* case .......................................................................................12

ARGUMENT.......................................................................................................................12

    I.     There is good cause to believe that Counsel's conduct may be sanctionable .......12

      A.     Counsel's advertising appears to be misleading and may violate ethical rules .........................................................................................13

      B.     Counsel may have used the estate administrator to enable vexatious litigation. ....................................................................................15

      C.     Counsel's voluntary dismissals appear to show vexatious conduct..........17

    II.    This Court should hold a short evidentiary hearing if necessary to determine whether sanctions are appropriate .......................................................19

CONCLUSION....................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ball v. A.O. Smith,*
   451 F.3d 66 (2d Cir. 2006) ..................................................................................................19

*Chambers v. NASCO,*
   501 U.S. 32 (1991)...............................................................................................................12

*Cooter & Gell v. Hartmarx,*
   496 U.S. 384 (1990)..............................................................................................................18

*Gollomp v. Spitzer,*
   568 F.3d 355 (2d Cir. 2009) ................................................................................................12

*Gschwend v. Abbott Labs.,*
   No. 21-cv-2151-JPM-cgc (W.D. Tenn.).............................................................................11

*Holley v. Gilead Scis.,*
   2021 WL 940594 (N.D. Cal.) ..............................................................................................13

*Hunte v. Abbott Labs.,*
   No. 3:20-cv-1626-SRU.................................................................................................*passim*

*Jeffrey C. Stone v. Greenberg Traurig,*
   2011 WL 995930 (D. Ariz.)..................................................................................................17

*Lee v. Hilco Trading,*
   2019 WL 10303702 (D. Conn.) ............................................................................................18

*Lugo v. Rapuano,*
   2007 WL 356024 (Conn. Super. Ct.) ...................................................................................15

*Polaris Images v. CNN,*
   365 F. Supp. 3d 340 (S.D.N.Y. 2019) ..................................................................................17

*Ransmeier v. Mariani,*
   718 F.3d 64 (2d Cir. 2013) ..................................................................................................12

*Rinehart v. Abbott Labs.,*
   No. 21-cv-805-SDG (N.D. Ga.)...........................................................................................11

*Thompson v. Fla. Bar,*
   2010 WL 5497673 (M.D. Fla.) .............................................................................................17

*Ziemba v. Lynch*,
    2011 U.S. Dist. LEXIS 71591 (D. Conn.) ........................................................................... 19

**Statutes**

28 U.S.C. § 1927 ............................................................................................... 1, 12, 16, 18

Conn. Gen. Stat. § 45a-303 ........................................................................................ 15

**Other Authorities**

12 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
    § 2982 (2d ed. 1997) ........................................................................................... 16

Connecticut Rule of Professional Conduct 7.1 ........................................................ 13

Connecticut Rule of Professional Conduct 7.2 ........................................................ 14

Connecticut Rule of Professional Conduct 7.3 ........................................................ 14

D. Conn. L. Civ. R. 11 ................................................................................................ 19

D. Conn. L. Civ. R. 16(g)1 ......................................................................................... 13

D. Conn. L. Civ. R. 83.2(a)1 ...................................................................................... 13

Fed. R. Civ. P. 11 ........................................................................................................ 18

Fed. R. Civ. P. 23(e) .............................................................................................. 15, 16

Fed. R. Civ. P. 23.1(c) ................................................................................................ 16

Fed. R. Civ. P. 23.2 ..................................................................................................... 16

Fed. R. Civ. P. 30(b)(6) ................................................................................................ 8

Fed. R. Civ. P. 41(a)(1)(A) ..................................................................................... 15, 16, 18

Fed. R. Civ. P. 66 ........................................................................................................ 16

Statewide Grievance Committee, *Internet Advertising Regarding Illegal Phone
    Calls,* Advisory Opinion 14-03932-A, *available at*
    jud.ct.gov/sgc/Adv_opinions/Adv_14-03932-A.pdf ........................................... 13

## INTRODUCTION

Counsel for Plaintiff voluntarily dismissed this case. That may seem like an ordinary procedural development, one that a defendant and the Court should not question. In this case, however, it is anything but ordinary. Counsel is pursuing a much larger litigation agenda in which this is only the first of many cases. To further that agenda, Counsel appears to have abused and indeed co-opted this Court's processes, first by vexatiously litigating this case and resisting the Court's orders, and then, when this Court refused to go along with a fifth amended complaint, by suddenly dropping this case in favor of another—the *Hunte* case, which is also pending before this Court.

Abbott has uncovered information that suggests this case may have been a sham since the start. Lurking behind the voluntary dismissal are potential abuses of the judicial process in three areas: (a) apparently misleading advertisements, conducted through a front company, which Counsel may have used to entice bereaved parents to sue; (b) a longtime friend of Counsel in the role of a seemingly non-independent estate administrator, who may have abandoned this case and the infant's estate for reasons other than the dubious one Counsel gave this Court; and (c) 15 months of unreasonable litigation conduct. That vexatious conduct was capped by using a voluntary dismissal to try to force the "disjointed and rambling" complaint that this Court refused to allow to go to the Connecticut Supreme Court in the present case to go there in *Hunte* instead. The voluntary dismissal confirmed that all of the effort this Court and Abbott put into this case for well over a year was a waste, resulting from Counsel's strategic use of the Court's processes to further a larger litigation agenda.

Accordingly, Abbott moves the Court for a hearing to determine whether sanctions are appropriate, under the Court's inherent power and 28 U.S.C. § 1927. As set forth below, there is

no question that this Court retains jurisdiction to address a motion for sanctions arising out of a voluntarily dismissed case. Abbott reluctantly files this motion to bring Counsel's conduct to the Court's attention and ask the Court to conduct a short evidentiary hearing to provide a factual foundation for evaluating Counsel's conduct, and thus to determine whether sanctions are appropriate. Well before filing this motion, Abbott provided to Counsel and the Court's clerk a courtesy notice that it was coming.

As noted above, the conduct falls into three areas. Each independently—and especially all three in combination—appears to have been done to vexatiously and unreasonably multiply these proceedings. If a hearing substantiates that observation, Abbott will ask the Court to impose appropriate monetary or other sanctions to provide relief to Abbott and deter Counsel from repeating the conduct in other cases, including *Hunte*.

The first area is attorney advertising. On Facebook and other social media, Counsel has used advertisements targeted at bereaved parents to try to generate lawsuits about Abbott's infant formulas. Fifteen lawsuits have been filed so far. The advertisements at issue appear to be misleading, because (1) they stated the parents "are entitled to financial compensation directly from the manufacturer," which the parents can "click now to claim"; (2) they did not show the name of the sponsoring attorney; and (3) they were not labeled "Advertising Material." All three seem to be violations of the Connecticut Rules of Professional Conduct, and recent changes to the advertisements corroborate this view.

The second area is the use of an administrator as the plaintiff representing the estate in this case. The administrator is a law school classmate, personal friend, and business associate of Counsel who has no apparent connection to the infant or her parents. Connecticut law requires the administrator to act in an independent, fiduciary capacity, but there are reasons to question

whether he has. He appears to have condoned 15 months of vexatious litigation, capped by a voluntary dismissal that left the estate for which he is responsible with no claim at all against Abbott or Mead Johnson. The federal rules acknowledge the importance of a court supervising dismissals by representative plaintiffs, and here the Court of Probate appears to have required the administrator to seek this Court's permission if he wanted to dismiss the case—but the administrator and Counsel did not.

The third area is the voluntary dismissal itself. Whether or not the rules allow a voluntary dismissal, courts have held that voluntary dismissals may be sanctionable conduct. Not only did the dismissal here cap 15 months of vexatious litigation, the explanation that Counsel gave for it is questionable. Counsel asserted that the case had to end because the mother would not cooperate with it. But the mother is not the plaintiff and her refusal to cooperate has not stopped Counsel's separate lawsuit against the hospital for using Abbott's formulas, which continues. And just a few weeks ago, Counsel emphasized to the Court the father's involvement in this case, so there is no obvious reason that the mother—who is a witness subject to subpoena, not a party—had to cooperate with Counsel in order for the estate's case to proceed.

Judging by Counsel's statements and conduct, the real reason for the voluntary dismissal may be that Counsel wanted the planned certification to the Connecticut Supreme Court to take place in a different case, *Hunte.* Just before the voluntary dismissal here, this Court refused Counsel permission to file a "rambling and disjointed" fifth amended complaint, which Counsel repeatedly argued was necessary to put one-sided, untested allegations before the Connecticut Supreme Court. Counsel had previously filed an essentially identical complaint in *Hunte,* so the voluntary dismissal may have been aimed at thwarting the Court's ruling on the fifth amended complaint in this case.

The voluntary dismissal here is not the only one. In two other cases Counsel filed against Abbott about infant formulas, Abbott spent time and money only to have Counsel voluntarily dismiss them—with no explanation. But the present case, with its 15 months of vexatious litigation, provides the most dramatic example of the waste of time and money that Counsel has caused with the voluntary dismissals.

For all of these reasons and those explained below, Abbott respectfully requests that this Court hold a short evidentiary hearing on Counsel's potentially sanctionable conduct.

## BACKGROUND

### A.    Advertising to generate lawsuits

Counsel uses targeted social media advertising on Facebook, Instagram, and Facebook Messenger to find bereaved parents and encourage them to sue infant formula companies. These are examples of some of the ads that Counsel has used:



These ads stated:

> If your premee passed away or suffered serious harm after developing
> Necrotizing Enterocolitis (NEC), you are entitled to financial
> compensation directly from the manufacturer.
>
> Time to get justice is limited – click now to claim the compensation you
> are rightfully owed….

Each ad was accompanied by a photo of a premature infant in a hospital or a drawing that

represents bereaved parents.

These ads did not identify Counsel as their sponsor. The only entity identified is the

website publiclawsuits.com. Anyone who presses the button labeled "Sign Up" or "Learn More"

would have been taken to the website publiclawsuits.com/baby-formula, which displayed a

questionnaire asking about the infant, whether the infant was fed formula, and so on.  Only after

submitting answers did users see a message stating that Counsel will contact them:

> Your form has been submitted and you will soon receive a call or text from
> Attorney Stephen M. Reck or one his associates. Please answer the phone as the
> consultation is necessary to determine if you have a case.
>
> The law firm of Stephen Reck is the first law firm in the country to bring a
> lawsuit against the makers of Similac and Enfamil, whose cows milk formulas
> have been known to cause NEC and death in premature infants. Incredibly,
> mothers are not told that these formulas can harm their baby. We seek to protect
> mothers and their babies who have suffered from NEC and hope to stop the use of
> these dangerous products in the NICU.

That publiclawsuits.com website is owned by Internet Marketing Solutions (IMS), a company

specializing in attorney advertising. From public information it appears that IMS's clients pay for

each response that each ad generates. (newclient.us/faq.html)

Abbott does not know how many responses those ads have generated, nor does Abbott

know the specific terms of engagement and compensation. But as of this writing, Counsel has

filed or appears to be behind at least 15 lawsuits against Abbott (sometimes with Mead Johnson

as a co-defendant) or against hospitals and doctors. Those lawsuits, including the *Hunte* case
pending before this Court, are identified in Appendix A.

After Counsel voluntarily dismissed the present case, Abbott inquired with Counsel about
the use of those ads. Counsel did not respond to Abbott's inquiry about being responsible for the
ads in question. Counsel now appears to have stopped using the ads shown above, switching
instead to ads that *are* labeled as attorney advertising and that do *not* say parents are entitled to
financial compensation directly from formula manufacturers.

### B.    Counsel and Kevin Ferry

The plaintiff in the present case was Kevin Ferry. He is a personal injury attorney who
has—so far as the complaints and other filings in this case disclose—no prior connection to the
infant or her parents. But he is connected to the lead attorney who filed this case, Stephen Reck.

Mr. Reck and Mr. Ferry were law school classmates. They graduated together 30 years
ago, and since then they have remained personal friends. They have also worked together as
lawyers on at least 10 lawsuits, one of which was still pending when Mr. Ferry was appointed as
the administrator of the infant's estate. They have even represented each other. Mr. Reck
represented Mr. Ferry in a personal injury case, and Mr. Ferry represented Mr. Reck in a
property dispute. All of these cases are identified in Appendix B.

 In March 2019, the Court of Probate appointed Mr. Ferry, represented by Mr. Reck, as
the administrator of the infant's estate. (Ex. 1.) During discovery in the lawsuit that Counsel and
Mr. Ferry then filed against Yale New Haven Hospital, the hospital served an interrogatory
asking Mr. Ferry to provide information about his relationship with the parents and how he came
to be appointed as the administrator for their infant's estate. On his behalf, Mr. Reck refused to
answer. (Ex. 2, Interrogatory 1.)

### C.      The present case

In December 2019, six months after suing the hospital, Counsel and Mr. Ferry sued

Abbott and Mead Johnson. While gathering the other cases identified in Appendix A, Counsel

spent 15 months litigating and delaying the present case.

Much of that activity revolved around repeated amendments to the complaint. When this

Court ruled on Abbott's motion to dismiss, Counsel was already up to the fourth amendment.

The Court allowed that amendment, which added to the complaint a variety of materials from

Defendants' websites, but held those materials were irrelevant to the claims. The Court also

granted Abbott's motion to strike from Counsel's briefs inappropriate and inflammatory

statements about Abbott killing babies for profit, which the Court held had "no value." (Dkt. 82,

Hr'g Tr. at 52: 10–14.)

In its ruling on the failure to warn claim, the Court decided to certify to the Connecticut

Supreme Court the issue of the applicability of the learned intermediary doctrine. The Court

instructed the parties:

> In the 60 days between now and the date I enter that certification order, the parties
> are directed to engage in ***limited discovery regarding facts*** that will be important
> in resolving whether the learned intermediary doctrine applies to [Plaintiff's]
> failure to warn claim. Those facts might relate to, but are not limited to, the
> following issues:
>
> - What are the exact products at issue in this case?
>
> - How are those products made available for use, both in general and
>   specifically in this case? That is, are those products provided directly to
>   hospitals? Are they available for purchase on store shelves?
>
> - How are the products at issue in this case marketed?
>
> - What role, if any, did Tylea's parents play in her care?

(Dkt. 87 at 14 (emphasis added).)

Counsel, however, pursued wide-ranging discovery that often had no connection to the learned intermediary doctrine or the Court's questions. Counsel served on Abbott a Rule 30(b)(6) deposition notice that sought testimony on topics including:

- Abbott's "[p]ost-sale market surveillance, tracking and reporting of adverse events and/or general research efforts relating to death and morbidity of premature infants who ingested its infant formula and/or fortifier and were diagnosed with NEC."

- The "impact of its premature infant formula food in regards to reported rates of NEC in the infant population receiving same," compared to other foods.

- "Abbott's scientific, product design and testing and improvement teams as regards infant formula and fortifier intended for consumption by prematurely born infants."

- "Regulatory interactions with the FDA regarding Similac Special care and other formula and fortifier designed for ingestion by premature infants."

(Ex. 3, Topics 7–10.) Counsel also sought discovery about infant formulas that are not at issue in this litigation. (*Id.*, Topics 2, 4–5.) Counsel's approach led to objections, disputes, and correspondence between the parties—but not to any discovery.

To try to move the process along, Abbott offered to treat the questions in the Court's order as interrogatories and provide an affidavit answering them. But Counsel refused. (Ex. 4, Dkt. 117, Hr'g Tr. at 28: 17–24; Ex. 5, 3/22/21 Email from D'Amore to Rojas.)

Counsel also hindered Abbott from taking discovery. Yale proposed dates for the doctor's deposition, but Counsel wanted the deposition of Abbott to come first. (Ex. 6, 2/15/21 Email from Levin to D'Amore.) The doctor was never deposed. Abbott also tried to depose the parents, as the Court's order contemplated, but Counsel first told Abbott the mother could not be found, and then said she would not cooperate. (Ex. 7, 2/24/21 Email from Reck to D'Amore; Ex. 8, 3/9/21 Email from Levin to Billy; Dkt. 111 at 3.)

Rather than focus on the limited discovery the Court ordered, Counsel proposed a fifth amended complaint. (Dkt. 107.) The motion for leave to file it admitted that its purpose was to put one-sided allegations before the Connecticut Supreme Court. (Dkt. 107-1 at 5–8.) Those allegations were about topics such as the marketing of infant formulas that are not at issue in the case, as well as formulas developed after the events of the case. Abbott opposed the motion.

On March 19, one week before the limited discovery deadline, Counsel moved to extend it. (Dkt. 111.) Among other things, the motion addressed discovery that Abbott intended to take. It asserted that although the infant's mother refused to cooperate with Counsel and Mr. Ferry, the infant's "father … is available to testify." (*Id*. at 3.)

The Court held a status conference on March 23. To justify the fifth amendment, counsel explained, "I've amended the complaint, I've put all of these issues before you, which I believe the Connecticut Supreme Court can look at the amended complaint and determine if those are relevant to the learned intermediary, whether or not they should even apply the learned intermediary to such a product … I would respectfully request the amended complaint go to the Supreme Court and that be the basis for their ruling." (Ex. 4, Hr'g Tr. at 17–18.) The Court responded, "You've more than doubled the length of the complaint, and it appears to me that it's making the matter more confusing rather than helpful." (*Id*. at 18.) About discovery, the Court explained, "There's going to be a record that's necessary, provides them hopefully what is necessary … [s]o we're not going to have three years of discovery before we go through the certification process." (*Id*. at 28.) Counsel then discussed *Hunte,* the other NEC case pending before this Court, and asked for a certification to take place in that case. (*Id*. at 31.)

At the end of the hearing, the Court announced its "intention at this point to deny the proposed amendment." (*Id*. at 38.) Counsel continued arguing: "there's quite a bit of what I

believe are important allegations in the proposed amended complaint which go to the specific

learned intermediary doctrine before the Connecticut Supreme Court." (*Id.*) This Court

responded: "The point has been made, I think accurately so, the Connecticut Supreme Court

doesn't have to accept as true allegations in a complaint when deciding an issue that is certified

to them …. Putting it into a complaint, you doubled the size of the complaint. You made it more

complex and confusing. It's not going to be helpful to the Supreme Court to have an amended

complaint that's rambling and disjointed and it goes into issues that are not critical to the

certified questions." (*Id.* at 39.)

The Court concluded that discussion by telling Counsel that discovery would be "limited

to [the Court's] four questions." (*Id.* at 42.) The Court ordered that discovery be finished by May

19. (Dkt. 114 at 2.)

### D.   Voluntary dismissals in several cases

Just over one week later, on April 1, Counsel filed a notice of voluntary dismissal that

ended the *Ferry* case. The notice did not explain why, after 15 months of litigation and just over

a week after the Court granted Counsel's request for more time for limited discovery, the case

was over. By then, the parties had filed briefs totaling almost 400 pages, with over 1,000 pages

of exhibits, and appeared at 3 hours of hearings with the Court. The Court had also issued a 45-

page ruling.

Counsel later provided an explanation for the *Ferry* dismissal that raises questions, not

answers: the mother would not cooperate in the case. (*Hunte*, Dkt. 47-1 at 3 n.1.) That

explanation ignored the father's involvement, which Counsel had used only two weeks earlier to

justify keeping limited discovery open. It also did not mention the separate lawsuit against the

hospital or try to explain why, if the *Ferry* case against Abbott foundered because the mother

10

would not cooperate, the *Ferry* case against the hospital continues. In the case against the hospital, Counsel originally named the mother as a plaintiff along with Mr. Ferry. Counsel has now withdrawn the mother as a named plaintiff (Ex. 9), and the case goes on without her.

The explanation also justified the dismissal by referring to the Court of Probate's recent order to Mr. Ferry. (The order is attached as Ex. 10.) Counsel misquoted the order as stating "that Kevin Ferry was 'authorized and/or to seek permission to dismiss the federal products liability suit.'" (*Hunte*, Dkt. 47-1 at 4 n.1.) The order actually says that Mr. Ferry is "***authorized to withdraw*** and/or to seek permission to dismiss the federal products liability suit." (Ex. 10 (emphasis added).) Thus, on its face, and without further information, the probate court appears to have given Mr. Ferry a choice: withdraw as the administrator acting as plaintiff (he cannot "withdraw" a federal lawsuit) or seek *this Court's* permission to dismiss the case. Mr. Ferry did neither.

Counsel has also unilaterally dismissed two other infant formula cases against Abbott under unusual circumstances. In Georgia, Counsel sued in state court. Abbott removed to federal court, the parties agreed on a schedule for Abbott's motion to dismiss, and Abbott spent time and money preparing it. But as the agreed deadline approached, Counsel voluntarily dismissed the case without any explanation. *Rinehart v. Abbott*, No. 21-cv-805-SDG, at Dkt. 26 (N.D. Ga.).

Just over two weeks ago, the same thing happened in Tennessee. Counsel sued in state court, Abbott removed to federal court, Abbott prepared a motion to dismiss, and Counsel voluntarily dismissed the case, without explanation, 11 days before the motion to dismiss was to be filed. *Gschwend v. Abbott*, No. 21-cv-2151-JPM-cgc, at Dkt. 18 (W.D. Tenn.). As in *Ferry*, Counsel did not dismiss a separate lawsuit against the doctors.

### E.     The *Hunte* case

The same day Counsel dismissed the *Ferry* case, Abbott moved to dismiss the *Hunte*

case. (*Hunte*, Dkt. 45.) The very next day, Counsel filed a motion asking the Court to certify the

learned intermediary doctrine issue in *Hunte* rather than in *Ferry*. (*Hunte*, Dkt. 47.)

The motion did not acknowledge the limited discovery that the Court has repeatedly held

is necessary to provide a factual foundation for a certification. Instead, it relied entirely on one-

sided allegations from the *Hunte* complaint, substantially identical to the proposed Fifth

Amended Complaint here. (*Hunte*, Dkt. 47-1 at 2–3.) The motion ignored the Court's

explanation that the certification will be based on facts, not allegations, and that a "rambling and

disjointed" complaint is not helpful.

Counsel filed the *Hunte* amended complaint less than a week after the *Ferry* proposed

complaint, and the two are substantively the same. They have matching sections about "The

Science" and Abbott's marketing. The marketing allegations have no connection to *Hunte*

because they concern products that were never fed to the infant in *Hunte*, as well as marketing

that the *Hunte* plaintiffs never saw. In all, the *Hunte* complaint spans 65 pages and includes 371

paragraphs (which it obscures by not numbering all of them consecutively and by labeling some

with letters instead of numbers). It is as "rambling and disjointed" as the *Ferry* proposed

complaint that this Court refused permission to file.

## ARGUMENT

### I.     There is good cause to believe that Counsel's conduct may be sanctionable.

Sanctions are appropriate as an exercise of this Court's inherent authority, or that granted

by 28 U.S.C. § 1927, when an attorney has "'acted in bad faith, vexatiously, wantonly, or for

oppressive reasons.'" *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013) (quoting *Chambers*

*v. NASCO*, 501 U.S. 32, 45–46 (1991)); *see also Gollomp v. Spitzer*, 568 F.3d 355, 368 (2d Cir.

2009); D. Conn. L. Civ. R. 16(g)1. The events of this case point to three potential grounds for sanctions: (1) advertising, (2) the estate administrator, and (3) voluntary dismissals and other vexatious litigation tactics.

### A.   Counsel's advertising appears to be misleading and may violate ethical rules.

It seems that Counsel used targeted social media advertisements to attempt to locate bereaved parents and persuade them to sue Abbott. It also appears that some of those ads were misleading and for several reasons did not comply with Counsel's obligations under this Court's adoption in Local Rule 83.2(a)1 of the Connecticut Rules of Professional Conduct.

*First*, the ads stated that if an infant with NEC had complications or passed away, "you are *entitled to financial compensation directly from the manufacturer*" and need only "click now to *claim the compensation you are rightfully owed*." (emphasis added). Connecticut Rule of Professional Conduct 7.1 forbids any "false or misleading communication about the lawyer or the lawyer's services."  As the Statewide Grievance Committee has explained, "an assertion of *entitlement* to compensation … [that] is not conditionally worded … is potentially misleading because a potential client, in reading the proposed advertisement and not knowing the applicable law, would be led to believe they are *entitled* to compensation without regard to the particular circumstances of the matter."[1] Other attorneys have been sanctioned for similar conduct. In *Holley v. Gilead Scis.*, 2021 WL 940594, at *1 (N.D. Cal.), for example, an attorney was sanctioned for conduct including "misleadingly impl[ying] that cash settlements were available."

*Second*, the ads did not identify Counsel.  They refer only to publiclawsuits.com, which is a website owned by IMS, and to "Justice for Families of NEC," which is a Facebook page

---

[1] Statewide Grievance Committee, *Internet Advertising Regarding Illegal Phone Calls,* Advisory Opinion 14-03932-A at 3 (emphasis added), *available at* jud.ct.gov/sgc/Adv_opinions/Adv_14-03932-A.pdf.

owned by IMS. All advertisements "must include the name and contact information of at least one lawyer admitted in Connecticut responsible for its content." Conn. R. Pro. Conduct 7.2(e). Counsel's ads did not.

*Third*, each ad "must be clearly and prominently labeled 'Advertising Material' in red ink." Conn. R. Pro. Conduct 7.3(e). Counsel's ads were not labeled. Combined with the lack of any name and contact information for a Connecticut attorney, a bereaved parent may not know these ads are solicitations for lawsuits.  A message from Counsel appears only after viewers (a) click through following the message that they are "entitled to financial compensation," and (b) provide personal information in response to Counsel's questionnaire.

Subsequent events indicate there is cause for serious concern about the content of those ads. After Abbott's counsel inquired with Counsel about them, Counsel did not respond. At some point, however, the ads being used were changed. Abbott does not know the financial arrangements between Counsel and IMS, including whether the amount of any consideration paid by Counsel to IMS rises to the level of an unauthorized payment to generate lawsuits in potential violation of Connecticut Rule of Professional Conduct 7.2(c).

A possible result of Counsel's advertisements has been to build a pool of cases that can be pressed forward or dismissed, allowing Counsel to favor different plaintiffs and cases as Abbott exposes defects in others, or when a court's rulings are unfavorable. Counsel has now voluntarily dismissed several cases after forcing Abbott to spend time and money on them, with this case providing the most dramatic example, after 15 months of unnecessary litigation.

For all these reasons, sanctions may be appropriate with regard to Counsel's advertisements, and this Court should if necessary hold an evidentiary hearing to find facts on which to base its sanctions decision.

**B.    Counsel may have used the estate administrator to enable vexatious litigation.**

The choice of the estate administrator in this case was unusual. Mr. Ferry is neither a member nor a friend of the family, so far as the record reveals. He is not a professional estate administrator, so far as his firm's website reveals. His only obvious connection to the present case is his 30-year friendship with Mr. Reck. They graduated from law school together, they have represented each other, and they have worked together as co-counsel on at least ten cases, one of which was still pending when Mr. Ferry was appointed, so they are also business associates.

Mr. Ferry was appointed under Conn. Gen. Stat. § 45a-303. That statute requires him to be an independent fiduciary for the estate. He "must remain loyal to the estate that [h]e is administering and must not act out of self-interest or for the interests of parties other than the heirs, distributees, and creditors of the estate." *Lugo v. Rapuano*, 2007 WL 356024, at *4 (Conn. Super. Ct.). But there are several reasons to question whether he has done so.

First, Mr. Ferry allowed Counsel to engage in 15 months of costly and unnecessary litigation, before abruptly dismissing the case. Second, Mr. Ferry allowed Counsel to dismiss the case and leave the estate with no claim against Abbott or Mead Johnson for its formulas, even as they pursue a claim against the hospital based on doctors' use of those very same formulas. Third, Mr. Ferry allowed Counsel to drop this case, apparently in order to push ahead and seek certification to the Connecticut Supreme Court in a different case, *Hunte*, for which Mr. Ferry has no fiduciary responsibility.

The rule that Counsel used to voluntarily dismiss this case, Federal Rule of Civil Procedure 41(a)(1)(A), indicates that this Court has a special role to play in policing a certain type of voluntary dismissals. That rule makes voluntary dismissals "[s]ubject to Rules 23(e),

23.1(c), 23.2, and 66." Those are all rules about representative plaintiffs, such as class representatives (Rule 23(e)) and receivers (Rule 66). When one of those representative plaintiffs wants to dismiss a case, a court must approve the dismissal. Those rules are based on a clear policy concern that involvement by a court is needed to prevent abuses of people whose interests are being litigated by others.

By its terms, Rule 66 applies to "a receiver or a similar court-appointed officer," which could describe Mr. Ferry, but cases interpreting it have limited its application to representative plaintiffs appointed under federal (not state) law. 12 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2982 (2d ed. 1997). Nevertheless, this Court should use its inherent authority and its authority under section 1927 to take action if the dismissal of this case, involving a fiduciary plaintiff created under Connecticut law, was in bad faith.

The need for this Court to review the circumstances of the dismissal is also strongly supported by the Court of Probate's order. It appears, on its face and without further explanation, to have authorized Mr. Ferry to "withdraw" as the representative plaintiff or *seek permission* to dismiss this case. By requiring him to seek permission, the order would operate just like Rule 41(a)(1)(A), Rule 66, and other rules for other representative parties. But Mr. Ferry did not seek permission.

In exercising its authority, this Court should pay close attention to Counsel's explanation for the dismissal: lack of cooperation from the mother. Her refusal to cooperate is a potential red flag. She is not the plaintiff on whose involvement the case depends—she is a witness who may be compelled to testify by subpoena. In addition, Counsel's explanation raises questions. Counsel withdrew the mother as a plaintiff from the case against the hospital, but that case continues, nonetheless. There is no reason that the mother refusing to cooperate should end the

16

present case but not the parallel case against the hospital. Counsel's explanation also ignores the involvement in the present case of the father, even after Counsel focused on the father's involvement a few weeks ago when seeking to extend the deadline for limited discovery.

For all these reasons, sanctions may be appropriate with regard to Counsel's use of Mr. Ferry as estate administrator, and if necessary this Court should hold an evidentiary hearing to find facts on which to base its sanctions decision.

### C.    Counsel's voluntary dismissals appear to show vexatious conduct.

Even in cases *not* involving representative parties, in which the plaintiff clearly has a right to voluntarily dismiss, the dismissal may be the subject of sanctions when done for an improper purpose. In *Thompson v. Fla. Bar*, 2010 WL 5497673, at *1, 10–12, n.9 (M.D. Fla.), for example, the plaintiff's pattern was to "a) file suit, b) harass and abuse, and c) [voluntarily] dismiss." The court sanctioned him by enjoining him from filing any further cases. *See also Jeffrey C. Stone v. Greenberg Traurig,* 2011 WL 995930, at *1–4 (D. Ariz.) (sanctions for a voluntary dismissal after two rounds of motions to dismiss were briefed). By contrast, in *Polaris Images v. CNN*, 365 F. Supp. 3d 340, 342 (S.D.N.Y. 2019), the court declined to sanction based on a voluntary dismissal, because "counsel did not burden the Court by 'multipl[ying] the proceedings'" in the two months the case was on file.

This case falls on the *Thompson* side of the line. Counsel has now voluntarily dismissed three infant formula cases after forcing Abbott to spend time and resources on each one.  The present case is the worst, involving 15 months of vexatious litigation in which the parties filed almost 400 pages of briefs with over 1,000 pages of exhibits, many of which came in motions that should have been unnecessary. Counsel also disturbed the framework for limited discovery that this Court ordered must take place to set up the certification to the Connecticut Supreme Court. Rather than follow the Court's order, Counsel sought to continue amending the complaint

in order to put untested and controversial allegations before the Supreme Court, rather than facts targeted to the four questions identified by this Court in its ruling on Abbott's motion to dismiss.

It is difficult to avoid concluding that Counsel ended this case in order to sidestep the Court's indication that the *Ferry* complaint could not be amended to add scores of allegations that the Court held would make it unhelpful, more "complex and confusing," and "rambling and disjointed." Just over a week later, Counsel dropped this case and moved to certify in *Hunte* instead, seeking to guarantee that the *Hunte* complaint, largely copied from the rejected *Ferry* complaint, would make its way to the Connecticut Supreme Court.

It is also impossible to ignore the pattern that has developed: Counsel sues; forces Abbott to spend time, money, and effort defending itself; and then dismisses. Counsel appears to be using voluntary dismissals, along with the other tactics described above, vexatiously and unreasonably to multiply these proceedings.

Counsel has tried, but cannot succeed, in using the voluntary dismissal as a shield against this motion invoking the Court's inherent power and 28 U.S.C. § 1927. At 12:15 a.m. on Saturday, April 10, Counsel sent an email to this Court's clerk, Mr. Rosenberg, in which he contended that Abbott's consideration of a motion regarding sanctions was improper because "[t]he case has been dismissed." But "nothing in the language of Rule 41(a)(1)[(A)](i), Rule 11, or other statute or Federal Rule terminates a district court's authority to impose sanctions after such a [voluntary] dismissal." *Cooter & Gell v. Hartmarx*, 496 U.S. 384, 395 (1990); *see also Lee v. Hilco Trading*, 2019 WL 10303702, at *3 (D. Conn.). On the contrary, this Court may determine "whether the attorney has abused the judicial process and, if so, what sanction would be appropriate … after the principal suit has been terminated." *Cooter*, 496 U.S. at 396. Under

Local Rule 11, the only time limitation on a motion for sanctions is that it cannot be filed more than 30 days after judgment. This motion is timely.

For all these reasons, sanctions may be appropriate with regard to Counsel's voluntary dismissals and vexatious litigation tactics, and if necessary this Court should hold an evidentiary hearing to find facts on which to base its sanctions decision.

## II.   This Court should hold a short evidentiary hearing if necessary to determine whether sanctions are appropriate.

If necessary to find facts on which to base a sanctions decision, this Court should hold an evidentiary hearing. There is, of course, no doubt about the Court's authority to hold one. *Ball v. A.O. Smith*, 451 F.3d 66, 68 (2d Cir. 2006); *Ziemba v. Lynch*, 2011 U.S. Dist. LEXIS 71591, at *2 (D. Conn.) (order adopted by Underhill, J.).

At this writing, it appears that documents and testimony from the following witnesses, primarily on the following topics, may illuminate the issues identified in this motion:

1. IMS employees: IMS's connections to Counsel, the placement of the advertisements, the bases for the assertions in the advertisements, any responses to the advertisements, the terms of compensation to IMS, and the related web pages (including on Publiclawsuits.com, Facebook, and other social media).
2. Kevin Ferry: his relationship with Counsel, the circumstances of his appointment, his communications with the infant's parents, his involvement in the decision to dismiss the case and the reasons for dismissing it, and information provided to the probate court.
3. Infant's mother and father: the effect on them of Counsel's advertisements and/or websites (if viewed), their consent to and involvement in Mr. Ferry's appointment, their communications with Mr. Ferry, their cooperation or lack of cooperation with Mr. Reck and/or Mr. Ferry, and their knowledge and understanding of the decisions to file and dismiss this case.

Depending on Counsel's response to this motion and other developments, other witnesses and topics may also be identified.

Abbott recognizes that its request for an evidentiary hearing comes in the context of a case that has been dismissed. That is unfortunate but unavoidable because the dismissal itself is

part of Counsel's questionable conduct. And the issues discussed in this motion are important not just to the present case, but also to the *Hunte* case before this Court, as well as the other infant formula cases that Counsel has filed or instigated. In order to avoid burdening the Court, Abbott believes that the hearing can be limited to half a day or less, followed by targeted briefing on the key issues.

## CONCLUSION

For the foregoing reasons, Abbott respectfully requests that this Court hold an evidentiary hearing on the potentially sanctionable conduct of Counsel.

Dated: April 23, 2021                    ABBOTT LABORATORIES, INC.

By: */s/ Bryce A. Cooper*
John J. Robinson (ct14802)
Kelcie B. Reid (ct30550)
Gordon Rees Scully Mansukhani, LLP
95 Glastonbury Boulevard, Suite 206
Glastonbury, CT 06033
(860) 278-7448
(860) 560-0185 (fax)
Email: jjrobinson@grsm.com
Email: kreid@grsm.com

Stephen V. D'Amore (admitted *pro hac vice*)
Scott P. Glauberman (admitted *pro hac vice*)
Bryce A. Cooper (admitted *pro hac vice*)
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600
(312) 558-5700 (fax)
Email: sdamore@winston.com
Email: sglauberman@winston.com
Email: bcooper@winston.com

*Attorneys for Abbott Laboratories, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of April, 2021 the foregoing document was filed electronically and served by mail on anyone able to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECMF System.

*/s/ Bryce A. Cooper*
Bryce A. Cooper